UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____
                                                    )
AMIR MESHAL,                                         )
                                                    )
        Plaintiff,                                  )
                                                    )
                v.                                  )                No. 09-cv-2178 (EGS)
                                                    )
CHRIS HIGGINBOTHAM, *et al.*,                        )
                                                    )
        Defendants.                                 )
_____)

**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
FILED BY DEFENDANTS CHRIS HIGGINBOTHAM, STEVE HERSEM,
JOHN DOE 1, AND JOHN DOE 2**

## <u>TABLE OF CONTENTS</u>

TABLE OF POINTS AND AUTHORITIES ................................................................. iv

INTRODUCTION ........................................................................................ 1

BACKGROUND ......................................................................................... 3

ARGUMENT ............................................................................................. 8

I.    COUNTS I, II, AND III SHOULD BE DISMISSED BECAUSE SPECIAL FACTORS
COUNSELLING HESITATION FORECLOSE THE CREATION OF THE *BIVENS*
REMEDY MESHAL SEEKS ....................................................................... 8

II.   COUNTS I-IV SHOULD BE DISMISSED BECAUSE THE DEFENDANTS ARE
ENTITLED TO QUALIFIED IMMUNITY ....................................................... 18

   A.  The Standard For Qualified Immunity ..................................................... 18

   B.  Counts I, II, and III Do Not Allege Clearly Established Violations Of
The Fourth or Fifth Amendments ......................................................... 19

   C.  Counts II And III Do Not State A Violation Of Any Constitutional Right ...................... 29

       1.  Count II's procedural due process claim and Count III's Fourth Amendment claim
fail to state a violation of any constitutional rights because Meshal has not sufficiently
alleged that any of the identified Defendants personally participated in the alleged
wrongful conduct ................................................................. 31

       2.  Count II otherwise fails to state a violation of Meshal's
procedural due process rights ..................................................... 34

   D.  Counts I and IV Fail To State A Clearly Established Violation of Meshal's Rights Under
The Substantive Due Process Clause Or The Torture Victim Protection Act ................ 35

       1.  Count I fails to state a violation of any clearly established
substantive due process right ..................................................... 35

       2.  Count IV does not state a clearly established violation of the
Torture Victim Protection Act ..................................................... 38

          a)  Meshal fails to satisfy the statutory requirement that Defendants Higginbotham and
Hersem have acted "under actual or apparent authority, or color of law, of any
foreign nation" ................................................................. 38

b)    Meshal fails to allege any acts that are clearly established as "torture" within the definition of the TVPA ........................................................................................ 41

c)    The Defendants are entitled to qualified immunity because it was not clearly established that U.S. officials could violate the TVPA while acting under color of federal law ................................................................................................................ 43

CONCLUSION ............................................................................................................... 45

# TABLE OF POINTS AND AUTHORITIES

**Cases**

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005) ...................... 43

*Anderson v. Creighton*, 483 U.S. 635 (1987) ............................................................................. 20

*Arar v. Aschcroft*, 414 F. Supp. 2d 250 (E.D.N.Y. 2006),
  *aff'd*, 585 F.3d 559 (2d Cir. 2009) ....................................................................................... 40

*Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009),
  *cert. denied*, No. 09-923, 2010 WL 390379 (U.S. Jun. 14, 2010) .................................... passim

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................... 10, 31, 38

*Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006) ................................................................... 20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 31, 34

*Bell v. Wolfish,* 441 U.S. 520 (1979) ......................................................................................... 22

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ... 8

*Boumediene v. Bush*, 128 S. Ct. 2229 (2008) ..................................................................... 12, 21

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ............................................................................... 21

*Bush v. Lucas*, 462 U.S. 367 (1983) ......................................................................................... 10

*Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ........................................ 20, 35

*Carlson v. Green*, 446 U.S. 14 (1980) ....................................................................................... 9

*Chappell v. Wallace*, 462 U.S. 296 (1983) ............................................................................... 16

*Chavez v. Carranza*, 413 F. Supp. 2d 891 (W.D. Tenn. 2005) ................................................ 43

*Chavez v. Martinez*, 538 U.S. 760 (2003) ................................................................................. 34

*Chicago & S. Air Lines, Inc.* v. *Waterman S.S. Corp.*, 333 U.S. 103 (1948) .............................. 13

*Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, 588 F. Supp. 2d 375 (E.D.N.Y. 2008) ....... 43

*Christopher v. Harbury*, 536 U.S. 403 (2002) ........................................................................... 23

iv

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992)............................................................. 30

*Collins v. Cundy,* 603 F.2d 825 (10th Cir. 1979)..................................................................... 37

*Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61 (2001)...................................................... 10

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)........................................................ 35, 36

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ......................................................................... 18

*Davis v. Passman*, 442 U.S. 228 (1979) ................................................................................... 9

*Davis v. Scherer*, 468 U.S. 183 (1984) ................................................................................... 29

*Dep't of Navy v. Egan*, 484 U.S. 518 (1988) ......................................................................... 11

*Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004)................................................................. 43

*El-Masri v. U.S.*, 479 F.3d 296 (4th Cir. 2007) ...................................................................... 27

*El-Shifa Pharmaceutical Industries Co. v. U.S.*, No. 07-5174, 2010 WL 2352183
(D.C. Cir. Jun. 8, 2010)........................................................................................................ 12

*Emmons v. McLaughlin,* 874 F.2d 351 (6th Cir.1989) ............................................................ 37

*FDIC v. Meyer*, 510 U.S. 471 (1994) ...................................................................................... 10

*Fong Yue Ting* v. *United States*, 149 U.S. 698 (1893)............................................................. 13

*Graham v. Connor*, 490 U.S. 386 (1989) .......................................................................... 30, 36

*Haig v. Agee*, 453 U.S. 280 (1981) ......................................................................................... 11

*Halkin v. Helms*, 690 F.2d 977 (D.C. Cir. 1982), ............................................................. 15, 16

*Halperin v. Kissinger*, 807 F.2d 180 (D.C. Cir. 1986) ........................................................... 11

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ............................................................................... 22

*Harbury v. Deutch*, 233 F.3d 596 (D.C. Cir. 2000),
*rev'd on other grounds sub nom. by Christopher v. Harbury*, 536 U.S. 403 (2002) ............... 23

*Harbury v. Hayden*, 444 F. Supp. 2d 19 (D.D.C. 2006),
*aff'd*, 552 F.3d 413 (D.C. Cir. 2008) .............................................................................. 40, 44

*Harbury v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008). ................................................................. 45

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................................................ 18

*Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45 (D.D.C. 2009)................................................ 28

*Hopson v. Fredericksen,* 961 F.2d 1374 (8th Cir. 1992) ........................................................ 36

*Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261 (1997)............................................................. 10

*In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157 (2d Cir. 2008)............. 24

*Int'l Action Ctr. v. United States*, 365 F.3d 20 (D.C. Cir. 2004) ..................................... 20, 21, 31

*Johnson v. District of Columbia*, 528 F.3d 969 (D.C. Cir. 2008)................................................ 28

*\*Kar v. Rumsfeld*, 580 F. Supp. 2d 80 (D.D.C. 2008) ......................................................... 24, 25

*King v. Olmsted County,* 117 F.3d 1065 (8th Cir. 1997) ........................................................ 37

*Kletschka v. Driver*, 411 F.2d 436 (2d Cir. 1969) ............................................................ 41

*Lamar v. Steele,* 698 F.2d 1286 (5th Cir. 1983) .............................................................. 37

*Malley v. Briggs*, 475 U.S. 335 (1986) ....................................................................... 18

*Massie v. Government of Democratic People's Republic of Korea,*
    592 F. Supp. 2d 57 (D.D.C. 2008)........................................................................... 43

*Mathews v. Eldridge*, 424 U.S. 319 (1976).................................................................... 22

*McIntosh v. Turner*, 861 F.2d 524 (8th Cir. 1988) ........................................................... 10

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................... 22

*Munaf v. Geren*, 128 S. Ct. 2207 (2008)...................................................................... 13

*Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080 (8th Cir. 2005)................................................ 10

*Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416 (D.D.C. 2007) ..................................... 43

*O.K. v. Bush*, 377 F. Supp. 2d 102 (D.D.C. 2005)........................................................... 37

*Oetjen* v. *Central Leather Co.*, 246 U.S. 297 (1918)........................................................ 13

vi

*Padilla v. Yoo*, 633 F. Supp. 2d 1005 (N.D.Cal. 2009),
  *appeal docketed*, No. 09-16478 (9th Cir. Jul. 14, 2009).........................................16

*\*Pearson v. Callahan*, 129 S. Ct. 808 (2009).............................................................19

*Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83 (D.C. Cir. 2005)..................1

*Phillips v. Bureau of Prisons*, 591 F.2d 966 (D.C. Cir.1979).......................................28

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) ..................42

*Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009) ...........................................................19

*Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985)............................................30

*Reid v. Covert*, 354 U.S. 1 (1957)............................................................................21, 22

*Sami v. United States*, 617 F.2d 755 (D.C. Cir. 1979),
  *abrogated on other grounds by Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)....................23

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985)......................................12

*\*Saucier v. Katz*, 533 U.S. 194 (2001) .........................................................19, 20, 31

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)..................................................................1

*Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004),
  *aff'd*, 412 F.3d 190 (D.C. Cir. 2005). ......................................................................40

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005)................................................12

*Schweiker v. Chilicky*, 487 U.S. 412 (1988) ...............................................................10

*Scott v. Harris*, 127 S. Ct. 1769 (2007) ......................................................................22

*Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, (D.C. Cir. 2005) .................................40

*Simpkins v. District of Columbia Gov't*, 108 F.3d 366 (D.C. Cir. 1997)........................31

*\*Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230 (D.C. Cir. 2003).....42, 43

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)...........................................................23

*Terry v. Ohio*, 392 U.S. 1 (1968) ................................................................................22

*Tinker v. Beasley*, 429 F.3d 1324 (11th Cir. 2005) ........................................................ 37

*U.S. v. Verdugo‒Urquidez*, 494 U.S. 259 (1990) ........................................... 21, 22, 23

*United States v. Classic*, 313 U.S. 299 (1941) ............................................................ 41

*United States v. Stanley*, 483 U.S. 669 (1987) ............................................................ 16

*Vance v. Rumsfeld*, No. 06-C-6964, 2010 WL 850173 (N.D.Ill. March 5, 2010),
    *appeal docketed*, No. 10-1687 (7th Cir. Mar. 22, 2010) ..................................... 16, 27

*West v. Atkins*, 487 U.S. 42 (1988) ............................................................................ 41

*Wilkie v. Robbins*, 551 U.S. 537 (2007) .......................................................... 9, 10, 17

*Williams v. United States*, 396 F.3d 412 (D.C. Cir. 2005) .......................................... 40

*Wilson v. Layne*, 526 U.S. 603 (1999) .................................................................. 28, 29

*Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) ................................................ 9, 11, 16, 17

*Wyoming v. Houghton,* 526 U.S. 295 (1999) ............................................................... 22

## Statutes

18 U.S.C. § 2340 ........................................................................................................ 29

28 U.S.C. § 1350 ............................................................................................. 38, 41, 42

28 U.S.C. § 1602 ........................................................................................................ 43

28 U.S.C. § 517 .......................................................................................................... 17

42 U.S.C. § 1983 ........................................................................................................ 40

## Other Authorities

5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) ......................... 31

A Review of the FBI's Involvement in and Observations of Detainee Interrogations in
    Guantanamo Bay, Afghanistan, and Iraq (U.S. Department of Justice, Office of the Inspector
    General, May 2008) *available at* http://www.justice.gov/oig/reports/FBI/index.htm ............. 28

Executive Order No. 13491, 74 Fed. Reg. 4893 (Jan. 22, 2009). ................................................ 14

Press Release Department of Justice   (August 24, 2009) *available at*
http://www.justice.gov/opa/pr/2009/August/09-ag-835.html ................................................. 14

Press Release, Department of Justice, US Citizen Pleads Guilty to Training to Fight Jihad (April
19, 2007) *at*
http://www.justice.gov/usao/txs/releases/April2007/070419-Maldonado_print.htm. ................ 5

\* Indicates authorities upon which Defendants chiefly rely

## INTRODUCTION

This lawsuit arises out of the United States' national security operations abroad and its efforts to address terrorism that threatens the United States.   Plaintiff Amir Meshal challenges acts of U.S. officials allegedly participating in the Combined Joint Task Force – Horn of Africa ("CJTF-HOA"), consisting of U.S. military and civilian personnel, and representatives from coalition countries operating in Yemen, Eritrea, Ethiopia, Sudan, Kenya, and Uganda.   *See* AC ¶¶ 24-29 (filed May 10, 2010).[1]   As Meshal himself describes, the genesis of CJTOF-HOA was the "1998 bombing of the U.S. Embassies in Kenya and Tanzania," and its objectives included "identifying, arresting, and detaining individuals suspected of ties to terrorist organizations or activity in order to stem the rise of militant Islam in the region."   *Id.* ¶ 24.   Meshal claims, in broad terms, that in 2007 he was apprehended by Kenyan authorities – allegedly as part of a joint U.S.-Kenyan-Ethiopian military operation.   *Id.* ¶ 2.   Meshal contends that his subsequent detentions in Kenya, Somalia, and Ethiopia by Kenyan, Somali, and Ethiopian authorities, respectively, were unlawful.   He alleges that during his detention in Kenya and Ethiopia, U.S. officials conducted over 30 unlawful "custodial" interrogations.   *Id.* ¶ 3.   Meshal further claims he was subjected to an unlawful "rendition" from Kenya to Somalia and Ethiopia.   *Id.* ¶ 123.   He contends that his detention by Kenyan, Ethiopian, and Somali authorities, and his rendition from Kenya were at the direction or behest of U.S. officials, carried out with their active and substantial participation, and/or the result of a conspiracy between U.S. and foreign officials.   *Id.* ¶ 2.

Meshal has sued a number of government officers or employees in their individual

---

[1]   The facts alleged in the Complaint are assumed to be true for the limited purposes of this motion to dismiss only.   *See, e.g.*, *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 84 n.1 (D.C. Cir. 2005) (*citing Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993) ("Because this case comes to us on a motion to dismiss the complaint, we assume that we have truthful factual allegations before us though many of those allegations are subject to dispute.")).

capacities.    The defendants are Federal Bureau of Investigation ("FBI") Supervisory Special

Agents ("SSAs") Chris Higginbotham and Steve Hersem; two "unknown named employees,

officers, or agents of the United States government" (John Does 1 and 2);[2]  and John and Jane

Does 3-10.    This motion to dismiss is submitted by Higginbotham, Hersem, John Doe 1, and

John Doe 2 (collectively, the "Defendants").

      Meshal claims that the Defendants' actions violated various constitutional and statutory

provisions.    Counts I and II of the Complaint allege, respectively, violations of Meshal's Fifth

Amendment substantive due process and procedural due process rights.    Count III alleges

violations of the Fourth Amendment's protection against detention "without a prompt judicial

hearing."    Count IV alleges violations of the Torture Victim Protection Act, 28 U.S.C. § 1350,

note.    Meshal seeks unspecified money damages from each Defendant.

      All of Meshal's claims should be dismissed.    Counts I-III fail as a matter of law because

special factors counsel hesitation and preclude the Court from creating the implied constitutional

tort damages remedy sought in the new and sensitive context presented by this Complaint -

extraterritorial national security operations, *see* AC ¶ 56, in which, as alleged, the United States

and foreign governments are working together to identify and apprehend suspected terrorists, *see*

*id.* ¶¶ 24-29.    Alternatively, even if the Court recognizes a damages remedy without any statutory

foundation, all Defendants are entitled to qualified immunity on Counts I-III, and Higginbotham

and Hersem (the only defendants named) are entitled to qualified immunity for Count IV.[3]

---

[2]    By Order dated February 3, 2010, the pseudonyms "John Doe 1" and "John Doe 2" are
to be used to refer to Defendants John Doe 1 and John Doe 2 in any public filing.

[3]    Notwithstanding the nature of Meshal's allegations, this case does not concern the
propriety of torture or whether it should be countenanced by courts under certain circumstances.
Torture is flatly illegal and the government has repudiated it in the strongest terms.    Federal law

**BACKGROUND**

Meshal alleges that he arrived in Somalia in November 2006 and later evacuated after fighting erupted between rival factions of the Somali government.   *Id.* ¶¶ 33-36.   Around January 3, 2007, Meshal reached the Kenyan border, where he and others were ordered out of the truck they were traveling in and fled through a forest.   *Id.* ¶¶ 38-39.   Meshal claims that after wandering in the forest for nearly three weeks he was apprehended on or about January 24, 2007, by Kenyan soldiers who subsequently transported him to the town of Kiunga.   *Id.* ¶¶ 46-48.

Meshal alleges that once he arrived in Kiunga he was taken to a local jail, where he was photographed and interrogated in English by Kenyan authorities.   *Id.* ¶ 49.   Around January 25, 2007, Kenyan authorities transported Meshal to Nairobi.   *Id.* ¶ 50.   When he arrived in Nairobi, Meshal was taken to the Ruai Police Station where he was met by a group of Kenyan officials in civilian clothing, one of whom identified himself as an officer of Kenya's Criminal Investigation Department ("CID").   *Id.* ¶ 51.   Meshal alleges that he told the CID officer he was an American citizen and that he had gone to Somalia to further his religious education.   *Id.* ¶ 52.   Meshal alleges that he was detained at the Ruai Police Station for approximately one week.   *Id.* ¶ 54.

Meshal claims that on or about February 3, 2007, the Kenyan CID officer who questioned him on his first day of detention returned to the police station and told Meshal that a gentleman from the U.S. Embassy had come to see him.   *Id.* ¶ 58.   The CID officer escorted Meshal outside where Meshal saw three Americans.   *Id.*   Meshal alleges that these three Americans were

---

makes it a criminal offense to engage in torture, to attempt to commit torture, or to conspire to commit torture outside the United States.   *See* 18 U.S.C. § 2340A.   Moreover, the President has stated unequivocally that the United States does not engage in torture.   *See* May 21, 2009 Remarks by the President on National Security; *cf.* Exec. Order No. 13491, § 3, 74 Fed. Reg. 4894 (Jan. 22, 2009) (directing that individuals detained during armed conflict "shall in all circumstances be treated humanely and shall not be subjected to violence to life and person (including murder of all kinds, mutilation, cruel treatment, and torture))."

Defendants Hersem, Higginbotham, and John Doe 1.   *Id.* ¶¶ 58-63.   Meshal states that Hersem

asked him to get into the back seat of a vehicle.   *Id.* ¶ 64.   The CID officer got in the front seat

and Higginbotham sat in the back with Meshal.   *Id.*

Meshal alleges that between February 3 and 10, 2007, he was "interrogated" by Hersem,

Higginbotham, and John Doe 1 on at least four occasions.   *Id.* ¶ 69.   The sessions purportedly

took place in a suite in a building in Nairobi.   *Id.*   Meshal alleges that during these sessions, he

was continuously accused of having received weapons and interrogation resistance training in an

al Qaeda camp.   *Id.* ¶ 84.   Meshal also claims that he was subjected to mistreatment.   *Id.* ¶¶

86-88.   This alleged mistreatment consisted of verbal statements made by two of the defendants,

*id.*, and two instances where Meshal was subjected to physical contact: an instance where

Higginbotham "grabbed" Meshal and "forced" him to the window of a room, *id.* ¶ 86, and an

instance where Hersem "vigourously pok[ed]" Meshal in the chest, *id.* ¶ 87.   According to

Meshal, when he was not being questioned by these defendants, he remained in a cell at a Kenyan

police station.   *Id.* ¶ 90.   Meshal claims Kenyan authorities never interrogated or questioned him,

and never provided him with any basis for his detention.   *Id.*

Meshal avers that on the first day of interrogation, John Doe 1 presented him a form that

notified him he could refuse to answer any questions without a lawyer present.   *Id.* ¶ 71.   When

Meshal asked for an attorney, however, John Doe 1 told him that he was not permitted to make any

phone calls.   *Id.*   Meshal claims that when he asked if he had a choice not to sign the document

because he had no way of contacting an attorney, Higginbotham responded: "If you want to go

home, this will help you get there.   If you don't cooperate with us, you'll be in the hands of the

Kenyans, and they don't want you."   *Id.*   Higginbotham also allegedly told Meshal that he was

being held in a lawless country and did not have the right to legal representation.   *Id.*   Meshal

4

maintains that he signed the document because he believed he had no choice and hoped that it would expedite his return to the United States.   *Id.*   According to Meshal, Hersem told him that "his buddy 'Beantown,'" a U.S. citizen named Daniel Maldonado, who Meshal met in Kenya and who was seized by Kenyan soldiers on or about January 21, 2007, "had a lot to say about [Meshal]."   *Id.* ¶ 65-67.   Hersem allegedly told Meshal that his story would have to match Maldonado's.   *Id.* ¶ 66.[4]

Meshal claims that during this first session the Kenyan CID officer remained in the room during the first part of Meshal's questioning, left after two hours, and returned around 4:00 pm. *Id.* ¶¶ 76, 78.   Meshal claims that Defendant John Doe 1 asked the officer if he wanted to ask any questions and the officer replied that he did not.   *Id.* ¶ 78.   Meshal alleges that at the end of the first day of questioning, he was taken to a different facility – the Kileleshwa Police Station.   *Id.* ¶ 80.   Meshal claims that for each subsequent questioning session, a Kenyan officer took Meshal from his jail cell and brought him to U.S. agents.   *Id.* ¶ 82.

According to the Complaint, on February 7, 2007, a consular affairs officer from the U.S. Embassy in Nairobi, accompanied by a Kenyan man, visited Meshal in jail.   *Id.* ¶ 103.   Meshal alleges that the consular affairs officer told Meshal that he was trying to get Meshal home, and that someone would be in touch with Meshal's family in New Jersey.   *Id.*

Meshal claims that on February 9, 2007, Kenyan officials, wearing goggles and carrying guns, removed him from the police station where he was being held and took him to the airport, *id.* ¶¶ 108-09, where he was placed on a plane by Kenyan officials and flown to Somalia, *id.* ¶ 111.

---

[4]   Daniel Maldonado admitted to FBI agents that he had received military training in Somalia.   AC ¶ 67.   Maldonado pled guilty to receiving training from a foreign terrorist organization, admitting that he traveled to Somalia to join Al Qaeda to fight "jihad."   *See* Press Release, DOJ, US Citizen Pleads Guilty to Training to Fight Jihad (April 19, 2007) *at* http://www.justice.gov/usao/txs/releases/April2007/070419-Maldonado_print.htm**.**

After the plane landed, Meshal was placed on a truck and driven to a place where he was held for two days.   *Id.* ¶ 111.   Meshal alleges that on or about February 12, 2007, men who appeared to be members of the Somali military ordered Meshal and others who had been transported from Kenya to leave.   *Id.* ¶ 115.   The Somali military members handed over Meshal and the others to individuals wearing Ethiopian military uniforms.   *Id.* ¶ 116.   The group was taken by the Ethiopian officers to an airport where they were placed in a tent patrolled by armed guards.   *Id.* ¶¶ 117.   Meshal alleges that he remained in this tent with his hands shackled from approximately February 12 to February 16, 2007.   *Id.* ¶ 118.   Meshal alleges that on or about February 16, 2007, Ethiopian soldiers took Meshal and the others to a plane and informed them that they were being taken to Ethiopia.   *Id.* ¶ 119.   Meshal's Complaint contains only conclusory allegations that "[o]n information and belief" one or more Defendants "directed, authorized, conspired to effect, actively and substantially participated in, and/or took affirmative action(s) demonstrating consent and acquiescence to" Meshal's purported "rendition" to Somalia and Ethiopia, *see id.* ¶ 123; the Complaint contains <u>no</u> allegation of fact that any U.S. official, let alone any of the Defendants, was present at any point during or participated in any way in Meshal's transfer from the custody of Kenyan officials to the Somali military and then to the Ethiopian military.   *See id.* ¶¶ 108-119.

Meshal alleges that when he arrived in Ethiopia he was taken by Ethiopian soldiers to a prison facility, where he was placed in a cell with five other persons.   *Id.* ¶¶ 130, 134.   After approximately one week, Meshal was taken from the prison facility by an Ethiopian guard and driven approximately forty-five minutes to a gated villa where he was interrogated by U.S. agents. *Id.* ¶ 140.   Meshal alleges that over the next three months he was questioned by U.S. agents, including Defendants John Doe 1 and John Doe 2, at the same gated villa on a regular basis.   *Id.* ¶¶ 140, 144.   On each occasion, an Ethiopian arrived at the prison at approximately 5:00 a.m. and

brought Meshal to the villa.   *Id.* ¶ 141.   Once at the villa, Meshal remained under the close watch

of an armed Ethiopian guard until American officials requested him by name.   *Id.* ¶¶ 142-43.

Meshal alleges that at the beginning of each session he was presented with a document to

sign, which notified him that he could refuse to answer any questions without a lawyer present.

*Id.* ¶ 149.   Meshal claims that he was led to believe he had no choice except to sign the document

if he ever wanted to go home.   *Id.*   Each time, Meshal signed the document.   *Id.*   Meshal alleges

that he repeatedly asked to speak with a lawyer but was prohibited by John Doe 1 and John Doe 2

from contacting any attorney during the entire time he was detained in Ethiopia.   *Id.* ¶ 152.

Meshal claims that during these questioning sessions John Doe 1 repeatedly accused him of being

a terrorist or of having associated with terrorists.   *Id.* ¶¶ 150.   According to Meshal, when he was

not being questioned, he remained handcuffed in his Ethiopian prison cell.   *Id.* ¶ 154.

Meshal alleges that on three occasions he was brought before an Ethiopian military

tribunal, the first time on or around March 16, 2007.   *Id.* ¶ 155.   The tribunal had three military

judges, a prosecutor, and various translators.   *Id.*   Meshal claims that the tribunal asked him a

few basic questions: his name and nationality; where he was arrested; whether he had carried a

weapon; and whether he had been in military uniform.   *Id.*   When Meshal asked for a lawyer, one

of the judges told him that he had no rights until his status had been determined by the tribunal.

*Id.*   The judge also said that he would be classified as either: "innocent," "enemy combatant," or

"unlawful enemy combatant."   *Id.*   Meshal does not allege that any of the Defendants, or any

U.S. official, was present during any of his appearances before the Ethiopian military tribunal.

Meshal claims that U.S. consular officials did not gain access to him in Ethiopia until

March 21, 2007, when he had a consular visit at Ethiopian security headquarters in the presence of

one Ethiopian officer and an FBI Legal Attaché officer.   *Id.* ¶ 157.   Meshal alleges that he had

two more consular visits at the security headquarters, occurring on March 29 and April 3, 2007.

*Id.* ¶ 159.   Each visit of approximately 30 minutes occurred in an Ethiopian officer's presence.

*Id.*   Meshal alleges that on or about May 24, 2007, an Ethiopian guard came to his cell and

informed him that he would be released.   *Id.* ¶ 166.   Meshal was then taken to the U.S. Embassy

in Addis Ababa and arrived in the United States on May 24, 2007.   *Id.*

## ARGUMENT

I.    **COUNTS I, II, AND III SHOULD BE DISMISSED BECAUSE SPECIAL FACTORS COUNSELLING HESITATION FORECLOSE THE CREATION OF THE *BIVENS* REMEDY MESHAL SEEKS**

In Counts I-III, Plaintiff Meshal seeks money damages from the Defendants in their

individual capacities for the alleged violation of his constitutional rights.   *See Bivens v. Six*

*Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).   Meshal's suit is,

at its core, a constitutional challenge to the extraterritorial national security operations of the

Executive Branch.   It is clear that Meshal targets the United States' alleged relationships with

governments in the Horn of Africa and their joint efforts to identify, apprehend, detain, and

question suspected terrorists on foreign soil.   Meshal specifically avers he was apprehended in a

"joint U.S.-Kenyan-Ethiopian operation along the Somalia-Kenya border" and that his detention

by three foreign sovereigns "was at the direction or behest of U.S. officials, was carried out with

their active and substantial participation, and/or was the result of a conspiracy between the

Defendants and foreign officials."   AC ¶ 2.   Meshal alleges similar involvement by the

Defendants in his transfer from Kenya to Somalia and Ethiopia.   *Id.* ¶ 123.   These allegations

directly implicate the United States' intelligence and national security operations with respect to

terrorism that threatens the United States, and its relations with foreign sovereigns[5] – none of which are permissible contexts for Meshal to assert a constitutional tort remedy without any statutory foundation.

As the *en banc* Second Circuit recognized in *Arar v. Ashcroft*, "[o]ur federal system of checks and balances provides means to consider allegedly unconstitutional executive policy, but a private action for money damages against individual policymakers is not one of them." 585 F.3d 559, 574 (2d Cir. 2009) (finding special factors barred *Bivens* claim for alleged removal from the U.S. to Syria for the purpose of torture), *cert. denied*, No. 09-923, 2010 WL 390379 (U.S. Jun. 14, 2010). The "special factors" doctrine developed by the Supreme Court in *Bivens* and its progeny precludes a challenge to operations such as that alleged by Meshal.

A judicially-created damages remedy for constitutional violations "is not an automatic entitlement." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007); *Wilson v. Libby*, 535 F.3d 697, 705-06 (D.C. Cir. 2008), *cert. denied*, 129 S. Ct. 2825 (2009). In *Bivens*, the Supreme Court held that the victim of an alleged Fourth Amendment violation could bring suit to recover damages in the absence of a statutory cause of action only where there were "no special factors counseling hesitation in the absence of affirmative action by Congress." 403 U.S. at 396.[6] *Bivens* "rel[ied]

---

[5]   *See also*, *e.g.*, AC ¶¶ 24 (alleging deployment of civilian and military personnel to the Horn of Africa region to identify, arrest, and detain suspected terrorists); 29 (alleging direct U.S. involvement in training foreign armies and police units, and participation in the apprehension, detention, and interrogation of suspected terrorists in the Horn of Africa region); 31 (referencing alleged U.S. policy of "proxy detention" in which individuals alleged to have ties to foreign terrorists are detained by foreign authorities "at the behest of, the direction of, and/or with the active and substantial participation of" the U.S.).

[6]   Subsequently, the Court has allowed expansion of *Bivens* on just two occasions – *Davis v. Passman*, 442 U.S. 228 (1979) and *Carlson v. Green*, 446 U.S. 14 (1980) – and in both instances specifically determined that there were no such "special factors."

largely on earlier decisions implying private damages actions into federal statutes" – decisions from which the Court has since "retreated" and that reflect an approach to recognizing private rights of action that the Court has since "abandoned." *Correctional Servs. Corp.* v. *Malesko*, 534 U.S. 61, 67 & n.3 (2001).   Since then, the Supreme Court has "in most instances . . . found a *Bivens* remedy unjustified," *Wilkie*, 551 U.S. at 550, and accordingly, the Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants," *Malesko*, 534 U.S.at 68, "[b]ecause implied causes of action are disfavored," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).[7]   *Accord Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005) (recognizing "presumption against judicial recognition of direct actions for violations of the Constitution by federal officers or employees") (quoting *McIntosh v. Turner*, 861 F.2d 524, 526 (8th Cir. 1988)).   Moreover, the Supreme Court instructs that a wide range of factors may make it inappropriate to create a *Bivens* remedy in a particular context, even where the plaintiff has no alternative remedy.   *See* Wilkie, 551 U.S. at 550 ("even in the absence of an alternative [existing process for protecting a constitutionally recognized interest], a *Bivens* remedy is a subject of judgment"); *id.* at 562 (finding that the "serious difficulty of devising a workable cause of action" was a special factor that precluded the creation of a *Bivens* claim); *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 280 (1997) (Harlan, J., concurring) (noting that "the range of concerns to be considered in answering the [special factors] inquiry is broad").

---

[7]   *See, e.g.*, *Malesko*, 534 U.S. at 70-72 (refusing to recognize *Bivens* remedy against private companies performing governmental functions under contract with the United States because doing so would not serve the remedy's public policy purposes); *FDIC v. Meyer*, 510 U.S. 471, 486 (1994) (refusing to allow *Bivens* claim against a federal agency because of its potential impact on federal fiscal policy); *Schweiker v. Chilicky*, 487 U.S. 412, 425-29 (1988) (rejecting *Bivens* remedy for Social Security denial because statutory procedure existed to challenge adverse eligibility determinations); *Bush v. Lucas*, 462 U.S. 367, 389-90 (1983) (refusing to recognize a *Bivens* remedy for alleged First Amendment violations arising out of federal personnel decisions for fear such a claim might interfere with statutory scheme regulating the federal workplace).

Meshal seeks an unprecedented extension of *Bivens* into a new, previously unrecognized, and highly sensitive context – extraterritorial national security investigations in which the United States and foreign governments allegedly work together to identify, apprehend, detain, and question suspected terrorists.   In this case, the investigation occurred in the Horn of Africa and allegedly involved the joint efforts of three regional governments and the United States.   AC ¶¶ 2, 27-29.   No court has ever recognized a *Bivens* remedy in this context, and this Court should decline Meshal's invitation to do so here.   The remedy Meshal seeks would impinge upon the Executive Branch's authority to pursue cooperative arrangements with foreign governments aimed at protecting our nation from terrorist attack.   Permitting Meshal's claims to proceed in the face of these concerns would violate the bedrock separation-of-powers principles in national security and foreign affairs that courts should be hesitant to wade into, and would constitute a departure from the Supreme Court's well-settled reluctance to extend *Bivens* liability to new contexts.

**1.**      The Supreme Court has repeatedly recognized the "generally accepted view" that matters implicating national security and intelligence operations, particularly those involving foreign governments, are "the province and responsibility of the Executive," *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (*quoting Haig v. Agee*, 453 U.S. 280, 293-94 (1981)), and that "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs," *id.* (citing cases).   The D.C. Circuit has fully embraced this view as well.   *See Halperin v. Kissinger*, 807 F.2d 180, 187 (D.C. Cir. 1986) (noting that the "harm produced" by the assertion of damages actions against federal officials "is particularly severe in the national security field, since 'no governmental interest is more compelling'") (quoting *Haig*, 453 U.S. at 307); *Wilson*, 535 F.3d at 710 (D.C. Cir. 2008) (no *Bivens* remedy where litigation of plaintiffs' claims "would inevitably

11

require judicial intrusion into matters of national security and sensitive intelligence information"); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985) ("the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials . . . The foreign affairs implications of suits such as this cannot be ignored . . .").[8]

This reluctance to intrude upon the authority of the Executive is driven by two overriding considerations.   The first consideration is the constitutional separation of powers among the branches of government, as discussed above.   This concern, which counsels in favor of judicial restraint, is apparent in this case.   The Defendants are alleged to have been acting in accordance with guidelines established by the Executive Branch.   *See* AC ¶ 56.   These guidelines allegedly permitted the Defendants to conduct investigations abroad and participate with foreign officials in investigations abroad.   *Id.*   According to the Complaint, the Defendants were working as part of a task force, formed in the aftermath of two major terrorist attacks on U.S. Embassies in Kenya and Tanzania, whose purpose is to identify and disable terrorist threats in the Horn of Africa region. *Id.* ¶¶ 24-29.   This Court should clearly be concerned about using an implied constitutional tort claim to set judicially-derived standards with respect to the exercise of Executive power at issue here.   As the Supreme Court observed in *Boumediene v. Bush*, 128 S. Ct. 2229, 2276-77 (2008), "neither [its] Members . . . nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people.   The law must accord the Executive substantial authority to apprehend and detain those who pose a real danger to our security."

---

[8]   *Cf. Schneider v. Kissinger*, 412 F.3d 190, 197 (D.C. Cir. 2005) ("To determine whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking."); *El-Shifa Pharmaceutical Industries Co. v. U.S.*, No. 07-5174, 2010 WL 2352183, at *5 (D.C. Cir. Jun. 8, 2010) ("We have consistently held, however, that courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security.").

*Boumediene*'s caution raises the second consideration that counsels in favor of judicial restraint – the limited institutional experience of the judiciary in the areas of national security, intelligence operations, and foreign policy.   In addition to affecting our government's ability to ensure the nation's security, judicial review of U.S. policy with respect to intelligence sharing and other cooperative arrangements with foreign governments in the Horn of Africa to identify and disable terrorist threats on their soil impinges on bedrock separation-of-powers principles by interfering with the management of our country's relations with those sovereigns.   As the Supreme Court has long recognized, "[t]he political branches are well situated to consider sensitive foreign policy issues[,] . . . [t]he Judiciary is not suited to [make] determinations [in the area of foreign affairs] that would . . . undermine the Government's ability to speak with one voice in this area."   *Munaf v. Geren*, 128 S. Ct. 2207, 2226 (2008) (citation omitted).[9]

Meshal's Fourth and Fifth Amendment claims both require considering the governmental interests implicated by Meshal's alleged detention and custodial interrogation.   *See infra* § II.C. Meshal's claims cannot be adjudicated without some inquiry into: national security threats in the Horn of Africa region; substance and sources of intelligence; the extent to which each government in the region participates in or cooperates with U.S. operations to identify, apprehend, detain, and question suspected terrorists on their soil; the actions taken by each government as part of any participation or cooperation with U.S. operations; and the propriety of particular applications of

---

[9]   *See Oetjen* v. *Central Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative – 'the political' – Departments."); *Fong Yue Ting* v. *United States*, 149 U.S. 698, 705 (1893) (the Constitution commits "the entire control of international relations" to the political Branches); *Chicago & S. Air Lines, Inc.* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (foreign policy matters are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility.").

the policy to specific terrorist threats in light of the prevailing geopolitical circumstances and our relations with the governments in that region.  *See Arar*, 585 F.3d at 575.   Inquiry would also be required into the substance and sources of the intelligence and/or national security information underlying the alleged application of the Horn of Africa policy in Meshal's particular case.

In addition, Meshal's "rendition" claim inherently implicates significant national security concerns with respect to sensitive and confidential communications between the U.S. and the governments of Kenya, Somalia, and Ethiopia.   Litigating this claim would undoubtedly require discovery from government officials in those countries, including deposition testimony regarding agreements, if any, between the U.S. and those countries to share information, and the substance of sensitive and confidential communications between the U.S. and those countries concerning their participation in or cooperation (or the lack thereof) with U.S. operations to identify, apprehend, detain, and question suspected terrorists on their soil.[10]   For example, as support for his claim that his detention by Kenyan, Ethiopian, and Somali authorities was at the behest of the United States, Meshal alleges that he was of no interest to the governments of Kenya and Ethiopia.   *See AC ¶¶* 78, 91, 96, 141, 162.   Proving or disproving this allegation would likely require identifying and

---

[10]   Assuming Meshal's allegations to be true (for the limited purpose of this motion to dismiss only, *see supra* n.1), if in fact the United States were involved in any alleged extraterritorial "rendition" of the plaintiff, this is precisely the sort of arena in which the Executive is best-suited to act.   Indeed, President Obama signed an Executive Order establishing a Special Task Force on Interrogation and Transfer Policies, specifically commissioned "to study and evaluate the practices of transferring individuals to other nations in order to ensure that such practice complies with the domestic laws, international obligations, and policies of the United States and do not result in the transfer of individuals to other nations to face torture," or to otherwise undermine "the humane treatment of individuals in its custody or control."   Executive Order No. 13491, 74 Fed. Reg. 4893 (Jan. 22, 2009).   That Task Force, in turn, has made recommendations on the United States' transfer policy.   *See* Aug, 24, 2009, Dept. of Justice Press Release *available at* http://www.justice.gov/opa/pr/2009/August/09-ag-835.html.   It is through such political avenues, and not individual-capacity implied rights of action, that national policies on matters such as the alleged international "rendition" here should be implemented.

deposing Kenyan and Ethiopian diplomatic, intelligence, and other officials on the exact nature of

their countries' interest in Meshal.   It would also likely require identifying and deposing the

Kenyan and Ethiopian officials who allegedly brought Meshal to, and in some cases were

allegedly present during, the questioning sessions with the Defendants.

Embroiling foreign countries and their officials in civil litigation in U.S. courts could

impact whether <u>these</u> countries give the United States access in the future to interview persons they

have detained in their countries on suspicion of terrorism, as well as whether <u>other</u> countries grant

the United States such access.   Foreign governments could very well decide to decrease the level

of their cooperation with the United States in addressing potential terrorist threats to the

international community if they face the prospect of publicly disclosing in civil litigation the

details of their country's relationship with the U.S., particularly as it relates to the actions of U.S.

military or law enforcement personnel on their soil.   Yet at the same time, this information would

be central to the litigation of this case, and particularly essential to its defense.   This is evident

because, with the exception of his alleged interviews by FBI personnel, <u>all</u> other conduct which

Meshal alleges in support of his claims is alleged to have been taken by foreign officials.

The D.C. Circuit has already recognized, in the most unambiguous of terms, the inherent

perils of such disclosures.   In *Halkin v. Helms*, 690 F.2d 977 (D.C. Cir. 1982), a suit based upon a

CIA surveillance program that relied upon the cooperation of foreign intelligence services, the

D.C. Circuit observed that

> [r]evelation of particular instances in which foreign governments assisted the CIA
> in conducting surveillance of dissidents could strain diplomatic relations in a
> number of ways – by generally embarrassing foreign governments who may wish
> to avoid or may even explicitly disavow allegations of CIA or United States
> involvements, or by rendering foreign governments or their officials subject to
> political or legal action by those among their own citizens who may have been
> subjected to surveillance in the course of dissident activity.

*Id.* at 993.[11]   And in *Wilson*, the Circuit cited the concern that the litigation "would inevitably require judicial intrusion into matters of national security and sensitive intelligence information" as being "further support" for its refusal to create a *Bivens* remedy.   535 F.3d at 710.[12]

Clearly the political branches, not the judiciary through the recognition of an implied cause of action, are best suited to consider the sensitive national security and foreign policy issues inherent in recognizing the *Bivens* remedy Meshal seeks.   *See*, *e.g.*, *Arar*, 585 F.3d at 581 ("We recognize our limited competence, authority, and jurisdiction to make rules or set parameters to govern the practice called rendition.   By the same token, we can easily locate that competence, expertise, and responsibility elsewhere: in Congress.").   A remedy, should one exist, is plainly the province of Congress.   *See Chappell v. Wallace*, 462 U.S. 296 (1983); *United States v. Stanley*, 483 U.S. 669, 681-83 (1987).

2.     While the considerations stated above, taken alone or in tandem, should be dispositive, another special factor that counsels hesitation in creating a *Bivens* remedy in this sensitive context is the clear inevitability that the Court will have to consider secret and classified

---

[11]   At the time *Halkin* was decided, the *Bivens* claims in the case had already been dismissed on other grounds.   690 F.2d at 987-88.   The remaining claims were dismissed on the basis of the state secrets privilege.   *Id.* at 990-97.

[12]   In two recent cases, a federal district court failed to recognize national security as a special factor that precluded recognition of a *Bivens* remedy – *Padilla v. Yoo*, 633 F. Supp. 2d 1005 (N.D.Cal. 2009), *appeal docketed*, No. 09-16478 (9th Cir. Jul. 14, 2009) and *Vance v. Rumsfeld*, No. 06-C-6964, 2010 WL 850173 (N.D.Ill. March 5, 2010), *appeal docketed*, No. 10-1687 (7th Cir. Mar. 22, 2010).   However, neither *Padilla* nor *Vance* defeats the special factors argument presented here.   Neither involved the unique national security/foreign policy issues alleged by Meshal – extraterritorial national security investigations in which the United States and foreign governments work together to identify, apprehend, detain, and question suspected terrorists on foreign soil.   In addition, unlike Meshal, both the *Padilla* and *Vance* plaintiffs were unquestionably in the custody of the United States.   Moreover, as district court cases from outside of the D.C. Circuit, both pending on appeal, neither *Padilla* nor *Vance* is authoritative.

information, which cannot be introduced into the public record, in order to adjudicate Meshal's

claims.   As noted above, Meshal's contention that the United States worked with the governments

of Kenya, Somalia, and Ethiopia to facilitate his detention, interrogation, and transfer between

countries inherently implicates sensitive and confidential communications between the United

States and the governments of Kenya, Somalia, and Ethiopia.   The Court's need to consider and

the parties' need to rely upon information that cannot be introduced into the public record should

provoke hesitation in recognizing a *Bivens* remedy for Meshal, particularly since this is not a case

where the Court has a statutory obligation to exercise jurisdiction.   In this context, "the preference

for open rather than clandestine court proceedings" counsels hesitation in extending *Bivens*.

*Arar*, 585 F.3d at 577 (stating that "[t]he court's reliance on information that cannot be introduced

into the public record . . . should provoke hesitation" in recognizing a *Bivens* remedy); *accord*

*Wilson*, 535 F.3d at 710 (citing the fact that litigation of the plaintiffs' claims would inevitably

require inquiry into "classified information that may undermine ongoing covert operations" as

"further support" for the district court's refusal to create a *Bivens* remedy).   This is true whether

the Court considers the state secrets issue and even in the absence of, or prior to, a formal assertion

of the state secrets privilege by the United States.[13]

In sum, Plaintiff Meshal proposes a judicially-created remedy that would strike at the heart

of the authority and discretion of the political branches in exercising their core national security

functions.   Accepting Meshal's invitation to create a judicial damages remedy in this instance

would be "a general *Bivens* cure . . . worse than the disease."   *Wilkie*, 551 U.S. at 561.

---

[13]   The state secrets privilege was asserted in *Arar* but neither the district court, the panel, nor the *en banc* court reached the issue or viewed the classified declarations in support.   No state secrets privilege was asserted in *Wilson.*   The United States, a non-party, may intervene and assert the state secrets privilege in this matter, and reserves the right to do so.   *See* 28 U.S.C. § 517.

17

Accordingly, this Court should dismiss Counts I-III as a matter of law.

## II.   COUNTS I-IV SHOULD BE DISMISSED BECAUSE THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Even if the Court does not find that special factors preclude the creation of the *Bivens* remedy that Plaintiff Meshal seeks, his constitutional claims, asserted in Counts I-III under the Fourth and Fifth Amendments, and his statutory claim, asserted in Count IV under the TVPA, should nonetheless be dismissed because the Defendants are entitled to qualified immunity.

### A.     The Standard For Qualified Immunity

Qualified immunity shields from civil liability government officials who perform discretionary governmental functions so long as their conduct does not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."   *Malley v. Briggs*, 475 U.S. 335, 341 (1986).   It is not merely a defense to liability.   Rather, qualified immunity is intended to afford sweeping protection to federal officials from the entirety of the litigation process.   Government officials are accorded qualified immunity "to shield them from undue interference with their duties and from potentially disabling threats of liability."   *Harlow*, 457 U.S. at 806.   Accordingly, the Supreme Court has repeatedly emphasized that an official's entitlement to qualified immunity must be resolved at the earliest possible stage of the litigation and that "discovery should not be allowed" until it is determined that the plaintiff has properly stated a claim for the violation of a clearly established right.   *Harlow*, 457 U.S. at 818-19; *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).

Traditionally, the determination of whether a defendant's actions are shielded by

qualified immunity required the two-step inquiry mandated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), asking, first, whether the alleged facts show that the defendant's conduct violated a statutory or constitutional right, and, second, whether that right was clearly established at the time of the conduct.   *Id.* at 200.   However, the Supreme Court recently held that the *Saucier* sequence is not mandatory and that lower federal courts have the discretion to decide only the more narrow "clearly established" issue "in light of the circumstances in the particular case at hand."   *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).[14]   One circumstance identified by the Supreme Court as being appropriate for proceeding directly to the clearly established inquiry is where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."   *Id.*

As will be shown below, qualified immunity is appropriate for Counts I-IV.   With respect to Counts I-III, the Court need not address the first prong of the qualified immunity inquiry – whether these Counts state a violation of a constitutional right – because it is plain that the rights asserted were not clearly established in the context presented by Meshal's Complaint. Even if the Court does begin its analysis with the first prong of the qualified immunity standard, the Defendants are entitled to qualified immunity for Counts II and III because they fail to state violations of any constitutional right let alone a clearly established one.   Qualified immunity is appropriate for Counts I and IV because both fail to state a violation of clearly established law.

**B.    Counts I, II, and III Do Not Allege Clearly Established Violations Of The Fourth or Fifth Amendments**

Meshal's Amended Complaint presents the precise situation envisioned by the Supreme

---

[14]   *See Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009) (dismissing constitutional claims of Guantanamo Bay detainees on qualified immunity grounds without reaching prong one inquiry because "[n]o reasonable government official would have been on notice that plaintiffs had any Fifth Amendment or Eighth Amendment rights").

Court for beginning the qualified immunity inquiry with the question of whether the constitutional rights allegedly violated were clearly established at the time.   It was far from clearly established that the particular constitutional rights invoked in Counts I-III apply in the manner and extent necessary to support Meshal's claims in this factual context, which involves alleged cooperative operations between the United States and the governments of Kenya, Somalia, and Ethiopia on foreign soil; it is thus plain that such an extraterritorial application of these constitutional provisions in this context was not clearly established at the time of Meshal's alleged injuries.

It is essential to the qualified immunity analysis that the inquiry be "fact specific," *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) and "undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier*, 533 U.S. at 201.   As the D.C. Circuit has recognized, "'courts must not define the relevant constitutional right in overly general terms, lest they strip the qualified immunity defense of all meaning.'"   *Int'l Action Ctr. v. United States*, 365 F.3d 20, 25 (D.C. Cir. 2004) (*quoting Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001)).   Thus, to overcome qualified immunity, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.   For these reasons, Meshal must do more than invoke general concepts such as "substantive due process," "procedural due process," and "detention without prompt judicial hearing" as the purported bases for the Defendants' liability.   It is not sufficient to allege a constitutional violation at such a high level of generality.   *See Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006) ("[I]t is not enough to say that it is clearly established that police officers may not

20

subject individuals to unreasonable searches and seizures.").[15]   Rather, Meshal must demonstrate that it was clearly established in 2007 that a person apprehended by foreign authorities in a "joint U.S.-Kenyan-Ethiopian operation along the Somalia-Kenya border" and subsequently detained under the actual or apparent authority of those foreign sovereign nations was entitled to the <u>particular</u> constitutional protections Meshal claims here with respect to the <u>particular</u> conduct that the U.S. officials here are alleged to have engaged in.[16]

Meshal cannot meet this burden because the nature and extent to which the Constitution prohibits the specific conduct alleged here is unsettled.   The Supreme Court has repeatedly refused to recognize any bright-line rule for determining the Constitution's reach in the territory of another sovereign.   *See Boumediene*, 128 S. Ct. at 2258 (recognizing that aspects of the Constitution may apply abroad and holding that whether Suspension Clause extends beyond country's borders depends on host of "objective factors and practical concerns"); *U.S. v. Verdugo−Urquidez*, 494 U.S. 259, 268-70 (1990) (rejecting "view that every constitutional provision applies wherever the Government exercises its power").[17]   In *Reid v. Covert*, 354 U.S. 1 (1957), a plurality of the Supreme Court stated,

---

[15]   *Cf. Int'l Action Ctr.*, 365 F.3d at 25 ("It does no good to allege that police officers violated the right to free speech, and then conclude that the right to free speech has been 'clearly established' in this country since 1791.").

[16]   *Cf. Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (per curiam) (rejecting consideration of general right against use of excessive force as the appropriate inquiry for Fourth Amendment claim and instead identifying relevant question as "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight").

[17]   *See also Reid v. Covert*, 354 U.S. 1, 74 (1957) (Harlan, J., concurring) (disputing that "every provision of the Constitution must always be deemed automatically applicable to American citizens in every part of the world" and arguing instead "there are provisions in the Constitution which do not necessarily apply in all circumstances in every foreign place").

21

> When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.

*Id.* at 5-6.   However, in *U.S. v. Verdugo–Urquidez*, 494 U.S. 259 (1990), the Supreme Court recognized that *Reid* stands only for the limited proposition that "United States citizens stationed abroad could invoke the protections of the Fifth and Sixth Amendments" in overseas criminal prosecutions.   *Id.* at 270.

Application of both the Fourth and Fifth Amendments, whether extraterritorial or domestic, requires a balancing of interests.   The "touchstone" of the Fourth Amendment is reasonableness, *Wyoming v. Houghton,* 526 U.S. 295, 300 (1999), as determined by "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted," *Bell v. Wolfish,* 441 U.S. 520, 559 (1979).   "[T]he specific content and incidents of th[e] [Fourth Amendment] right must be shaped by the context in which it is asserted." *Terry v. Ohio*, 392 U.S. 1, 19 (1968).   And courts must balance an individual's liberty interests against the importance of the governmental interests at stake.   *See Scott v. Harris*, 127 S. Ct. 1769, 1778 (2007).   Similarly, "[Fifth Amendment] due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).   Determining the process due in any particular circumstance requires courts to "weigh[] 'the private interest that will be affected by the official action' against the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (plurality op.) (addressing procedural due process requirements applicable to a U.S. citizen detained as an enemy combatant in the U.S.) (*quoting Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Meshal's Fourth and Fifth Amendment claims are based upon his alleged detention by Kenyan, Ethiopian, and Somali authorities (in some unspecified manner and upon "information and belief" directed by U.S. authorities) and "custodial" interrogation by the Defendants, both of which occurred in the context of a U.S. civilian and military operation in the Horn of Africa to identify, arrest, detain and question individuals suspected of ties to terrorist organizations or activity.   AC ¶¶ 24-29.   According to Meshal, this operation includes the United States training foreign armies and police units in counter-terror and counterinsurgency tactics, as well as U.S. personnel "participat[ing]," in wholly unspecified ways, in the apprehension, detention, and interrogation of individuals suspected of having ties to terrorist organizations operating in the region.   *Id.* at 29. Although *Reid* recognizes that certain aspects of the Fifth Amendment protect U.S. citizens abroad and *Verdugo-Urquidez* likewise indicates that U.S. citizens retain aspects of the Fourth Amendment's protections when abroad, *see* 494 U.S. at 265-66, neither *Reid* nor *Verdugo-Urquidez* addresses the application of these Amendments in a context requiring the particular balancing of the private and governmental interests at issue with respect to the particular allegations involved in this case.

The D.C. Circuit has followed the Supreme Court's lead in not recognizing any bright-line rule for determining the nature of the Constitution's protections in the territory of another sovereign.[18]   In particular, this Circuit has not addressed the extraterritorial

---

[18]   *See Harbury v. Deutch*, 233 F.3d 596, 603 (D.C. Cir. 2000) (noting that "constitutional protections (even for citizens) diminish outside the U.S."), *rev'd on other grounds sub nom. by Christopher v. Harbury*, 536 U.S. 403 (2002); *Sami v. United States*, 617 F.2d 755, 773 n.34 (D.C. Cir. 1979) (noting that "extent to which the Constitution's protections shield citizens, resident-aliens or aliens from actions which occur in other countries is not clear"), *abrogated on other grounds by Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).   *See also In re*

application of the Fourth or Fifth Amendment in a context analogous to that at issue in

this case.   However, in *Kar v. Rumsfeld*, 580 F. Supp. 2d 80 (D.D.C. 2008), a recent

decision from the U.S. District Court for the District of Columbia, Judge Robertson

addressed the extraterritorial application of the Fourth and Fifth Amendments, albeit

without the complicating factor of alleged in concert actions with foreign sovereigns

(central to Meshal's claims here) and determined that the rights claimed in that case with

respect to a detention of a U.S. citizen by the U.S. military were not clearly established.

Kar, the plaintiff, was arrested by Iraqi police for possessing components used in

the manufacture of improvised explosive devices.   *Id.* at 81-82.   After Kar told the

Iraqi police that he was a U.S. citizen, he was transferred to the U.S. military and

ultimately detained in Camp Cropper, a military detention center.   *Id.* at 82.   Kar

alleged that he was held in solitary confinement for seven weeks and also interrogated by

an FBI agent.   *Id.*   After he was released, Kar filed suit alleging that his detention

without probable cause and lack of opportunity to be heard in a meaningful manner at a

Detainee Status Board hearing violated his Fourth and Fifth Amendment rights.   *Id.* at

83-85.   Unlike Meshal, who was in fact held by Kenyan, Somalian, and Ethiopian

authorities (albeit at the alleged behest of the U.S.), as he alleges,[19] Kar was

---

*Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 167 (2d Cir. 2008) (holding
that Fourth Amendment's warrant requirement does not govern searches of U.S. citizens
conducted abroad by U.S. agents).

[19]   *See, e.g.*, AC ¶¶ 46-49 (arrested & placed in Kiunga jail by Kenyan soldiers); 50-51
(transferred by Kenyans to Nairobi and placed in Ruai Police Station jail); 58 (taken out of jail by
Kenyan CID officer); 76-80 (escorted to FBI interview by Kenyan CID officer); 81 (placed in
Kileleshwa Police Station jail cell by Kenyan CID officer); 108-10 (removed from Kileleshwa
Police Station by Kenyan officers, who transported him to airport, and placed him on a charted
plane); 111 (removed from plane by men speaking Somali and placed in detention cell); 115-16

unquestionably in U.S. military custody.   *Id.* at 82.   Judge Robertson acknowledged that "[t]he Fourth and Fifth Amendments certainly protect U.S. citizens detained in the course of hostilities in Iraq."   *Id.* at 83.   Yet even where U.S. custody was clear, Judge Robertson held that there was no violation of Kar's <u>clearly</u> <u>established</u> Fourth Amendment rights because Kar could not cite any precedent that clearly establishes the right of a U.S. citizen to a "prompt" probable cause hearing when detained in a war zone. *Id.* at 85.   Judge Robertson also rejected Kar's argument that he had a clearly established right to counsel under the Fifth Amendment for proceedings before the Detainee Status Board.   *Id.* at 86.   Judge Robertson found that "[n]o court has found a right to counsel in such a proceeding in such a place, at such a time, and it certainly cannot be said that Kar had a 'clearly established' right to counsel."   *Id.*   Key to the determination of both the Fourth and Fifth Amendment claims in *Kar* was the district court's recognition that the wartime extraterritorial context in which Kar's claims were asserted was materially different from the domestic contexts in the authorities he cited as support for his claims.[20]

The Fourth and Fifth Amendment claims in Counts I-III are premised upon the

---

(removed from cell by Somali military and handed over to Ethiopian officials); 117-19 (placed in a tent by Ethiopian officials, then subsequently on a plane bound for Ethiopia); 130 (removed from plane after landing by Ethiopians and transported to detention facility); 140 (removed from cell by Ethiopian guard and transported to location of interview by U.S. Agents); 155, 160, 162 (taken before an Ethiopian military tribunal); 166 (removed from jail by Ethiopian guard and brought to U.S. Embassy).

[20]   *See Kar*, 580 F. Supp. 2d at 85 ("Any attempt to apply the two-day (detention without hearing) requirement [for arrest in a domestic criminal case] or the seven-day (detention without hearing) requirement from the Patriot Act to Kar's circumstances ignores the differences between detention on U.S soil and detention in hostile territory"); *id.* at 86 (noting that precedent cited by Kar for right to access to counsel was a habeas proceeding in Virginia).

allegation that Meshal was detained in Kenya, Ethiopia, and Somalia without due process and/or probable cause.   *See* AC ¶¶ 175, 184, 196.   *Kar* recognizes that as recently as 2008, the year after Meshal returned to the U.S., there was no legal precedent which clearly established that a U.S. citizen detained in circumstances materially similar to those alleged by Meshal was entitled to a "prompt" legal proceeding to challenge the basis for that detention.   Thus, even if the Court were to determine that Meshal has stated a claim for violations of his Fourth and Fifth Amendment rights based upon his detention by Kenyan, Ethiopian, and Somali authorities without legal process, it cannot be said that these rights were clearly established at the time of the conduct alleged in the Amended Complaint.[21]

With respect to Meshal's "rendition" claim, which is asserted in Counts I and II under the Fifth Amendment, *see id.* ¶¶ 175-76, 186-88, no court has ever recognized a constitutional claim (on any basis) for an alleged "extraordinary rendition," in which U.S. officials were alleged to have been complicit in the transfer of a person between foreign countries with knowledge that the person would be subjected to mistreatment upon arrival in the receiving country.   In *Arar*, the Second Circuit held that special factors counseled against the creation of a *Bivens* remedy for such claims because "the context of extraordinary rendition is so different, involving as it does a complex and rapidly changing legal framework beset with critical legal judgments that have not yet been made, as well as policy choices that are by no means easily reached."   585 F.3d at 581-82.   For this

---

[21]   To the extent that Meshal claims that he lacked notice of the charges against him and that this is a distinct Fourth or Fifth Amendment injury, it is clear that Meshal was aware he was being held on suspicion of association with a terrorist organization and/or participation in terrorist activities.   *See*, *e.g.*, AC ¶ 84 (alleging that during interrogations Meshal was repeatedly accused of having received weapons and interrogation resistance training in an al Qaeda training camp).

reason, the Second Circuit did not reach the underlying constitutional claims.[22]   Even if

this Court concluded that substantive due process rights were implicated by the conduct

alleged by Meshal, it cannot be said that this right was clearly established in the context

and at the time of the events alleged in the Complaint.

Similarly, were this Court to recognize a due process claim based upon Meshal's

"interrogation," as alleged in Counts I and II, it cannot be said that either right was clearly

established in the context, and at the time of the events alleged.   The Defendants are aware

of only one decision – *Vance* – in which a court found that U.S. officials' alleged

interrogation of a U.S. citizen detained outside the U.S. stated a clearly established

substantive due process violation.[23]   *See* 2010 WL 850173, at *14.   *Vance*, however, was

not decided until 2010 and cannot govern 2007 conduct, and is in any event inapposite.[24]

Meshal's reference to an alleged FBI "legal analysis" of permissible interrogation

---

[22]   Similarly, in *El-Masri v. U.S.*, 479 F.3d 296, 312 (4th Cir. 2007), the Fourth Circuit found that a *Bivens* claim based upon an alleged extraordinary rendition was properly dismissed on a threshold state secrets assertion without reaching the underlying constitutional claim.

[23]   Meshal does not attribute any of the wrongful conduct that allegedly occurred during his interrogation – "threats of torture, serious injury, disappearance, and other serious harms" – to Defendants John Doe 1 or John Doe 2.   As far as the Defendants are aware, no court has ever recognized a due process claim based upon a U.S. official's mere participation, without more, in the interrogation of a U.S. citizen detained outside the U.S.

[24]   First, *Vance*, presently on appeal, does not set forth clearly established law for this Circuit.   Second, the plaintiffs in *Vance* were unquestionably within the custody of the U.S. military for their entire detention.   *See* 2010 WL 850173, at *1-2.   And third, the wrongful conduct alleged in *Vance* occurred allegedly over the entire course of the plaintiffs' detention and was different, in both degree and duration, than the conduct Meshal alleges by Defendants here. *See id.* at *2,*9 (alleging "threats of violence and actual violence, sleep deprivation and alteration, extremes of temperature, extremes of sound, light manipulation, threats of indefinite detention, denial of food, denial of water, denial of needed medical care, yelling, prolonged, solitary confinement, *incommunicado* detention, falsified allegations and other psychologically-disruptive and injurious techniques").

methods, *see* AC ¶ 89, does not support any due process claim.[25]   First, the document in question is not a statement of official FBI policy (nowhere does Meshal even allege this), nor is it binding in any way; it was prepared by an agent in the Behavioral Analysis Unit ("BAU") in relation to a particular issue involving detainees at Guantanamo Bay.[26] BAU's mission is to provide behavioral based investigative and operational support.[27] Second, "clearly established" law for purposes of a qualified immunity inquiry is not determined by an isolated memorandum of a federal employee, it is determined by federal case law, and involves a determination of not merely whether the conduct could be considered unlawful, but whether the unlawfulness was clearly established at the time. *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) ("In determining whether officers strayed beyond clearly established bounds of lawfulness, we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view.") (*citing Wilson v. Layne*, 526 U.S. 603, 617 (1999)).   Meshal does not

---

[25]   The document in question can be found in the public domain at http://www.aladin0.wrlc.org/gsdl/cgi-bin/library?e=d-01000-00---off-0torture--00-1--0-10-0---0---0prompt-10---4-------0-1l--11-en-50---20-home---01-3-1-00-0-0-11-0-0utfZz-8-00&a=d&cl=CL6.4&d=HASH01ccd65f96a8281ae933e0b1.   The document may be considered in resolving the Defendants' motion to dismiss because even though Meshal has not produced the document, his Amended Complaint references and thus "necessarily relies" upon it.   *Hinton v. Corr. Corp. of Am.*, 624 F.Supp.2d 45, 46 (D.D.C. 2009).

[26]   *See* "A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq" (U.S. Department of Justice, Office of the Inspector General, May 2008) ("OIG Report") at 106, *available at* http://www.justice.gov/oig/reports/FBI/index.htm.   *See also id.* at 104-07.   As noted in the OIG Report, the document was sent to, as opposed to prepared by, FBI's Office of General Counsel, in an effort to seek guidance from that office.   *Id.* at 91, 106.   The Court may consider matters of general public record in resolving a motion to dismiss.   *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir.1979).

[27]   *See* http://www.fbi.gov/hq/isd/cirg/ncavc.htm#bau.

28

even allege the Defendants were aware of this memorandum.   Further, to the extent that the document represents that certain conduct violates the "Torture Statute," 18 U.S.C. § 2340, *see* AC ¶ 89, caselaw and not that conclusion would control qualified immunity.[28] "Neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation – of federal or of state law – unless that statute or regulation provides the basis for the cause of action sued upon."   *Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984).   *Cf. Wilson*, 526 U.S. at 617 ("[A] policy . . . could not make reasonable a belief that was contrary to a decided body of caselaw.").   Meshal asserts no claim under 18 U.S.C. § 2340, nor could he, since it is a criminal statute.

### C.     Counts II And III Do Not State A Violation Of Any Constitutional Right

Even if this Court begins its analysis of Meshal's constitutional claims with the first prong of the qualified immunity inquiry – whether Meshal has stated the violation of a constitutional right – the Defendants would be entitled to qualified immunity on Counts II and III.

As a preliminary matter, it is important to define the proper framework in which Meshal's claims should be considered.   To the extent a substantive due process claim exists under Count I, it is properly limited to the allegedly coercive conduct by two of the Defendants when questioning Meshal.   In this regard, Meshal defines his substantive due process claim in Count I with respect to his alleged detention and "rendition" (as opposed to his claims of custodial questioning) far too broadly because the claim substantially overlaps with his Fifth Amendment procedural due

---

[28]   Contrary to Meshal's allegation, the document does not state that it is a *per se* violation of the Torture Statute to threaten to send a detainee to a third country in order to allow that country to use interrogation techniques which violate U.S. law; the document states that the <u>actual sending</u> of a detainee to a third country with the intent that that country use techniques that violate the Torture Statute is a violation of U.S. law.   *See* OIG Report at 106.

process claim in Count II and his Fourth Amendment claim in Count III.   Meshal includes his alleged detention in Kenya, Somalia, and Ethiopia in all three Counts.   *See* AC ¶¶ 175-77, 186-89, 198-99.   Similarly, Meshal includes his alleged "rendition" from Kenya to Somalia and Ethiopia, in both Counts I and II.   *See id.* ¶¶ 175-76, 186-89.   Meshal's alleged detention by Kenyan, Ethiopian, and Somali authorities and his alleged "rendition" by Kenyan authorities should not be considered under "the more generalized notion" of substantive due process.   Rather, claims challenging the mere fact of Meshal's alleged detention and "rendition" are, in essence "seizure" claims, properly considered under the more explicit textual provisions of the Fourth Amendment, under Count III.   Similarly, the aspects of the detention and "rendition" which go to Meshal's "process" claims – lack of probable cause, lack of review by a judicial officer, inability to consult with counsel – are most appropriately analyzed under the more particular rubric of Fifth Amendment procedural due process, under Count II.   To the extent a substantive due process claim exists under Count I, it is properly limited to the allegedly coercive conduct by two of the Defendants when questioning Meshal.

In determining whether a substantive due process claim has been sufficiently alleged, the Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."   *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-226 (1985)).   For this reason, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process" must be the guide for analyzing' such a claim."   *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality op.) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

1.    **Count II's procedural due process claim and Count III's Fourth Amendment claim fail to state a violation of any constitutional rights because Meshal has not sufficiently alleged that any of the identified Defendants personally participated in the alleged wrongful conduct**

Since "[t]he purpose of *Bivens* is to deter individual federal officers from committing constitutional violations," federal officers may only be subject to suit for constitutional violations if they are "directly responsible" for them.   *Malesko*, 534 U.S. at 70-71.   Thus, in order to satisfy the first prong of the qualified immunity inquiry – a showing of a constitutional violation by the defendant, *see Saucier*, 533 U.S. at 201 – "[t]he complaint must at least allege that the defendant federal official was *personally involved* in the illegal conduct," *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997) (emphasis added); *see also Int'l Action Ctr.*, 365 F.3d at 23-24.   This showing requires the plaintiff to allege facts, not simply conclusions, which show a defendant's personal involvement in the alleged constitutional violation.   The factual content of the complaint must be sufficient factual matter to "state a claim to relief that is plausible on its face."   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   In *Iqbal*, the Supreme Court stated that

> [a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.   The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.   Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

129 S. Ct. at 1949 (*citing Twombly*, 550 U.S. at 556-57, 570).[29]   *Iqbal* proffered a two-pronged approach to evaluate a complaint: first, identify the conclusory allegations that are not entitled to

---

[29]    *See also* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action").

the assumption of truth; and second, evaluate the remaining allegations of fact to determine if they plausibly suggest an entitlement to relief. *Id.* at 1949-52.   Applying that analysis here, it is clear that Meshal has not met the threshold requirement of sufficiently alleging the personal participation of any of the Defendants in either his detention by Kenyan, Ethiopian, and Somali authorities or his alleged "rendition" by Kenyan authorities.

Beyond wholly conclusory allegations devoid of any factual content, Meshal offers nothing that, if proven true, would establish that any of the Defendants had any role in his alleged detention by foreign authorities.   Meshal alleges that his detention "was at the direction or behest of U.S. officials," carried out with their participation, and/or the result of a conspiracy with foreign officials.   AC ¶ 2.   However, the facts concerning Meshal's custody, as alleged, do not support this conclusory statement.   There is no mention of any specific activities by any of the Defendants such that they could be said to be personally responsible for Meshal's detentions in Kenya, Somalia, or Ethiopia by officials of those countries, or his alleged "rendition" between those countries.   Meshal alleges that he was apprehended by Kenyan soldiers, apparently after entering the country illegally, and detained in Kenyan jails for the duration of his stay in Kenya. *Id.* ¶¶ 40, 46,  51.   A Kenyan police officer brought Meshal to each alleged interrogation session with the Defendants and brought him back to a Kenyan jail after each session was over.   *Id.* ¶¶ 58, 64, 76, 81-82.   Kenyan officials took Meshal from a Kenyan jail and put him on a plane to Somalia.   *Id.* ¶¶ 108-09.   In Somalia, the Somali military handed Meshal over to the Ethiopian military, which eventually flew Meshal to Ethiopia.   *Id.* ¶¶ 115-19.   In Ethiopia, Meshal was held in an Ethiopian prison facility.   *Id.* ¶¶ 130-35.   An Ethiopian brought Meshal to each alleged interrogation session and brought him back to the facility after each session was over. *Id.* ¶¶ 141-43.   Meshal remained under the watch of an armed Ethiopian guard.   *Id.* ¶ 142-43.

32

Meshal was brought before an Ethiopian military tribunal three times.   *Id.* ¶ 155.   In contrast to

the portions of his Amended Complaint where Meshal describes questioning by the four

Defendants, none of these allegations indicate responsibility by the Defendants for Meshal's

detention.[30]

There is no mention of any specific activities by any of the Defendants such that they

could be said to be personally responsible for Meshal's alleged "rendition" from Kenya to

Somalia and Ethiopia.   Meshal alleges that "one or more of" Defendants Higgenbotham,

Hersem, John Doe 1, and John Doe 2 "directed, authorized, conspired to effect, actively and

substantially participated in, and/or took affirmative action(s) demonstrating consent and

acquiescence to [his] rendition to Somalia and Ethiopia."   *See* AC ¶ 123.   However, Meshal

offers no factual support for this conclusory allegation.   Rather, Meshal relies upon the similarly

conclusory proposition that the involvement of Higgenbotham, Hersem, and John Doe 1, in

Meshal's interrogation in Kenya necessitates that "one of more of" these Defendants played a role

in Kenya's transfer of Meshal to Somalia and Somalia's transfer of Meshal to Ethiopia.   *See id.*

Beyond wholly conclusory allegations, Meshal offers no facts establishing that any

Defendant personally caused or participated in his alleged detention or "rendition."   Meshal

does not even allege facts that are consistent with the Defendants having any responsibility for

his detention or "rendition."   At most, Meshal alleges facts which might establish that the

Defendants were allowed to question him – perhaps as the result of some arrangement between

the U.S. and other unnamed officials of Kenya or Ethiopia.   A complaint does not "suffice if it

---

[30]   Similarly conclusory, and therefore deficient, allegations are offered with respect to the
Defendants' involvement in the alleged denial of access to courts.   *See, e.g.*, AC ¶ 2.   Moreover,
according to Meshal's Complaint his detention was brought "to the attention of the Kenyan courts"
by a Kenyan human rights organization, *see id.* ¶¶ 92-95, and Ethiopian officials brought him
before a military tribunal in Ethiopia three times, *see id.* ¶ 155.

tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"   *Iqbal*, 129 S. Ct. at 1949

(alterations in original)(*quoting Twombly*, 550 U.S. at 557).   *Iqbal* requires that Meshal's

conclusory assertions about the Defendants' alleged role in his detention and "rendition" not be

entitled to any presumption of truth.   *E.g., id.* ("It is the conclusory nature of [Iqbal's] allegations,

rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.");

*Twombly*, 550 U.S. at 554-555.   For these reasons, Counts II and III fail as a matter of law

because they do not plead personal participation sufficient to sustain a *Bivens* claim.[31]

### 2.     Count II otherwise fails to state a violation of Meshal's procedural due process rights

Meshal's remaining procedural due process claim is that he was denied access to counsel.

AC ¶ 184(c).   The source of this alleged right to access counsel is unclear from the Amended

Complaint.   However, to the extent that Meshal asserts a violation of the Fifth Amendment's

privilege against self-incrimination, which includes the right to have any attorney present, if

requested, during a custodial interrogation, this claim fails as a matter of law.   Any violation of

the privilege against self-incrimination occurs, not at the moment law enforcement officials coerce

statements through custodial interrogation, but when a defendant's involuntary statements are

actually used against him in a criminal proceeding.   *See Chavez v. Martinez*, 538 U.S. 760, 769

(2003) (plurality op.) ("mere coercion does not violate the text of the self-incrimination clause

absent use of the compelled statements in a criminal case against the witness").   Meshal does not

allege that he made any incriminating statement that was used against him in a trial.

---

[31]   To the extent that Count I is construed to include a detention and/or "rendition" component, that aspect of Count I fails as a matter of law because, as shown above, Meshal fails to sufficiently allege the Defendants' personal participation in either his detention or rendition.

**D.**  **Counts I and IV Fail To State A Clearly Established Violation of Meshal's Rights Under The Substantive Due Process Clause Or The Torture Victim Protection Act**

**1.**  **Count I fails to state a violation of any clearly established substantive due process right**

The Defendants are entitled to qualified immunity for Meshal's substantive due process claim because he cannot demonstrate that the allegations in this case state a violation of any clearly established principle of substantive due process.   As shown above, the only aspect of Meshal's treatment that should be considered under the substantive due process claim in Count I, and in any event, the only alleged conduct for which there are any colorable allegations of personal participation by the defendants here, is the alleged conduct of Defendants Higginbotham and Hersem during Meshal's "custodial interrogations" in Kenya.[32]   To establish a substantive due process violation, Meshal must allege behavior that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."   *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998); *Butera*, 235 F.3d at 651 (requirement that state action be sufficiently egregious to shock conscience "exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law").   Every substantive due process inquiry "demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."   *Lewis*, 523 U.S. at 850.   The degree of culpability a plaintiff must show to prove a violation of substantive due process varies depending on those circumstances.   The bar is set highest in cases where government officials are faced with competing obligations "that tend to tug against each other."   *Id.* at 853.   In these circumstances,

---

[32]   Since Meshal does not allege that Defendants John Doe 1 or John Doe 2 engaged in any wrongful conduct during their "custodial interrogations" of Meshal, Count I should be dismissed as to these Defendants for lack of personal participation.

conduct will violate substantive due process only if it is "intended to injure in some way unjustifiable by any government interest." *Id.* at 849.

Meshal alleges that Defendant Higginbotham once grabbed him, forced him to a window, and told him that "Allah is up in the clouds," and that "the U.S. is almost as powerful as Allah." *See* AC ¶ 86. He also alleges that Defendant Hersem yelled at him and poked him "vigorously" in the chest. *See id.* ¶ 87. Although physical violence towards a subject during questioning is never condoned, it was not clearly established that such conduct under these circumstances would constitute a substantive due process violation. Indeed, the Supreme Court has essentially rejected such claims under the less demanding excessive force standard applied in the Fourth Amendment context, explaining: "Not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citation and internal quotations omitted).

Meshal further alleges that these two Defendants threatened him, saying: they "had ways of getting the information they want;" he would be sent to Israel, where the Israelis would "make him disappear;" he would be returned to Somalia if he refused to answer questions; the Egyptians were very interested in speaking with him and "had ways of making [Meshal] talk;" he could meet the same fate as the lead character in the movie "Midnight Express" if Meshal did not cooperate and admit his connection with al Qaeda; and Meshal made it so that his "grandkids" would be affected by his actions. *See* AC ¶¶ 86-88.[33] Unlawful threats during interrogation are not condoned and do not comport with Executive branch policies. Clearly, certain kinds of threats of

---

[33] Only one of these alleged threats (to return Meshal to Somalia) was ever repeated over the course of four "day-long" interrogations. And only two were accompanied by any physical contact – a "grab" and "vigorous poking." *Cf. Hopson v. Fredericksen,* 961 F.2d 1374 (8th Cir. 1992) (threat to kill accompanied by cocking and aiming gun violated the Constitution).

imminent death or infliction of severe pain could amount to conduct that shocks the conscience

under particular circumstances.   However, at the time of the conduct alleged, there was no

precedent which clearly established that the sort of highly contingent and speculative threats

alleged by Meshal, taken in the context of all the surrounding circumstances, amounted to conduct

that shocks the conscience.   No D.C. Circuit case has recognized that such threats constitute a

substantive due process violation in any context, let alone the national security context at issue.[34]

Other circuits have found that not all verbal threats are alone sufficient to state a substantive due

process claim.[35]

        In short, no court has ever opined on the scope of the substantive due process rights that

attend the interrogation of a U.S. citizen detained in a foreign country by foreign officials on

suspicion of terrorist involvement.   Therefore, it cannot be said that it was clearly established in

the specific context presented in this case that Meshal's allegations would constitute substantive

due process violations.[36]

---

[34]   *Cf. O.K. v. Bush*, 377 F. Supp. 2d 102, 117 (D.D.C. 2005) ("set[ting] to one side" the question of whether repeatedly threatening detainee that he would be transferred to a third country where he would be sexually assaulted amounted to torture or otherwise violated any of detainee's rights in a military interrogation setting).

[35]   *See, e.g., Lamar v. Steele,* 698 F.2d 1286 (5th Cir. 1983) (per curiam) ("mere words" or "idle threats" insufficient to violate substantive due process); *Emmons v. McLaughlin,* 874 F.2d 351, 354 (6th Cir.1989) (finding that fear from "threat" that "I am going to get you . . ." is not an "actual infringement of a constitutional right"); *Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir. 1979) (claim that sheriff laughed at prisoner and threatened to "hang him" did not establish constitutional violation); *King v. Olmsted County,* 117 F.3d 1065, 1067-68 (8th Cir. 1997) (social worker's threat that the state would take parents' children away unless they cooperated insufficient to "constitute an invasion of an identified liberty interest"); *Tinker v. Beasley,* 429 F.3d 1324, 1326, 1328-29 (11th Cir. 2005) (no substantive due process violation where officers told suspect during interrogation that her lawyer had abandoned her, she would never see her children again unless she confessed, and that her only options were the electric chair or life in prison).

[36]   To the extent Count I can be construed as asserting a "state-created danger" claim, this

### 2.      Count IV does not state a clearly established violation of the Torture Victim Protection Act

In Count IV of his Complaint, Meshal alleges that Defendants Higginbotham and Hersem violated Meshal's rights under the Torture Victim Protection Act (the "TVPA"), 28 U.S.C. 1350, note.   AC ¶ 204.   In relevant part, the TVPA creates a civil cause of action against "[a]n individual, who under actual or apparent authority, or color of law, of any foreign nation (1) subjects an individual to torture . . ."   28 U.S.C. 1350, note.   Meshal's TVPA claim fails because he has not alleged facts establishing that Defendants Higginbotham and Hersem acted under the authority or color of foreign law, or that these defendants subjected Meshal to any treatment that meets the definition of "torture" under the TVPA.

### a)      Meshal fails to satisfy the statutory requirement that Defendants Higginbotham and Hersem have acted "under actual or apparent authority, or color of law, of any foreign nation"

Meshal states in conclusory fashion that "Defendant Higginbotham and Defendant Hersem acted under actual or apparent authority of the Kenyan government and/or under the color of Kenyan law in conducting their interrogations of Plaintiff." AC ¶ 209; 28 U.S.C. § 1350 note § 2. However, to state a TVPA claim, Meshal must adequately allege that Defendants Hersem and Higginbotham possessed power under Kenyan law, that the alleged acts of torture derived from the exercise of power under Kenyan law, or that the Defendants would have been unable to undertake their culpable actions had they not possessed such power.   *Arar*, 585 F.3d at 568.   Meshal's Complaint falls far short of this mark.   Rather, the factual allegations of Meshal's Complaint

---

claim also fails as a matter of law.   The Defendants did not create or increase any risk that Meshal would suffer harm if "rendered" to Somalia and Ethiopia from Kenya, *see* AC ¶ 176, because Meshal has not alleged sufficient facts from which it could be concluded that the Defendants had any personal involvement in his alleged "rendition."   *See infra* § II.C.1.   Meshal offers nothing but conclusory allegations not entitled to any presumption of truth.   *See Iqbal*, 129 S. Ct. at 1949.

plainly establish that Defendants Hersem and Higginbotham were acting under color of U.S., not

Kenyan, law, and that they acted in accordance with particular federal policies to pursue the aims

of the U.S. government in the Horn of Africa.

Meshal alleges that Defendants Hersem and Higginbotham, along with other FBI

personnel, were deployed to the Horn of Africa as part of a strategy to "identify[], arrest[], and

detain[] individuals suspected of ties to terrorist organizations or activity in order to stem the rise

of militant Islam in the region."   AC ¶¶ 13-14, 24.   Meshal alleges that the basis for his

interrogation was suspicion that he was a member of a terrorist organization.   *Id.* ¶¶ 74, 84,

87-88, 150, 156.   Meshal alleges that his interrogation was "ordered, directed, authorized, or

approved" by "U.S. government officials" "who were granted the authority to do so by the

Attorney General and the Director of Central Intelligence."   AC ¶ 56.   According to Meshal,

these U.S. government officials:

> follow[ed] the procedures set forth in The Attorney General's Guidelines for FBI National
> Security Investigations and Foreign Intelligence Collection, which were in force at the time
> and provided, inter alia, that "[t]he FBI may conduct investigations abroad, participate with
> foreign officials in investigations abroad, or otherwise conduct activities outside the
> United States with the written request or approval of the Director of Central Intelligence
> and the Attorney General or their designees."

*Id.*   These government officials were also either located in the United States or receiving

communications from other officials in the United States.   *Id.* ¶ 57.   Nothing about these

allegations supports a conclusion that Hersem and Higginbotham, or the U.S. government officials

who purportedly "ordered, directed, authorized, or approved" their actions, acted under an

authority other than U.S. law.   *See Arar v. Aschcroft*, 414 F. Supp. 2d 250, 265 (E.D.N.Y. 2006)

(finding that where complaint alleged unconstitutional conduct by high-ranking policymaking

U.S. officials, not low-level officers acting on their own, alleged conduct would have been taken

pursuant to U.S., not foreign, law), *aff'd*, 585 F.3d 559 (2d Cir. 2009), *cert. denied*, No. 09-923, 2010 WL 390379 (U.S. Jun. 14, 2010).[37]   At most, Meshal alleges that Hersem and Higginbotham solicited or directed certain conduct by foreign officials.   This is insufficient to establish that these defendants were either clothed with the authority of Kenyan, Somali, or Ethiopian law, or that their conduct in questioning Meshal may be fairly attributable to Kenya, Somalia, or Ethiopia.   *Arar*, 585 F.3d at 559.

To the extent Meshal suggest that the "under color of foreign law" requirement is satisfied by an allegation that Defendants Hersem and Higginbotham "conspired with Kenyan officials, acted as willful participants in joint activity with Kenyan officials, and/or engaged in actions entwined with Kenyan authorities' detention of Mr. Meshal," *see* AC ¶¶ 210-11, this argument fails.   TVPA plaintiffs have attempted to meet the "under color of foreign law" requirement by analogizing it to the "color of state law" test of 42 U.S.C. § 1983, arguing that U.S. officials can be deemed to have acted under color of foreign law in the same way courts have found federal officials to have acted under color of state law under Section 1983.   This analogy, however, has repeatedly been rejected under the TVPA.   *See Harbury v. Hayden*, 444 F.Supp.2d 19, 42 (D.D.C. 2006), *aff'd*, 552 F.3d 413 (D.C. Cir. 2008); *Arar*, 414 F. Supp.2d at 265.   First, Section 1983 does not apply to federal officials acting under color of federal law.   *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1104 (D.C. Cir. 2005).   If a federal official acts pursuant to his or her federal authority, those acts are simply not taken under color of state law.   *See Williams v. United States*, 396 F.3d 412, 415 (D.C. Cir. 2005).   Second, a federal official acting under color of

---

[37]   *Cf. Schneider v. Kissinger*, 310 F.Supp.2d 251, 267 (D.D.C. 2004) ("In carrying out the direct orders of the President of the United States, . . . Dr. Kissinger was most assuredly acting pursuant to U.S. law, if any, despite the fact that his alleged foreign co-conspirators may have been acting under color of Chilean law."), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005).

40

federal law does not act under color of state law, either alone or in conspiracy with state officials, unless the official exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."   *West v. Atkins*, 487 U.S. 42, 49 (1988) (*quoting United States v. Classic*, 313 U.S. 299, 326 (1941)).   Thus, to state a claim here, the Kenyans would have had to direct the conduct of U.S. officials, particularly Higginbotham and Hersem – the precise <u>opposite</u> of the theory alleged by Meshal.   *See, e.g.*, *Kletschka v. Driver*, 411 F.2d 436, 449 (2d Cir. 1969) (dismissing § 1983 conspiracy claim against federal officials because there was no evidence that federal officials were under the control or influence of state officials).

In this case, Meshal offers no allegation that Defendants Hersem and Higginbotham possessed any authority by virtue of the laws of Kenya, or were "clothed with the authority of" Kenyan law despite the fact that they were United States officials.   To the contrary, Meshal expressly alleges that these defendants were acting pursuant to policies and procedures established by the Attorney General of the United States.   *See* AC ¶ 56.   At all times, Hersem and Higginbotham were "clothed with the authority" of federal law, and thus they are entitled to qualified immunity – under the first part of that inquiry – for any TVPA claim.

> ### b) Meshal fails to allege any acts that are clearly established as "torture" within the definition of the TVPA

An additional reason why the Defendants are entitled to qualified immunity for Meshal's TVPA claim is that he does not allege any actions recognized by clearly established caselaw as being "torture" under the TVPA.[38]   The D.C. Circuit has recognized that the term "torture," as

---

[38]   The TVPA, 28 U.S.C. § 1350 note § 3(b)(1), defines torture as: "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession,

used in the TVPA

> borrows from the 1984 United Nations Convention Against Torture and Other
> Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N.
> GAOR, 39th Sess. Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984) ("Torture
> Convention"). . . [T]hat definition of torture includes a "severity requirement" that
> is "crucial to ensuring that the conduct proscribed by the Convention and the TVPA
> is sufficiently extreme and outrageous to warrant the universal condemnation that
> the term 'torture' both connotes and invokes."   "[T]orture does not automatically
> result whenever individuals in official custody are subjected even to direct physical
> assault."   Rather, torture is a label that is "usually reserved for extreme, deliberate
> and unusually cruel practices, for example, sustained systematic beating,
> application of electric currents to sensitive parts of the body, and tying up or
> hanging in positions that cause extreme pain."

*Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003)

(quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 91-93 (D.C. Cir. 2002)

(quoting S. Exec. Rep. No. 101-30, at 14 (1990))).

        None of the conduct Meshal alleges he was subjected to during his interrogation, *see* AC

¶¶ 86-88, would clearly be understood to meet the definition of torture under the TVPA.   The

limited physical conduct alleged clearly does not satisfy the "severe physical pain and suffering"

requirement of the TVPA.   *See* § 1350 note § 3(b)(2)(A).   Although threats may constitute a

TVPA violation under certain circumstances, the alleged contingent and speculative threats, in

the context alleged here, do not clearly satisfy the TVPA.   *See id.* § 3(b)(2)(A)&(C).

Moreover, the claim that the threats caused Meshal "severe mental pain or suffering," as the

TVPA requires, is wholly conclusory, and thus does not satisfy *Iqbal*'s pleading requirements.

        In addition, the interrogation conduct alleged by Meshal would not clearly be understood

to meet the definition of torture under the TVPA as that definition has been construed by this

---

punishing that individual for an act that individual or a third person has committed or is
suspected of having committed, intimidating or coercing that individual or a third person, or for
any reason based on discrimination of any kind."

Circuit.   *See* discussion *supra* at § II.D.1; *compare Simpson*, 326 F.3d at 234 (finding allegations

that plaintiff was interrogated, held incommunicado, and threatened with death <u>did not</u> constitute

torture within the meaning of the TVPA) *and Massie v. Government of Democratic People's*

*Republic of Korea*, 592 F.Supp.2d 57, 64 (D.D.C. 2008) (finding claims of severe physical

beatings accompanied by threats that captives would immediately be shot as spies if they did not

confess met TVPA's definition of torture) *and Nikbin v. Islamic Republic of Iran*, 517 F.Supp.2d

416, (D.D.C. 2007) (finding claims of repeated strikes on the soles of feet, hanging upside down

from the ceiling during an interrogation session, and sexual assault with an object met TVPA

standard).[39]   Nor does the conduct alleged by Meshal approach the level of conduct found by

other federal courts to constitute torture under the TVPA.[40]   While the United States certainly

does not condone inappropriate coercive interrogation techniques, nevertheless, the particular

conduct alleged by Meshal cannot be a clearly established violation of the TVPA.

> **c)**      **The Defendants are entitled to qualified immunity because it
> was not clearly established that U.S. officials could violate the
> TVPA while acting under color of federal law**

Even if the allegations of the Complaint can be construed to state a TVPA violation,

Defendants Higginbotham and Hersem are nonetheless entitled to qualified immunity because it

was not clearly established at the time of their alleged actions that U.S. officials could be held

---

[39]      *Simpson*, *Massie*, and *Nikbin*, involved the definition of "torture" under the Foreign
Sovereign Immunities Act, *see* 28 U.S.C. § 1602, *et seq.*, which defines the term as having the
same meaning as that given in Section 3 of the TVPA, *id.* §1605A(h)(7).

[40]      *See, e.g.*, *Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, 588 F.Supp.2d 375
(E.D.N.Y. 2008) (application of electric shock); *Chavez v. Carranza*, 413 F. Supp. 2d 891 (W.D.
Tenn. 2005) (sexual assault, application of electric shock, and burning with acid during
interrogation); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 (11th Cir. 2005)
(heavily armed security forces threatening unarmed and restrained labor unionists for several
hours that they would be killed "not sometime in the future, but that very night"); *Doe v. Qi*, 349
F.Supp.2d 1258 (N.D. Cal. 2004) (sustained beatings over an extended period of time).

liable for a violation of the TVPA.   The Defendants are aware of no case in the District of

Columbia Circuit in which a U.S. official has been held liable under the TVPA.   In fact, as far as

the Defendants are aware, *no federal court* has ever held a U.S. official liable under the TVPA.

This is not surprising because, as District Judge Kollar-Kotelly explained in *Harbury v. Hayden*,

> At the time of the TVPA's signing, the "under foreign color of law" requirement
> was understood to serve as an important limitation of the Act that would preclude
> its application to United States operations abroad.   As President George H.W.
> Bush noted upon its March 16, 1992 signing:
>
>> Finally, I must note that I am signing the bill based on my
>> understanding that the Act does not permit suits for alleged human
>> rights violations in the context of United States military operations
>> abroad or law enforcement actions.   Because the Act permits suits
>> based only on actions "under actual or apparent authority, or color
>> of law, of any foreign nation," I do not believe it is the Congress'
>> intent that [the TVPA] should apply to United States Armed Forces
>> or law enforcement operations, which are always carried out under
>> the authority of United States law. Stmt. by Pres. George H.W. Bush
>> Upon Signing H.R.2092, 22 Weekly Comp. Pres. Doc. 465 (Mar.
>> 16, 1992)).
>
> Indeed, President Bush further emphasized that "[t]his legislation concerns acts of
> torture and extrajudicial killing committed overseas by *foreign* individuals." *Id.*
> (emphasis added).   As President Bush recognized, a different reading of the law
> would expose every federal employee working abroad daily with employees of
> foreign governments – *i.e.*, employees in intelligence agencies, military agencies,
> diplomatic and foreign aid agencies, and law enforcement agencies – to personal
> liability under the construct that they were somehow actually or apparently acting
> under foreign law.

444 F. Supp. 2d 19, 41 (D.D.C. 2006), *aff'd*, 552 F.3d 413 (D.C. Cir. 2008).

The few times that district courts in this Circuit have considered TVPA claims asserted

against U.S. officials, the claims have been rejected.   *See Harbury*, 444 F.Supp.2d at 42

("Plaintiff has failed to cite a single case that stands for the principle that a U.S. agent serving the

interests of the United States and acting within his or her employment can be held liable pursuant

to the TVPA.   Rather, all relevant decisions point to the conclusion that such liability [] cannot

attach to U.S. agents."); *Schneider*, 310 F.Supp.2d at 267.   Most recently, in *Harbury v. Hayden*,

the D.C. Circuit declined to consider the TVPA's scope as applied to U.S. officials.   522 F.3d 413,

423 n.5 (D.C. Cir. 2008).   As its application to U.S. officials is at best unclear in the D.C. Circuit

and other federal courts, Meshal's TVPA claim must fail as not clearly established.

## **<u>CONCLUSION</u>**

As shown above, a judicially-created damages cause of action in this instance would strike

at the very authority and discretion of the political branches to exercise their core political

functions of national security and foreign policy by legislating a cause of action for such claims.

Even if the Court were to create this cause of action, the Defendants are entitled to qualified

immunity for Meshal's constitutional and TVPA claims.   For these reasons, and for all of the

reasons stated above, Counts I-IV of Meshal's Amended Complaint should be dismissed.

Respectfully submitted,

Dated: June 23, 2010                    ANN M. RAVEL
                                        Deputy Assistant Attorney General

                                        TIMOTHY P. GARREN
                                        Director, Torts Branch, Civil Division

                                        MARY HAMPTON MASON
                                        Senior Trial Counsel, Torts Branch

                                        *<u>s/ Glenn S. Greene</u>*
                                        Trial Attorney, Torts Branch
                                        U.S. Department of Justice, Civil Division
                                        Constitutional and Specialized Tort Litigation
                                        P.O. Box 7146, Ben Franklin Station
                                        Washington, D.C. 20044
                                        (202) 616-4143 (phone)
                                        (202) 616-4314 (fax)
                                        Glenn.Greene@usdoj.gov
                                        ATTORNEYS FOR DEFENDANTS
                                        CHRIS HIGGINBOTHAM, STEVE HERSEM,
                                        JOHN DOE 1, AND JOHN DOE 2