UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMIR MESHAL,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>CHRIS HIGGENBOTHAM, *et. al*,<br><br>　　　　　Defendants. | No. 09-cv-2178 (EGS) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

Nusrat J. Choudhury
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: 212-549-2500, Fax: 212-549-2583
nchoudhury@aclu.org

Jonathan Hafetz
169 Hicks Street
Brooklyn, NY 11201
Phone: 917-355-6896
hafetzj@yahoo.com

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
　of the Nation's Capital Area
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
Phone: 202-457-0800, Fax: 202-452-1868
artspitzer@aol.com

Hope R. Metcalf
National Litigation Project of the Allard K.
　Lowenstein International Human Rights Clinic
Yale Law School, P.O. Box 209090
New Haven, CT 0650-9090
Phone: 203-432-9404, Fax: 203-432-9128
hope.metcalf@yale.edu

September 3, 2010　　　　　*Counsel for Plaintiff Amir Meshal*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ..................................................................................................................... 6

I.    Meshal Properly Seeks Redress Under *Bivens* ....................................................... 6

II.   Meshal's Constitutional Claims Should Not Be Dismissed. ................................. 17

  A.   The Complaint Adequately Alleges the Personal Involvement of Each Defendant. ......... 17

  1.   All of the Defendants Were Personally Involved in Directing and/or Actively Participated
       in Meshal's Prolonged Detention and Unlawful Rendition. ................................................ 18

  2.   Doe 1 Was Personally Involved in Coercively Interrogating Meshal. .............................. 21

  B.   The Defendants Are Not Entitled to Qualified Immunity Simply Because the Challenged
       Conduct of U.S. Officials Occurred Abroad. ..................................................................... 22

    1.   The Defendants' Role in Meshal's Prolonged Detention Violated Clearly Established
         Fourth and Fifth Amendment Rights. ............................................................................... 25

      a.   Meshal Has Shown a Fourth Amendment Violation. ............................................... 25

      b.   Meshal Has Shown a Fifth Amendment Violation. .................................................. 26

      c.   Meshal's Fourth and Fifth Amendment Rights Were Clearly Established. ........... 28

    2.   The Defendants' Role in Meshal's Rendition Violated Clearly Established Fifth
         Amendment Rights. ......................................................................................................... 30

      a.   Meshal Has Shown a Fifth Amendment Violation. .................................................. 30

      b.   Meshal's Fifth Amendment Rights Were Clearly Established. .............................. 32

    3.   The Defendants' Coercive Interrogation of Meshal Violated Clearly Established Fifth
         Amendment Rights. ......................................................................................................... 34

      a.   Meshal Has Shown a Fifth Amendment Violation. .................................................. 34

      b.   Meshal's Fifth Amendment Rights Were Clearly Established. .............................. 35

III.  Meshal States a Clearly Established Violation of the Torture Victim Protection Act. ........ 37

A.   Hersem and Higgenbotham Acted Under Actual or Apparent Kenyan Authority or Under Color of Kenyan Law. ......................................................................................................37

B.   Hersem and Higgenbotham Subjected Meshal to Psychological Torture Threats for the Purpose of Coercing a Confession. ...................................................................................41

C.   Meshal's Right Not To Be Tortured by U.S. Officials Was Clearly Established. ............43

**INTRODUCTION**

Amir Meshal ("Meshal"), a U.S. citizen, brings this action pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note, against two known FBI Supervising Special Agents and two U.S. officials, Doe Defendants 1 and 2, for violations of his rights under the U.S. Constitution and the TVPA.  This case falls into core *Bivens* territory, addressing serious misconduct by federal law enforcement officers against a U.S. citizen.

Following the outbreak of hostilities between rival governments in Somalia in 2007, Meshal fled for his life with thousands of civilians and was apprehended near the Kenyan border.  During the next four months, he was detained in three different countries—at the behest of the Defendants or with their active participation—without charge, without access to counsel, and without presentment before a judicial officer.  While foreign authorities demonstrated no interest in Meshal, he was interrogated more than thirty times by Defendants, who threatened to forcibly disappear him in Israel, to send him to Egypt for torture and to war-torn Somalia, and to cause him other serious harm for the purpose of coercing a confession and prosecuting him in the United States.  Meshal was finally returned home on May 27, 2007.  He was never charged with a crime.

Meshal's Amended Complaint for Damages and Declaratory Relief ("Amended Complaint" or "AC") asserts four claims.  The first three are against all Defendants and challenge their respective roles in (i) Meshal's prolonged detention, illegal rendition, and coercive interrogation in violation of his substantive due process rights; (ii) his prolonged detention and illegal rendition in violation of his procedural due process rights; and (iii) his prolonged detention in violation of his Fourth Amendment right to a prompt probable cause hearing.  Claim IV alleges that the two known

1

FBI Supervising Special Agents, acting together with their Kenyan counterparts, violated Meshal's rights under the TVPA by subjecting him to psychological torture.

The Defendants' arguments for dismissal should be rejected. First, *Bivens* special factors do not counsel hesitation against a damages remedy. While Defendants' violations of Meshal's constitutional rights may have occurred abroad and, to some extent, may have involved foreign officials, they represent precisely the type of government misconduct that federal courts have remedied through *Bivens*. Second, Claims I-III should not be dismissed on qualified immunity grounds here, where multiple corroborating allegations establish the Defendants' direct role in Meshal's prolonged detention and rendition and Doe Defendant 1's ("Doe 1") personal participation in his coercive interrogation.[1] Third, Claims I-III also withstand dismissal on qualified immunity grounds because U.S. officials are not relieved of their obligation to obey the Constitution when they act against U.S. citizens abroad. Clearly established law protected Meshal from violation of the Fourth and Fifth Amendment rights that he asserts. Finally, Meshal's TVPA claim also survives qualified immunity because the two known Defendants acted under color of foreign law, subjected him to threats of torture, and were on notice that their conduct was subject to the statute.

## BACKGROUND

Amir Meshal is a U.S. citizen and practicing Muslim who was born and raised in New Jersey.[2] AC ¶ 1. In November 2006, Meshal traveled to Mogadishu, Somalia to experience living in a country governed by Islamic law and to deepen his understanding of Islam. *Id.* At that time, peace and security had come to Mogadishu after years of instability. *Id.* ¶ 21. Approximately one month after Meshal's arrival, however, fighting erupted between rival governments. *Id.* ¶ 34. Fearing for

---

[1] Meshal withdraws his coercive interrogation claim against Doe Defendant 2.
[2] At the motion to dismiss stage, the facts alleged in the Amended Complaint are taken as true and all inferences are drawn in favor of the non-moving party. *See City of Harper Woods Employees' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).

his safety and unable to leave Somalia by plane, Meshal joined thousands of civilians who fled south to Kenya.  *Id.* ¶¶ 36-38.  Around this time, U.S. officials set out to intercept individuals entering Kenya in an attempt to capture al Qaeda members.  *Id.* ¶¶ 37, 40-41, 44.

On or around January 24, 2007, Meshal was apprehended by Kenyan soldiers.  *Id.* ¶ 46.  He was transported to Nairobi, where an officer of Kenya's Criminal Investigation Department ("CID") told Meshal that he had to find out what the United States wanted to do with him.  *Id.* ¶¶ 50-52.

On or around February 3, 2007, the CID officer escorted Meshal to three Americans, who identified themselves as "Steve," "Chris," and "Tim," but refused to provide their true full names or titles.  *Id.* ¶ 58.  "Steve" is Defendant FBI Supervising Special Agent Steve Hersem ("Hersem") and "Chris" is Defendant FBI Supervising Special Agent Chris Higgenbotham ("Higgenbotham").  *Id.* ¶¶ 59, 61.  "Tim" is Doe 1.  *Id.* ¶ 63.[3]  During the following week, Hersem, Higgenbotham and Doe 1 coercively interrogated Meshal at least four times.  *Id.* ¶ 69.  Each interrogation session lasted a full day and took place in a building controlled by the FBI.  *Id.* ¶¶ 69-70.  After each session, the agents returned Meshal to his detention site.  *Id.* ¶¶ 82, 90.

During the first interrogation, Hersem told Meshal that he would not be able to go home unless his story matched that of Daniel Maldonado, a U.S. citizen who had recently been seized by Kenyan soldiers and interviewed by Hersem and Higgenbotham.  *Id.* ¶¶ 65-66.  Doe 1 presented Meshal with a document and asked him to sign it, telling him that it notified him that he could refuse to answer any questions without a lawyer present.  *Id.* ¶ 71.  But when Meshal asked for an attorney, Doe 1 told him that he was not permitted to make any phone calls.  *Id.*  Meshal asked if he had a choice not to sign the document because he could not contact an attorney.  *Id.*  Higgenbotham responded, "If you want to go home, this will help you get there," and told Meshal that he was being held in "a lawless country" without any right to legal representation.  *Id.*  Believing that he had no

---

[3] The true name of Doe 1 has been filed with the Court under seal.

choice and hoping that it would expedite his safe return home, Meshal signed the document.  *Id.*
The Kenyan CID Officer who was present at the interrogation did not ask Meshal any questions and
left for several hours.  *Id.* ¶ 76.

   During their interrogations of Meshal, Doe 1, Hersem and Higgenbotham threatened Meshal
with torture and to make him disappear if he did not admit to being connected to, and receiving
training from, al Qaeda.  *Id.* ¶¶ 84, 86-88.  Higgenbotham told Meshal that the agents "had ways of
getting the information they want" and threatened to render Meshal to Israel, where the Israelis
would "make him disappear."  *Id.* ¶ 86.  Hersem told Meshal that Egyptian authorities were very
interested in speaking with Meshal and "had ways of making [him] talk."  *Id.* ¶ 88.  Hersem told
Meshal that he could make the same things happen to him that happened to the protagonist of
"Midnight Express"—a movie about a man tortured in prison—if he did not admit to having a
connection with al Qaeda.  *Id.*  Hersem also told Meshal, "You made it so that even your grandkids
are going to be affected by what you did."  *Id.*  Hersem threatened to send Meshal back to Somalia if
he refused to answer questions.  *Id.* ¶ 87.  Higgenbotham and Doe 1 made similar threats on other
occasions.  *Id.*

   Members of the Muslim Human Rights Forum ("MHRF"), a Kenyan human rights
organization, went to the facility where Meshal was detained several times between February 5 and
9, 2007.  *Id.* ¶ 93.  MHRF learned from Kenyan police that the FBI was in charge of the detention of
Meshal and other detainees who were seized fleeing Somalia and were being held without charge.
*Id.* ¶ 96.  MHRF filed habeas corpus petitions in Kenyan court on behalf of detainees, asserting that
their confinement was illegal under Kenyan law and demanding immediate relief.  *Id.* ¶ 100.

   MHRF last visited Meshal on February 9, 2007, just days after Kenyan courts began hearing
the habeas petitions and as at least one court was preparing to grant those petitions.  *Id.* ¶¶ 93, 108.

That day, Kenyan officials removed Meshal from the jail, handcuffed him, and placed a black hood over his head.  *Id*. ¶¶ 108-09.  They flew him and twelve others to Somalia—just as the agents had threatened would happen if Meshal did not confess a connection to al Qaeda.  *Id.* ¶¶ 87, 109-111.  There, Meshal was detained in handcuffs in an underground room referred to as "the cave."  *Id.* ¶¶ 111-112.  Following Meshal's rendition, Kenyan authorities presented a passenger manifest to the court considering the MHRF habeas petitions, which showed that Meshal and other detainees had been flown to Somalia.  *Id*. ¶ 114.  The court dismissed the petitions for want of jurisdiction.  *Id.*

Several days later, Meshal was handed over to individuals wearing Ethiopian military uniforms.  *Id.* ¶ 116.  On or around February 16, 2007, Meshal was transported by plane to Addis Ababa, Ethiopia, and driven to a military barracks where he was detained with others who had been rendered from Kenya to Somalia and Ethiopia.  *Id.* ¶¶ 117-119, 130-137, 166.

After a week of incommunicado detention, and continuing over the next three months, Meshal was regularly transported from a prison near Addis Ababa to a villa for interrogation by Doe 1, who had interrogated him in Kenya, and Doe Defendant 2 ("Doe 2"), a U.S. official who introduced himself as "Dennis."  *Id.* ¶¶ 140-141, 144-145.[4]  Apart from a brief initial interrogation upon his arrival, Meshal was never questioned by Ethiopian officials.  *Id.* ¶¶ 132-133.  A senior Western government official based in Kenya stated publicly, "[T]hey've concealed their role, but you can assume the Americans were behind all these renditions.  By sending prisoners to Ethiopia, they had a convenient place to interrogate people."  *Id.* ¶ 122.  A U.S. human rights group that extensively investigated the events found that the United States, at a minimum, was "complicit" in the rendering of detainees from Kenya to Somalia and Ethiopia.  *Id.*

Doe 1 led all but one of the interrogations of Meshal in Ethiopia.  *Id.* ¶¶ 146, 149.  He was joined at times by Doe 2, who led the final interrogation.  *Id.* ¶ 146.  Each time, Doe 1 made Meshal

---

[4] The true name of Doe 2 has been filed with the Court under seal.

believe that he and other FBI agents would determine whether Meshal could go home. *Id.* ¶ 149. Does 1 and 2 refused Meshal's repeated requests to speak with a lawyer. *Id.* ¶ 152. Does 1 and 2, Higgenbotham and Hersem intentionally prolonged Meshal's detention in Ethiopia so that they could further interrogate him without affording him constitutional protections. *Id.* ¶ 164.

No charges were ever filed against Meshal in Ethiopia. *Id.* ¶¶ 155, 160, 162. On three occasions, he was taken for closed proceedings before a military tribunal. *Id.* After the first proceeding, Doe 1 pressed Meshal to admit that he was connected to al Qaeda and told Meshal that he would not be allowed to go home unless he told Doe 1 what he wanted to hear. *Id.* ¶ 156.

Although FBI agents had been regularly interrogating Meshal in Ethiopia for more than three months, U.S. consular officials did not gain access to Meshal until on or about March 21, 2007, after McClatchy Newspapers first reported that he was being held at a secret location in Ethiopia and the fact of his detention became public knowledge.[5] *Id.* ¶ 157. On or around May 24, 2007, Meshal was taken to the U.S. Embassy in Addis Ababa and flown to the United States. *Id.* ¶ 166.

## ARGUMENT

### I.  Meshal Properly Seeks Redress Under *Bivens*.

This case, like *Bivens*, involves claims against federal law enforcement officials for serious misconduct against a U.S. citizen resulting in the deprivation of constitutional rights. *Bivens*, 403 U.S. 388; *Sullivan v. Murphy*, 478 F.2d 938, 962-963 (D.C. Cir. 1973). Defendants argue that this case would extend *Bivens* to a new "context." Motion to Dismiss Plaintiff's Amended Complaint ("MTD") at 11. But they do not deny that at least some of the Fourth and Fifth Amendment violations alleged here—including detention without presentment and due process, and the use of torture and other coercion during interrogations—would give rise to a *Bivens* remedy if committed in the United States. Their argument thus hinges on the fact that the violations occurred outside the

---

[5] *See American's Rendition to an Ethiopian Prison Raises New Questions*, McClatchy Newspapers, Mar. 16, 2007.

United States and involved the cooperation of foreign officials. But this does not make the "context" new in any material respect. First, U.S. officials are not relieved of the obligation to obey the Constitution when they act against U.S. citizens abroad. Second, Meshal's claims of torture and other mistreatment by Defendants during more than thirty interrogations, AC ¶ 3, do not challenge conduct by foreign officials. Third, Defendants should not be permitted to use the fig-leaf of foreign custody to conceal their responsibility for their own acts. Finally, U.S. officials have long been liable under *Bivens* for violations of the Fourth and Fifth Amendment rights of U.S. citizens. *See, e.g.*, *Bivens*, 403 U.S. at 389 (Fourth Amendment); *Davis v. Passman*, 442 U.S. 228, 249 (1979) (Fifth Amendment due process); *Bartel v. Fed. Aviation Admin.*, 725 F.2d 1403, 1414-15 & n.20 (D.C. Cir. 1984) (Fifth Amendment procedural due process). In short, while the Defendants' acts may have occurred abroad and, to some extent, may have involved foreign officials, they are precisely the type of government misconduct courts have remedied through *Bivens*.

This Court should uphold a *Bivens* remedy even if it finds that the context is new in some respects. The Supreme Court has "not remove[d] the availability of a *Bivens* remedy to federal courts tasked with adjudicating distinct constitutional violations," *Vance v. Rumsfeld*, 694 F. Supp. 2d 957, 973 (N.D. Ill. 2010), *appeal docketed*, No. 10-1687 (7th Cir. Mar. 22, 2010). Rather, the provision of a *Bivens* remedy ultimately is "a subject of judgment," in which judges weigh *Bivens'* purposes against any congressional directives or other special factors counseling hesitation. *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). Here, the balance strongly favors a *Bivens* remedy.

*Bivens* serves two purposes. First, it deters unconstitutional conduct by federal officials. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001) ("*Bivens* from its inception has been based . . . on the deterrence of individual officers who commit unconstitutional acts"); *Carlson v. Green*, 446 U.S. 14, 21 (1980). Second, *Bivens* "provide[s] a cause of action for a plaintiff who lack[s] *any*

*alternative remedy* for harms caused by an individual officer's unconstitutional conduct." *Id.* at 70 (emphasis in original). As Justice Harlan explained in his *Bivens* concurrence, "the judiciary has a particular responsibility to assure the vindication of constitutional interests" even absent express congressional authorization of judicial relief. *Bivens*, 403 U.S. at 407; *see also Passman*, 442 U.S. at 242. The existence of alternative remedies has thus played a key role in decisions denying *Bivens* remedies. *See Wilkie*, 551 U.S. at 550-54; *Malesko*, 534 U.S. at 72; *see also Wilson v. Libby*, 535 F.3d 697, 709-10 (D.C. Cir. 2008).

Both purposes support a *Bivens* remedy here. *Bivens* provides a critical deterrent against federal officials' subjecting U.S. citizens to abusive interrogation practices, arbitrary detention, and illegal rendition. *Bivens* also is the *only* available remedy.[6] Without it, Meshal has no recourse and the judiciary will be powerless to vindicate the constitutional rights of a U.S. citizen against illegal detention and mistreatment by officials of his own government. Here, as in *Bivens*, it is "damages or nothing." 403 U.S. at 410 (Harlan, J., concurring).[7]

Defendants seek a sweeping "national security" exemption for violations of an American citizen's Fourth and Fifth Amendment rights under the guise of "special factors counseling hesitation." They ask this Court to deny a *Bivens* remedy for violations occurring in an extraterritorial national security investigation in which the United States worked with foreign officials. MTD at 11. But the label "national security" does not automatically shield government officials from *Bivens* suits seeking to hold them accountable for constitutional violations. *See Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985) (holding that the Attorney General does not have

---

[6] Meshal has also invoked the TVPA against Higgenbotham and Hersem. But even if Meshal has a remedy under the TVPA (which the government disputes, MTD at 38-45), that remedy is confined to a limited category of illegal conduct by two of the defendants and does not provide any remedy for the other abuses Meshal endured during interrogations, his rendition, or his four-month-long detention without due process.

[7] Under Defendants' reasoning, a U.S. citizen who goes to the U.S. Embassy in Paris to report a lost passport could be thrown in the dungeon, held incommunicado for three years and beaten daily, and would have no cause of action for damages against any person or entity.

absolute immunity from *Bivens* claims with respect to actions taken to further national security).[8] Nor can U.S. officials evade responsibility for violating a U.S. citizen's constitutional rights by orchestrating their conduct through, or hiding behind, foreign officials.  No "special factors" counsel hesitation, and Defendants' arguments to the contrary should be rejected.

**1.**  Defendants argue that matters touching upon intelligence operations and national security are exclusively the province of the executive and that courts should not intrude absent specific direction from Congress, because of two considerations: "the constitutional separation of powers among the branches of government" and "the limited institutional experience of the judiciary in the area of national security." MTD at 12-13.  Both considerations are specious.  Moreover, Defendants ignore the import of recent Supreme Court decisions affirming a meaningful judicial role in the detention and treatment of individuals by U.S. officials, even in matters affecting national security and where the U.S. acts outside its borders.

As a threshold matter, Defendants mischaracterize the nature of this action.  This is *not* "a constitutional challenge to the extraterritorial national security operations of the Executive Branch." *Id.* at 8.  Meshal does not challenge the United States' counter-terrorism operations in the Horn of Africa, nor its cooperation with other governments in carrying out those operations.  Rather, this suit concerns only the *manner* in which four federal law enforcement officers treated a U.S. citizen.  It challenges their personal roles in, and responsibility for, Meshal's detention without due process, unlawful rendition, coercive interrogation, and other mistreatment.  Recognizing a judicial remedy here would not prevent the government from carrying out counter-terrorism operations in the Horn of Africa or anywhere else.  It would require only that U.S. officials abide by the Constitution in

---

[8] *See also Vance*, 694 F. Supp. 2d at 972-75 (rejecting argument that "special factors" precluded *Bivens* action by a U.S. citizen detained and interrogated in an active warzone); *Padilla v. Yoo*, 633 F. Supp. 2d 1005, 1028-30 (N.D. Cal. 2009) (rejecting national security and foreign affairs as special factors precluding *Bivens* action by a U.S. citizen detained by the military), *appeal pending*, No. 09-16478 (9th Cir.).

their treatment of U.S. citizens during the course of those operations, just as they must when conducting such operations in the United States.

The constitutional separation of powers underscores the judiciary's importance in vindicating the rights of a U.S. citizen against unlawful detention and mistreatment even—indeed *especially*—in matters affecting national security, where individual freedoms may more readily be sacrificed. In *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), eight Supreme Court justices rejected the government's argument that the federal courts had no role in protecting the constitutional rights of a U.S. citizen. *Id*. at 537 (plurality opinion); *id*. at 541 (Souter, J., concurring); *id*. at 562-64 (Scalia, J., dissenting). As Justice O'Connor cautioned in her plurality opinion, even "a state of war is not a blank check . . . when it comes to the rights of the Nation's citizens." *Id*. at 536. The Court thus ensured a meaningful judicial role in vindicating the due process rights of a U.S. citizen despite the fact that he had allegedly been captured on a battlefield while fighting alongside enemy forces against the United States and its allies. *Id*. at 535 ("[W]e necessarily reject the Government's assertion that separation of powers principles mandate a heavily circumscribed role for the courts.").

More recently, in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), the Court upheld the constitutional right of foreign nationals detained at Guantánamo Bay to habeas corpus, invalidating the provisions of a federal statute seeking to deprive them of that right. *Boumediene* acknowledged the security concerns confronting the executive in fighting terrorism. *Id*. at 2276-77. The Court nonetheless rejected the government's argument that the judiciary could not enforce constitutional protections of individual liberty. So important was the judiciary's place in the separation of powers that the Supreme Court upheld the right of non-citizen detainees to a prompt judicial hearing over the objection of both the executive and Congress, which had enacted legislation stripping judges of their habeas corpus jurisdiction. *Boumediene*, 128 S. Ct. at 2274. Separation of powers necessarily

supports a judicial remedy here: not only does this case concern the rights of a U.S. citizen, but the executive alone seeks to oust the judiciary from its duty of vindicating constitutional guarantees.

Defendants rely heavily on the fact that Meshal was detained in foreign countries and that they were communicating or working with foreign government officials. But, as noted above, Meshal's claims of torture and other abuse during interrogations do not challenge the conduct of foreign officials. As to his other claims, U.S. officials cannot avoid accountability for violating the constitutional rights of U.S. citizens by directing or colluding with foreign actors or hiding behind the fig-leaf of a foreign custodian. *See Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1542-43 (D.C. Cir. 1984) (en banc) ("[T]eaming up with foreign agents cannot exculpate officials of the United States from liability to United States citizens for the *United States* officials' unlawful acts." (emphasis in original)), *rev'd on other grounds*, 471 U.S. 1113 (1985). Indeed, accepting the Defendants' argument would encourage practices that conceal the United States' role in illegal detention and other unconstitutional practices. *Cf. Hamdi*, 542 U.S. at 524 (plurality opinion) (conditioning jurisdiction on where a U.S. citizen is detained would create "a perverse incentive" for the government to evade constitutional protections by manipulating the locus of detention).

It was precisely this concern about U.S. officials' circumventing the Constitution that caused Judge Bates to deny the government's motion to dismiss a habeas petition filed by a U.S. citizen detained in a Saudi prison where that citizen alleged he was in constructive U.S. custody. *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28 (D.D.C. 2004) (denying government's motion to dismiss and ordering jurisdictional discovery). The government vigorously argued that judicial involvement would interfere with the executive's national security and foreign affairs powers. But, Judge Bates

11

explained, the executive cannot strip an American citizen of fundamental constitutional rights "merely by choosing where he will be detained or who will detain him." *Id.* at 40.[9]

*Hamdi*, *Boumediene*, and *Abu Ali* involved habeas petitions, not *Bivens* claims. But if anything, habeas is more disruptive of executive affairs and intelligence operations than a retrospective damages action: it demands that the executive do something now that it does not wish to do, rather than declaring later that what was done was wrong.

Further, there is no indication that Congress believes U.S. citizens treated like Meshal cannot seek redress in the courts of their own country. If anything, Congress's actions support a *Bivens* remedy here. Congress has criminalized torture, 18 U.S.C. § 2340, and the President has signed and the Senate ratified the Convention Against Torture, art. 2, cl. 2, Dec. 10, 1984, 1465 U.N.T.S. 85, under which "[n]o exceptional circumstances whatsoever, whether a state of war or a threat of war . . . may be invoked as justification of torture." [10] Congress also has expressly prohibited other cruel, inhuman, and degrading treatment—abuse less severe than torture—by any U.S. official regardless of where it occurs. *See* Detainee Treatment Act of 2005, 28 U.S.C. § 2241. Moreover, Congress has twice legislated to limit civil actions for non-citizens designated by the executive as "Alien Enemy Combatants," but has never questioned their availability for U.S. citizens. *See* Military Commissions Act of 2006, Pub. L. No. 109-366, §7(a)(2),120 Stat. 2600, 2635-36 (2006); Detainee Treatment Act of 2005, Pub. L. No. 109-148, § 1005(e)(2), 119 Stat. 2740, 2741-42 (2005). To the contrary, these enactments show that Congress presumed that *Bivens* would remain available

---

[9] It is telling that the Defendants do not invoke the "act of state" doctrine, which "precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964). It underscores that Meshal does not challenge the public acts of any foreign government, but rather the unconstitutional conduct of U.S. officials.

[10] The State Department, moreover, has repeatedly taken the position before the world community that *Bivens* is a remedy available to torture victims. *See* United States Written Response to Questions Asked by the United Nations Committee Against Torture, ¶ 5 (bullet-point 5) (Apr. 28, 2006), *available at* http://www.state.gov/g/drl/rls/68554.htm; United States Report to the United Nations Committee Against Torture, ¶¶ 51 (bullet-point 5), 274, U.N. Doc. CAT/C/28/Add5 (Feb. 9, 2000), *available at* http://www. state.gov/documents/organization/100296.pdf.

to U.S. citizens to remedy constitutional violations by U.S. officials.  *See Abuelhawa v. United States*, 129 S. Ct. 2102, 2106 (2009) ("[W]e presume legislatures act with case law in mind.).

**2.**  Defendants' argument about "the limited institutional experience of the judiciary in the area[] of national security," MTD at 13-16, is equally without merit.  Over three decades ago, the Supreme Court rejected the suggestion that national security matters are "too subtle and complex for judicial evaluation."  *United States v. U.S. Dist. Ct. for the E. Dist. of Mich.*, 407 U.S. 297, 320 (1972).[11]  And the Court recently emphasized that federal judges will use their "expertise and competence" to fashion solutions to such matters as they arise.  *Boumediene*, 128 S. Ct. at 2276.

In addition to the Supreme Court's recent decisions in *Hamdi*, *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), and *Boumediene*, lower federal courts have considered challenges to government counter-terrorism policies and have demonstrated competence to resolve lawsuits implicating sensitive national security considerations.  *See, e.g.*, *John Doe, Inc. v. Mukasey*, 549 F.3d 861 (2d. Cir. 2008) (National Security Letter statutes' gag order provisions); *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008) ("enemy combatant" determination); *United States v. Moussaoui*, 365 F.3d 292 (4th Cir. 2004) (testimony of "enemy combatant" witnesses); *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) (closure of "special interest" deportation hearings on national security grounds).[12]  These examples are instructive: had the government's view of the judiciary's limited institutional competence and experience prevailed in these cases—all of which involved national security issues every bit as sensitive as any presented here—important constitutional issues might

---

[11] *See also Zweibon v. Mitchell*, 516 F.2d 594, 641-42 (D.C. Cir. 1975) (en banc) ("[W]e do not believe federal judges will be insensitive to or uncomprehending of the issues involved in foreign security cases . . . .") (internal quotation marks omitted).

[12] *See also In re Nat'l Sec. Agency Telecomm. Records Litig.*, 700 F. Supp. 2d 1182 (N.D. Cal. 2010) (National Security Agency's Terrorist Surveillance Program); *ACLU v. Dep't of Def.*, 389 F. Supp. 2d 547 (S.D.N.Y. 2005) (disclosure of information about treatment of detainees in Iraq, Afghanistan, and Guantánamo Bay); *Doe v. Ashcroft*, 334 F. Supp. 2d 471 (S.D.N.Y. 2004) (National Security Letter statute), *vacated in part*, *Doe v. Gonzales*, 449 F.3d 415 (2d Cir. 2006).

never have been decided and the courts would have been wrongly ousted from fulfilling their separation of powers role.[13]

Although Defendants further argue that the Court will have to inquire into the U.S. government's cooperation and communications with foreign governments, Meshal's Fifth Amendment challenge to abusive interrogations by Defendant FBI agents does not involve any such actions or communications.  It challenges only U.S. action and requires an inquiry only into conduct by U.S. officials against a U.S. citizen.  Meshal's illegal detention and rendition claims under the Fourth and Fifth Amendments also challenge only U.S. action.  These claims, to be sure, may require some inquiry into the Defendants' relationship and communications with foreign officials. But that is an inquiry that federal courts unquestionably have the competence and "institutional experience" to conduct.

As Judge Bates noted in rejecting the same separation of powers argument in *Abu Ali*, a judicial "determination of the relative involvement of the United States and [a foreign government] in the detention of a United States citizen . . . is precisely the inquiry that federal courts conduct in any criminal case where a defendant alleges that evidence . . . was obtained by foreign governments at the behest of the United States in violation of his constitutional rights."  350 F. Supp. 2d at 62-63. Thus, in determining whether to provide a remedy for constitutional violations committed in a foreign country, courts routinely inquire into the relationships, cooperation, and communications between the United States and foreign governments and officials.  *See, e.g.*, *United States v. Abu Ali*, 528 F.3d 210, 226-30 (4th Cir. 2008) (investigating "working arrangement" and "improper collaboration" between Saudi and U.S. law enforcement and whether U.S. officials "actively" and "substantially" participated in foreign interrogation); *United States v. Yousef*, 327 F.3d 56, 123 (2d

---

[13] Congress, moreover, has repeatedly contemplated an active role for federal courts in policing the limits of the government's authority even where national security is implicated.  *See, e.g.*, *Ray v. Turner*, 587 F.2d 1187, 1191-95 (D.C. Cir. 1978) (per curiam) (reviewing government classification determinations under Freedom of Information Act).

Cir. 2003) (noting district court assessment of whether the U.S. "participated in or condoned [the defendant's] incarceration in the Philippines and the alleged torture that occurred there" in suppression context).[14]  Experience shows that those inquiries will proceed with due caution and care.  *See Abu Ali*, 350 F. Supp. 2d at 64.

Courts conduct similar examinations in criminal cases where a defendant alleges that the court lacks jurisdiction because he was brought into its jurisdiction through abduction or torture, often allegedly by foreign officials at the direction of U.S. officials.  *See, e.g.*, *United States v. Toscanino*, 500 F.2d 267, 281 (2d Cir. 1974), *limited on other grounds*, *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 167 (2d Cir. 2008); *see also Abu Ali*, 350 F. Supp. 2d at 63 & n.34 (citing cases).  They also conduct similar inquiries in civil cases where a U.S. citizen overseas challenges the joint involvement of U.S. and foreign officials in a continuing violation of the citizen's constitutional rights that falls short of outright detention.  *See Abu Ali*, 350 F. Supp. 2d at 63 & n.35 (citing *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 147 (D.D.C. 1976)).

None of the cases on which Defendants rely supports its position here.  *Arar v. Ashcroft*, 585 F.3d 559 (2d Cir. 2009) (en banc), *cert. denied*, 130 S. Ct. 3409 (2010), was a suit by a non-citizen against senior officials for their implementation of a U.S. government policy and was driven by a concern about "'foreign citizens' using the [federal] courts . . . to obstruct the foreign policy of our government." 585 F.3d at 575-76 (quoting *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985)).[15]  In *Wilson v. Libby*, not only had Congress enacted a "comprehensive remedial scheme," *supra*, but the action there challenged the disclosure of CIA operations and covert operatives, not the conduct of individual federal law enforcement officials.  *See* 535 F.3d at 710-11

---

[14] *See also United States v. Karake*, 281 F. Supp. 2d 302, 309 (D.D.C. 2003) (finding defendants "entitled to evidence [of] cooperation between the United States and Rwandan governments sufficient to reveal an agency relationship").
[15] *Sanchez-Espinoza*, on which the government also relies, was likewise a suit by non-citizens, challenging U.S. foreign policy of providing support to forces to overthrow the Nicaraguan government.  770 F.2d at 205-06.

(noting unique concerns surrounding covert CIA agents). *Department of Navy v. Egan*, 484 U.S. 518 (1988), involved the discretionary denial of a security clearance and did not adjudicate any constitutional right. *Chappell v. Wallace*, 462 U.S. 296 (1983), and *United States v. Stanley*, 483 U.S. 669 (1987), involved the distinct context of challenges by U.S. service members for "injuries . . . incident to [military] service," *Stanley*, 483 U.S. at 684 (internal quotation marks omitted), and were motivated by "the unique disciplinary structure of the military establishment," *Chappell*, 462 U.S. at 304. Service members, moreover, can access an alternative remedial system. *Schweiker v. Chilicky*, 487 U.S. 412, 436 (1988).

**3.** Defendants' final "special factor" argument—that the Court may have to consider information that cannot be introduced into the public record, MTD at 16-17—fares no better.

Courts in the United States are presumed to be open, *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573 (1980), and routinely hear a wide range of cases on the basis of partially or totally sealed records, including cases implicating national security or diplomatic concerns, *see, e.g.*, *In re Terrorist Bombings*, 552 F.3d 157; *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1213-14 (D.C. Cir. 1993). Courts in this district now regularly adjudicate cases in the Guantánamo detainee habeas corpus litigation that involve information that cannot be introduced in the public record and, during the course of that litigation, determine what information can be made public. *See In re Guantánamo Bay Detainee Litig.*, 630 F. Supp. 2d 1 (D.D.C. 2009); *In re Guantánamo Bay Detainee Litig.*, 624 F. Supp. 2d 27 (D.D.C. 2009).

It may be that Defendants can overcome the presumption of openness with respect to some aspects of this case. But their suggestion that the entire action should therefore be dismissed is nonsensical. It ignores how courts regularly operate by sealing records, would allow the executive to eliminate judicial involvement merely by raising the specter of sensitive or classified information,

and would shield the entire course of alleged government misconduct from the public through the drastic measure of dismissal when more narrowly tailored tools are readily available.[16]

## II.    Meshal's Constitutional Claims Should Not Be Dismissed.

Defendants' qualified immunity claims should be denied.  *See* MTD at 18-38.  First, Meshal has demonstrated Fourth and Fifth Amendment rights violations by more than adequately alleging the personal involvement of all four Defendants in his prolonged detention and unlawful rendition and of Doe 1 in his coercive interrogation.[17]  Second, clearly established law protected Meshal from the Fourth and Fifth Amendment violations that he asserts.  Finally, Defendants Hersem and Higgenbotham do not merit qualified immunity on Meshal's TVPA claim because they acted under color of foreign law, subjected him to torturous threats, and were on notice that their conduct was subject to the statute.

### A.   The Complaint Adequately Alleges the Personal Involvement of Each Defendant.

Liability under *Bivens* is limited to those "directly responsible" for such violations.  *Malesko*, 534 U.S. at 69-71.  A complaint must provide "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), which is accomplished "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  The plausibility standard is not, however, a "probability requirement," *id.* at 1949; a plaintiff need only plead "enough fact to raise a reasonable expectation that discovery will reveal evidence." *Twombly*, 550 U.S. at 556.

---

[16] The government references the "state secrets" privilege.  MTD at 16 n.11.  But the potential availability of the privilege undermines the government's *Bivens* "special factors" argument because, when properly applied, it gives courts an additional tool to prevent the disclosure of information, the release of which would harm national security, without dismissing the action.  *See United States v. Reynolds*, 345 U.S. 1 (1953).

[17] Although Defendants frame this request for dismissal as one based on qualified immunity for lack of showing a constitutional violation, MTD at 31-34, the request really seeks dismissal for failure to state a claim for lack of showing a defendant's personal involvement.  *See, e.g., Vance*, 694 F. Supp. 2d at 962-65.

**1.   All of the Defendants Were Personally Involved in Directing and/or Actively Participated in Meshal's Prolonged Detention and Unlawful Rendition.**

Meshal has pleaded multiple corroborating facts that establish the Defendants' direct role in his prolonged and near-incommunicado detention and unlawful rendition.  He alleges that after his initial apprehension by the Kenyans, the Defendants—FBI officers engaged in a law enforcement operation in Kenya—sought to interrogate him for purposes of eliciting information and a confession of a connection to al Qaeda in order to prosecute him in the United States.  AC ¶¶ 56, 69, 84-88.  Detailed factual allegations support the inference that each of the Defendants was personally involved in detaining Meshal for this purpose.  The Kenyans never pressed charges against him, *id.* ¶ 90, and Kenyan police officers informed a local human rights organization that the FBI was in charge of his detention, *id.* ¶ 96.  Kenyan authorities told Meshal that they were waiting to "find out what the United States wanted to do with him."  *Id.* ¶ 52.  On at least four occasions, Doe 1, Defendant Higgenbotham and Defendant Hersem extensively interrogated him, *id.* ¶¶ 69, 86-88, employed coercive interrogation techniques in an effort to secure a confession, *id.* ¶¶ 71-72, 83-84, 86-88, arranged for him to be moved to a prison closer to their villa to facilitate their interrogation, and physically transported him there, *id.* ¶ 79.  During interrogations, the Defendants told Meshal that they controlled whether he would remain detained in Kenya and where he would be sent if permitted to leave or forcibly transferred.  *Id.* ¶¶ 87-88.  They told him that waiving his right to counsel prior to interrogation would help him get home, that he would be able to return to the U.S. if he confessed or provided information, and that he would be sent elsewhere—to Egypt, Somalia, or Israel—if he did not.  *Id.* ¶¶ 71, 86-88.[18]  Hersem promised Meshal that he could go home if he confessed a connection to al Qaeda, but he would not be allowed to return unless his story matched

---

[18] In contrast, during Meshal's interrogation by FBI agents, Kenyan officials neither asked questions nor took notes, and on one occasion, left the room altogether for an extended period of time, *id.* ¶¶ 76, 78.

that of another U.S. citizen who had confessed to an al-Qaeda connection, admitted facts permitting him to be charged, and then was brought back to the United States. *Id.* ¶¶ 65-68, 87, 120-21.

The Defendants were also personally involved in Meshal's prolonged and near-incommunicado detention in Ethiopia. While Ethiopian authorities never charged Meshal and only once questioned him for about ten minutes during the more than three months that he was detained, *id.* ¶ 133, Doe 1 traveled from Kenya to Ethiopia to interrogate him numerous times with Doe 2, *id.* ¶¶ 144, 147-48. Doe 1 told Meshal that Meshal had been sent to Ethiopia because Doe 1 "and his fellow FBI agents thought Meshal wasn't 'being truthful' with them in Kenya," that Meshal would be able to return to the United States if he told them "what they wanted to hear," and that Meshal's "truthfulness would determine whether he could ever go home." *Id.* ¶¶ 148, 156. Doe 2 participated in the interrogations during which these statements were made and led the final interrogation of Meshal. *Id.* ¶¶ 148-50, 163. The U.S. ambassador to Ethiopia, moreover, admitted to Meshal's father that the Ethiopian military tribunal proceedings would not impact whether or when Meshal was to be returned home. *Id.* ¶ 161.[19]

Together, these factual allegations strongly support the inference that the Defendants directed or were otherwise responsible for Meshal's detention in Kenya following their discovery of his presence there, *id.* ¶ 56, so that they could interrogate him for information or for a confession to use in criminal prosecution. They also support the inference that because Meshal did not confess, the Defendants directed or were otherwise actively involved in causing his detention in Somalia and his

---

[19] The allegations showing Defendants' personal involvement in Meshal's detention in Ethiopia are corroborated by the following facts: While Meshal was brought before a military tribunal, the tribunal never issued a determination. AC ¶¶ 155, 160, 162. Media outlets and NGO reports confirmed that Addis Ababa, "swarmed with U.S. intelligence officers during the processing of the detainees," *id.* ¶ 137, that the Ethiopian government was used as the detaining authority for persons of interest to the United States, *id.* ¶ 136, and that the moment U.S. officials lost interest in a detainee, he was released from custody, *id.* ¶ 138. Furthermore, a Western diplomat told U.S. press that he saw the "United States as playing a guiding role" in the detentions. *Id.* ¶ 137. Indeed, these facts support the inference that Defendants held Meshal in proxy detention (i.e. constructive custody) or that, at a minimum, they colluded with foreign authorities in keeping him detained.

prolonged detention in Ethiopia for further coercive interrogations. *Id.* ¶¶ 123, 164. Whether Defendants detained Meshal by proxy through foreign agents, thereby holding him in constructive U.S. custody, or participated in a joint venture with foreign authorities to detain him, they were each intimately involved in ensuring that he was subject to detention for approximately four months.

All of these facts also support the inference that the Defendants directed or actively participated in Meshal's unlawful rendition—the method by which they secured him for further interrogation free from constitutional guarantees. *Id.* ¶ 123. In further support, the Amended Complaint alleges that Hersem, Higgenbotham and Doe 1 threatened Meshal with rendition to Somalia if he did not confess a connection to al Qaeda. *Id.* ¶ 87. Meshal did not confess, and this threat was realized. While Ethiopian authorities expressed no interest in Meshal, *id.* ¶¶ 133, 155, Doe 1 followed him to Ethiopia and once there, said that Meshal was sent to Ethiopia for not telling the truth to the FBI. *Id.* ¶¶ 148, 149, 156. Furthermore, the Defendants also knew, or reasonably should have known, that Ethiopia was more permissive of detention without charge than Kenya. *Id.* ¶¶ 125-28. Meshal was rendered just days after Kenyan courts began hearing the habeas petitions filed by MHRF on behalf of detainees contesting the legality of their confinement and as at least one court was preparing to grant those petitions. *Id.* ¶ 108. After the rendition, Doe 1 continued to use interrogations in Ethiopia to pressure Meshal for a confession. *Id.* ¶¶ 148-150, 156.

Meshal has provided as much factual support for Defendants' personal involvement in his prolonged detention and unlawful rendition as a person held in near-incommunicado detention on foreign soil could reasonably be expected to offer. *See Nattah v. Bush*, 605 F.3d 1052, 1058 (D.C. Cir. 2010) (rejecting contention that plaintiff must "plead every conceivable fact or face dismissal of his claim"). He clearly meets the standards set forth in *Iqbal*. Whereas the plaintiff in *Iqbal* did not offer sufficient factual allegations as to discriminatory intent—an element of his claim—and there

was an "obvious alternative explanation" for the alleged violations, 129 S. Ct. at 1952, here there is

no "obvious alternative explanation" for Defendants' conduct.  In suggesting that Meshal's

allegations might at most "establish that the Defendants were allowed to question him," MTD at 33,

Defendants ignore the Amended Complaint's detailed descriptions of Defendants' statements and

behavior, and reports by government officials, news organizations, and human rights groups that

U.S. officials controlled the detention in Kenya of individuals who had been seized fleeing Somalia

and the detention and interrogation in Ethiopia of individuals rendered from Kenya and Somalia.

*See* AC ¶¶ 96-97, 122, 136-38; *see also al-Kidd v. Ashcroft*, 580 F.3d 949, 975 (9th Cir. 2009), *reh'g*

*en banc denied*, 598 F.3d 1129 (2010) (denying motion to dismiss Fourth Amendment claims where

alleged statements by defendant and other high-level officials "plausibly suggest something more

than just bare allegations of improper purpose").

### 2.  Doe 1 Was Personally Involved in Coercively Interrogating Meshal.

Similarly, Meshal has more than adequately alleged Doe 1's personal involvement in his

coercive interrogation.[20]  Doe 1 was the sole U.S. official to interrogate Meshal in both Kenya and

Ethiopia, threatened Meshal with rendition to Somalia, and was present at all but one of the more

than thirty interrogations of Meshal by U.S. officials, including those in which Hersem and

Higgenbotham uttered egregious threats.  AC ¶¶ 86-88, 144, 146.  In Ethiopia, he appeared to lead

all but one of the interrogations, which were inherently coercive because they were conducted during

Meshal's prolonged and near-incommunicado detention in a foreign country.  *Id*. ¶ 149.  Doe 1 also

employed coercive techniques, including threatening that Meshal's "truthfulness" in interrogation

"would determine whether he could ever go home" and that Meshal would not be allowed to return

unless he "told [Doe 1] what he wanted to hear."  *Id*. ¶¶ 148, 156.

---

[20] Hersem and Higgenbotham do not contest that they were personally involved in Meshal's interrogation.

**B. The Defendants Are Not Entitled to Qualified Immunity Simply Because the Challenged Conduct of U.S. Officials Occurred Abroad.**

Defendants' principal argument in support of their claim for qualified immunity is that no court has squarely held that the Fourth and Fifth Amendments apply to the "alleged cooperative operations between the United States and the governments of Kenya, Somalia, and Ethiopia on foreign soil." MTD at 20. This argument is without merit. [21]

Officials can claim qualified immunity only where a plaintiff cannot show that they violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Officials are not granted qualified immunity simply because "the very action in question" has not "previously been held unlawful." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). Rather, a clearly established constitutional right exists, "where the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* In determining whether a right is clearly established, the D.C. Circuit looks to "whether the Supreme Court, the District of Columbia Circuit, and, to the extent that there is a consensus, other circuits have spoken clearly on the lawfulness of the conduct at issue." *Butera v. Dist. of Columbia*, 235 F.3d 637, 652 (D.C. Cir. 2001).

Defendants suggest that Meshal's rights were not clearly established because no court has ruled that the Constitution prohibits the "particular conduct" complained of "in the context of a U.S.

---

[21] The Court should consider first the threshold question of whether the facts adequately allege the violation of any constitutional right. Courts in this district have followed this approach in other cases decided since the Supreme Court established in *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), that courts are granted discretion to determine which prong of the qualified immunity inquiry to address first. *See, e.g., Watts v. Williams*, 658 F. Supp. 2d 43, 49 (D.D.C. 2009); *CHS Indus., LLC v. U.S. Customs & Border Prot.*, 653 F. Supp. 2d 50, 56 (D.D.C. 2009). Following this "two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions [like those presented by this case] that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Pearson*, 129 S. Ct. at 818. While Defendants claim that here "it is plain that a constitutional right is not clearly established, but far from obvious whether in fact there is such a right," MTD at 19, this argument is unpersuasive. Meshal has demonstrated that his prolonged detention without presentment or legal process, unlawful rendition, and coercive interrogation violated specific Fourth and Fifth Amendment rights. *See infra* Section II.B.1-3.

civilian and military operation in the Horn of Africa to identify, arrest, detain and question individuals suspected of ties to terrorist organizations or activity." MTD at 21-23. But such a crabbed view of what it means for a right to be clearly established has been squarely rejected. "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning," *United States v. Lanier,* 520 U.S. 259, 271 (1997), and "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Lanier*, 520 U.S. at 271 ("There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages . . . ."). The question presented is thus whether reasonable FBI agents engaged in a law enforcement investigation abroad had "fair warning" that a U.S. citizen located far from any battlefield was protected by the Fourth and Fifth Amendments from being lawlessly detained, rendered, and coercively interrogated by U.S. officials. *See Hope*, 536 U.S. at 741.

The answer is yes. At the time of the alleged misconduct, it had been well established for over a half-century that "the shield which the Bill of Rights and other parts of the Constitution provide to protect [a citizen's] life and liberty should not be stripped away just because he happens to be in another land." *Reid v. Covert*, 354 U.S. 1, 6 (1957) (plurality opinion); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265-66 (1990) (recognizing that the Fourth Amendment protects "persons who are part of [our] national community" from "arbitrary action by their own Government"); *id*. at 270 ("*Reid* . . . decided that United States citizens stationed abroad could invoke the protection of the Fifth and Sixth Amendments."); *Rasul v. Myers*, 563 F.3d 527, 531 (D.C. Cir. 2009) (per curiam) (recognizing *Verdugo-Urquidez* as confirming that "American citizens abroad can invoke [at least] some constitutional protections"); *In re Terrorist Bombings*, 552 F.3d at

170 n.7 ("[A] U.S. citizen who is a target of a search by our government executed in a foreign country is not without constitutional protection—namely, the Fourth Amendment's guarantee of reasonableness which protects a citizen from unwarranted government intrusions."); *Toscanino*, 500 F.2d at 280 ("That the Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed against United States citizens is well settled.").[22]  In particular, it was well settled that Meshal was protected by the Fourth and Fifth Amendments from undue deprivations of his liberty and coercive interrogations by U.S. officials.  *See Hamdi*, 542 U.S. at 533 (plurality opinion) ("reaffirm[ing] the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law");[23] *Miller v. Fenton*, 474 U.S. 104, 109 (1985) (recognizing that "certain interrogation techniques . . . are so offensive to a civilized system of justice that they [violate due process]"); *Abu Ali*, 350 F. Supp. 2d  at 40-41 (citing *Reid* in affirming that a U.S. citizen held in foreign custody has constitutional protection for violations of fundamental rights).

        The cases on which Defendants rely do not alter the clearly established law, noted above, that the Fourth and Fifth Amendments apply to the conduct of U.S. officials against U.S. citizens abroad. Although the Supreme Court in *Boumediene,* 128 S. Ct. at 2258, declined to declare a bright-line rule for the extraterritorial reach of the Suspension Clause, that case involved the rights of *non-U.S. citizens*.[24]  While there may be doubt about the rights of non-citizens abroad, the same is not true for American citizens, who have long been understood to have rights under the Fourth and Fifth

---

[22] *See also Johnson v. Eisentrager*, 339 U.S. 763, 769 (1950) ("The years have not destroyed nor diminished the importance of citizenship nor have they sapped the vitality of a citizen's claims upon his government for protection."); *Vance*, 694 F. Supp. 2d at 971 ("[F]ederal officials may not strip citizens of well-settled constitutional protections against mistreatment simply because they are located in a tumultuous foreign setting"); *Abu Ali*, 350 F. Supp. 2d at 31 (a citizen held in foreign custody abroad "cannot be so easily separated from his constitutional rights").

[23] In *Hamdi*, decided in 2004, eight justices of the Supreme Court rejected the government's vigorous contention that an American citizen could be detained by his government without due process.  542 U.S. at 533 (plurality opinion); *id*. at 553 (Souter, J., dissenting in part and concurring in judgment); *id*. at 573-74 (Scalia, J., dissenting).

[24] *Cf. Munaf v. Geren*, 128 S.Ct. 2207, 2218 (2008) (confirming citizenship as a factor in favor of holding that U.S. citizens held overseas by U.S. soldiers subject to a U.S. chain of command have a right to habeas corpus).

Amendments wherever they are located.  *See Rasul*, 563 F.3d at 530-32 (reaffirming that U.S. citizens abroad are afforded certain constitutional protections even as "aliens abroad are in an altogether different situation").[25]

### 1. The Defendants' Role in Meshal's Prolonged Detention Violated Clearly Established Fourth and Fifth Amendment Rights.

Meshal's detention for four months and three days in Kenya, Somalia, and Ethiopia without ever being charged, without ever being granted access to counsel, and without ever being presented before a judicial officer violated his Fourth Amendment right to protection from prolonged detention without a probable cause hearing and his Fifth Amendment right to due process.

### a. Meshal Has Shown a Fourth Amendment Violation.

Among the Fourth Amendment's core guarantees is that a detainee must be promptly presented before a neutral magistrate following a warrantless arrest to determine if there is probable cause to justify continued detention.  *See Gerstein v. Pugh*, 420 U.S. 103, 112-13 (1975).  In the domestic criminal context, the government must accomplish presentment within forty-eight hours, a time-frame that strikes a "practical compromise" between the individual's liberty interest and law enforcement officers' need to make on-the-spot arrests.  *County of Riverside v. McLaughlin*, 500 U.S. 44, 53, 56 (1991); *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009).[26]

Even if the 48-hour "compromise" is recalibrated in the context of law enforcement efforts abroad, no recalibration can justify more than *four months* of detention, AC ¶ 2, without some form

---

[25] Although Defendants rely upon *Sami v. United States*, 617 F.2d 755, 773 n.34 (D.C. Cir. 1979), *abrogated on other grounds*, *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004), the D.C. Circuit recognized that when determining whether a constitutional protection is afforded to an individual abroad, the U.S. citizenship of the victim and the status of the complained actor as a U.S. official or agency are key factors.  *Id.* at 773 n.34.

[26] The USA Patriot Act, 8 U.S.C. § 1226a, allows non-citizens suspected of engaging in terrorist acts to be held for up to seven days without charge after certification by the Attorney General.  This provision has never been challenged in or upheld by a court, but even assuming its lawfulness, Meshal's detention was over *seventeen times* the duration that the U.S. government can hold a *non-citizen* terror suspect if the Attorney General has granted certification.

of a probable cause hearing.[27]  Meshal was never presented before a court for the purpose of

determining whether probable cause supported his detention in Kenya, Somalia or Ethiopia.[28]

Whether the Defendants held him in proxy detention or actively participated in a joint venture with

foreign authorities to detain him, Meshal has adequately alleged that through their personal

involvement in his detention, they violated his Fourth Amendment rights.  *See supra* Section II.A.1.

### b.  Meshal Has Shown a Fifth Amendment Violation.

The Supreme Court has consistently recognized "the interest in being free from physical

detention by one's own government" as "the most elemental of liberty interests." *Hamdi*, 542 U.S. at

529 (plurality opinion) (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily

restraint has always been at the core of the liberty protected by the Due Process Clause from

arbitrary governmental action")).  The process due to an individual whose liberty is restrained by the

government "in any given instance is determined by weighing 'the private interest that will be

affected by the official action' against the Government's asserted interest, 'including the function

involved' and the burdens the Government would face in providing greater process." *Hamdi*, 542

U.S. at 529 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Defendants violated Meshal's due process rights by keeping him in near-incommunicado

detention for approximately four months in three different countries without ever charging him or

---

[27] The Court need not determine the precise moment at which delay in presentment becomes a constitutional violation in the context of the FBI law enforcement operation at issue in this case.  Although the Supreme Court has recognized that certain factors may reasonably delay presentment, *see McLaughlin*, 500 U.S. at 57, Defendants do not claim that any such circumstances pertained to Meshal.  Nor could such reasons justify the Defendants' failure to provide Meshal any semblance of a probable cause hearing during more than four months of near-incommunicado detention.  Moreover, the Supreme Court has squarely rejected delays in presentment "for the purpose of gathering additional evidence to justify the arrest." *Id.* at 56.  Meshal's well-supported allegation that the Defendants kept him detained to procure information and a confession, AC ¶¶ 84-88, 144, 146, 148, 156, supports a finding of unconstitutional delay.

[28] Meshal could have been presented before a court without being brought to the United States, for example, via video link from the FBI's interrogation site.  The D.C. Circuit has recognized that under certain circumstances closed-circuit television may satisfy the presence requirement of Fed. R. Crim. P. 43, if the procedure is considered necessary by the court.  *See United States v. Washington*, 705 F.2d 489, 497 n.4 (D.C. Cir. 1983); *see also State v. Phillips*, 74 Ohio St. 3d 72, 94 (1995) (discussing states that permit the use of closed-circuit television for arraignments).

providing a process by which he could challenge the reasons for his detention.[29]  To the contrary, the Defendants directed or actively participated with foreign authorities to keep Meshal detained without legal process to coerce him to confess to criminal activity.  *See supra* Section II.A.1.

Government action that deprives a person of his liberty can be justified only if the government interest is compelling.  Here, the private interest affected by the official action—Meshal's liberty—is afforded great weight, far more than the government's interest in obtaining a confession.  Providing Meshal notice of the charges against him and an opportunity to contest the charges would have imposed a far lesser burden on the government than the deprivation suffered by Meshal, particularly in light of the fact that Meshal was detained far away from any battlefield.  The lack of any "fair opportunity" for Meshal to "rebut the government's factual assertions before a neutral decisionmaker," *Hamdi*, 542 U.S. at 533, 539, and the high risk of an erroneous deprivation of his rights in these circumstances renders the Defendants' failure to provide legal process constitutionally deficient.[30]

Should the Court conclude that Meshal's prolonged detention is not properly analyzed under the Fourth Amendment or the Fifth Amendment guarantee of procedural due process, it should then apply a Fifth Amendment substantive due process standard.  *See, e.g.*, *County of Sacramento v. Lewis ex rel. Lewis*, 523 U.S. 833, 849 (1998) (analyzing claims under substantive due process where Fourth Amendment did not apply); *Armstrong v. Squadrito*, 152 F.3d 564, 569-70 (7th Cir. 1998) (analyzing detention claim under substantive due process where Fourth and Eighth Amendments did not apply).  Substantive due process protects against government conduct that is

---

[29] Although Defendants contend (MTD at 26 n.21) that they provided Meshal notice of the charges against him when accusing him of being a suspected terrorist during interrogations, such "notice" does not remotely satisfy the due process requirement that Meshal receive a meaningful process by which to challenge his prolonged detention.  *Hamdi*, 542 U.S. at 533 (plurality opinion).

[30] Meshal does not raise an independent access to counsel claim.  Defendants' denial of his repeated requests for permission to call an attorney and other actions depriving him of counsel are aspects of his Fifth Amendment claim challenging Defendants' failure to afford him any legal process by which to challenge his detention.

"so brutal and so offensive to human dignity" as to exceed the permissible limits of our Constitution. *Rochin v. California*, 342 U.S. 165, 174 (1952). "[An] investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements." *Armstrong*, 152 F.3d at 570.

Meshal's detention without charge or due process spanned three different countries in East Africa, lasted more than four months, included periods of incommunicado detention, AC ¶ 140, often featured miserable and difficult conditions, *id.* ¶¶ 54, 65, 111-12, 118, and rendered him unable even to contact family members for help. *See, e.g.*, *id.* ¶¶ 105, 113. The fact that Meshal was subjected to such treatment by officials of his own government shocks the conscience. Indeed, courts have found that far shorter periods of detention have violated substantive due process rights. *Armstrong*, 152 F.3d 564 (57-day detention resulting from misfiling of records); *Hayes v. Faulkner County*, 388 F.3d 669 (8th Cir. 2004) (38-day detention prior to initial court appearance).

### c. Meshal's Fourth and Fifth Amendment Rights Were Clearly Established.

Defendants' principal basis for asserting qualified immunity in the face of Meshal's Fourth and Fifth Amendment challenges to his prolonged and arbitrary detention is that these rights do not apply abroad. MTD at 21-23. The defects in this argument are manifold.

First, as discussed above, it is clearly established that the Fourth and Fifth Amendments constrain U.S. officials who act against U.S. citizens abroad. *See discussion supra* at 25-28.

Second, the Defendants ignore the well established law providing that even where foreign authorities conduct a search and seizure, the Fourth Amendment will nonetheless apply if U.S. law enforcement officials "substantially participated" with foreign officials in the challenged activity or if foreign officials were acting as their agents. *United States v. Behety*, 32 F.3d 503, 510 (11th Cir.

1994).[31]  Courts have similarly found that Fifth Amendment protections apply to U.S. interrogations

abroad under the "joint venture" doctrine.  *Pfeifer v. U.S. Bureau of Prisons*, 615 F.2d 873,

877 (S.D. Cal. 1980).  The degree of Defendants' control over Meshal's prolonged detention, as

detailed in the Amended Complaint and supported by multiple corroborating allegations, far exceeds

what is necessary for constitutional liability to attach to the Defendants for violating his Fourth and

Fifth Amendment rights by proxy ( constructive) detention or joint venture.  *See supra* Section II.A.1

& n.18-19.

Third, the Defendants' emphasis on courts' application of a reasonableness analysis to

evaluate Fourth Amendment claims and of a balancing test to evaluate Fifth Amendment claims is

misplaced as a ground for qualified immunity.  MTD at 22.  The fact that courts may weigh factors

specific to the context in which a Fourth or Fifth Amendment right is asserted to determine the

constitutionality of government conduct does not mean that the underlying law pertaining to the

availability of such rights is not clearly established.  Obviously, the reasonableness of an intrusion or

the process that is due will vary based on context.  But the very purpose of affording a detainee a

prompt probable cause hearing and legal process is to determine whether an arrest was reasonable

and whether continued detention is warranted based on a court's balancing of the applicable factors.

Defendants point to no authority suggesting that a citizen's basic right to a hearing or legal process is

not clearly established.

Fourth, Defendants misread Judge Robertson's decision in *Kar v. Rumsfeld*, 580 F. Supp. 2d

80 (D.D.C. 2008).[32]  Judge Robertson held that the rights of a U.S. citizen in U.S. military custody

---

[31] *See also United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992) (finding that the Fourth Amendment attaches "where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials"); *United States v. Mount*, 757 F.2d 1315, 1318 (D.C. Cir. 1985); *Powell v. Zuckert*, 366 F.2d 634, 640-41 (D.C. Cir. 1966).
[32] *Kar* undermines Defendants' assertion that U.S. citizens do not enjoy Fourth and Fifth Amendment rights abroad. *See* 580 F. Supp. 2d at 83 ("The Fourth and Fifth Amendments certainly protect U.S. citizens detained in the course of hostilities in Iraq.").

abroad to a prompt probable cause hearing and to access counsel in a Detainee Status Board

proceeding in Iraq were not clearly established based on a lack of precedent of the availability of

these rights to a detainee *in a war zone*. *Id.* at 85-86. Even if Meshal's initial apprehension took

place in or near a zone of conflict, his months-long detention was overseen by civilian authorities in

Nairobi and Addis Ababa. Fourth and Fifth Amendment protections against prolonged and arbitrary

detention by U.S. officials towards a U.S. citizen in peaceful territories abroad is well established.[33]

### 2. The Defendants' Role in Meshal's Rendition Violated His Clearly Established Fifth Amendment Rights.

Defendants' involvement in Meshal's forced transfer for near-incommunicado detention and

interrogation, *see supra* Section II.A.1, violated his clearly established Fifth Amendment rights.

#### a. Meshal Has Shown a Fifth Amendment Violation.

As described above, *see supra* Section II.B.1.b, procedural due process protects against

undue deprivations of an individual's interest in being free from physical detention, *Hamdi*, 542 U.S.

at 529, while substantive due process guards against conduct that is "so brutal and so offensive to

human dignity" as to exceed the permissible limits of our Constitution, *Rochin*, 342 U.S. at 174.

When conduct "shocks the conscience," it can and should be deemed a violation of due process. *Id.*

at 172-74. The D.C. Circuit has recognized that substantive due process liability may also attach

where government officials show "deliberate indifference" to individuals in custody or, under the so-

called "state endangerment" theory, where they create or increase known or forseeable danger to an

individual." *Butera*, 235 F.3d at 651-52; *see also id.* at 647-49 & n.10 (collecting cases from circuits

recognizing substantive due process claims under state endangerment theory).

Meshal's rendition violated his Fifth Amendment procedural due process rights by resulting

in his prolonged and near-incommunicado detention without charge or legal process, for essentially

---

[33] Moreover, unlike Meshal, Kar had failed to demonstrate a violation of his right to legal process because he had received formal notice of the charge against him and a hearing before the Detainee Status Board. *Id.* at 85.

the same reasons that the detention itself violated these rights.  *See supra* Section II.B.1.b.  The rendition deprived him of his fundamental interest in liberty for no discernible government purpose other than making him available for coercive FBI interrogation.  The lack of process raised the risk of an erroneous deprivation.  There was no basis—or justification—for this deprivation.

The rendition was, moreover, nothing short of conscience-shocking.  U.S. officers were responsible for the forcible transfer of a U.S. citizen to two dangerous situations—including to a war-torn country from which he had just fled following the outbreak of hostilities—for near-incommunicado detention and more than thirty coercive FBI interrogations.  *See* AC ¶¶ 86-88, 133, 148-49, 155; *supra* Section II.A.1.  Pausing to consider the "totality of the circumstances" makes it clear that Defendants' conduct toward Meshal was egregious.  *Armstrong*, 152 F.3d at 570.  Doe 1, Hersem and Higgenbotham's threats to render Meshal for failing to confess and Doe 1's confirmation that these threats were realized underscore the offensive nature of the Defendants' actions towards a civilian fleeing for safety.  *See Butera*, 235 F.3d at 651.  Although the Defendants did not physically remove Meshal from his jail cell or fly the planes that took him from Nairobi to Somalia and Addis Ababa, Meshal has provided more than sufficient allegations to support the inference that Defendants held him in proxy (constructive) U.S. custody or, at a minimum, participated in a joint venture with foreign authorities to effect his forcible transfer.  *See supra* Section II.A.1.[34]

In the event that the Court determines that the allegations support a lesser role for the Defendants in Meshal's rendition, Meshal has nevertheless alleged sufficient facts to demonstrate a violation of his substantive due process rights under the state endangerment theory.  *Even if* the Defendants did not control or actively work with foreign authorities to direct or execute Meshal's rendition from Kenya to Somalia and Ethiopia, they were deliberately indifferent to the foreseeable

---

[34] Kenyan Police Officers, for example, reported to MHRF that the FBI was in control of Meshal's detention.  AC ¶ 96.

harm that would come to him if forcibly transferred. The Amended Complaint alleges that the Defendants knew, or reasonably should have known, that rendering Meshal to Somalia and Ethiopia would place him in grave danger and risk of serious harm, AC ¶¶ 125-28, and that Ethiopia was more permissive of detention without charge than Kenya. *Id.* ¶¶ 108, 128. In light of their continuous and active cooperation with foreign authorities to secure Meshal for interrogation in Kenya, it is implausible that Higgenbotham, Hersem and Doe 1 did not know that foreign authorities planned to transfer Meshal.[35] By working with foreign authorities to effect Meshal's transfer or acquiescing to it, the Defendants enhanced the danger that would come to Meshal and the foreseeable and serious injuries that would result.

### b. Meshal's Fifth Amendment Rights Were Clearly Established.

Defendants' actions in effecting or demonstrating deliberate indifference to Meshal's forced transfer for near-incommunicado detention and interrogation violated clearly established law. As discussed above, it is clearly established that the Fifth Amendment constrains U.S. officials who act against U.S. citizens abroad, particularly with respect to deprivations of their liberty. *See Reid*, 354 U.S. at 6; *Abu Ali*, 350 F. Supp. 2d at 40-41; *see supra* at 29. Because it was clearly established that subjecting Meshal to the undue liberty deprivation inherent in his prolonged detention without legal process violated his Fifth Amendment rights, *see supra* Section II.B.1.c, it was also clearly established that forcibly transferring him for the purpose of effecting near-incommunicado detention without legal process also violated these rights.

Moreover, in early 2007, any reasonable federal law enforcement officer in the position of the Defendants knew—or should have known—that the forcible transfer by federal law enforcement

---

[35] Doe 1, Hersem and Higgenbotham interacted extensively with foreign authorities to secure Meshal for at least four day-long interrogations in Kenya and to arrange for and carry out his transfer from one detention facility to another to facilitate his transport to and from the FBI interrogation site. AC ¶¶ 69, 79-80. Doe 1 followed Meshal to Ethiopia after the rendition and subjected him, with Doe 2, to more than two dozen additional interrogations. AC ¶ 141.

officers of a U.S. citizen for purposes of near-incommunicado detention and interrogation was conscience-shocking. *See Vance*, 694 F. Supp. 2d at 971 (recognizing that *Verdugo-Urquidez*, 494 U.S. 259, and *Rasul*, 563 F.3d 527, underscore "the importance of citizenship" in analyzing whether a U.S. citizen's due process right to protection from government misconduct is clearly established). The FBI's own legal analysis underscores this point. As Defendants concede, a 2002 memorandum prepared by the Behavioral Analysis Unit concluded that it is a violation of the Torture Statute, 18 U.S.C. § 2340 (2010), to send a detainee "either temporarily or permanently to Jordan, Egypt, or another third country to allow those countries to employ interrogation techniques that will enable them to obtain the requisite information," with the intent "to utilize, outside the U.S., interrogation techniques which would violate [the Torture Statute]." AC ¶ 89 (citing FBI Behavioral Analysis Unit, Legal Analysis of Interrogation Techniques at 1021 (Nov. 27, 2002) (Unclassified) ("FBI BAU Legal Analysis")); MTD at 29 n.28. While Defendants represent that this document is not a statement of official FBI policy and pertained only to a particular issue surrounding the treatment of a non-citizen Guantánamo Bay detainee, MTD at 28, it nevertheless suggests that reasonable FBI officers involved in interrogating terror suspects—whether at Guantánamo Bay or elsewhere—were aware that sending a suspect to a third country in an attempt to elicit information or a confession was gross misconduct prohibited by law. *See Lewis*, 523 U.S. at 847 n.8 (the "shocking to the conscience" standard "necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them").

Defendants rely solely on *Arar v. Ashcroft*, 585 F.3d 559, to argue that no clearly established rights protected Meshal from unlawful rendition. *Arar*, however, considered a *non-U.S.-citizen's Bivens* suit against *supervisory* U.S. officials to challenge *the policy* of extraordinary rendition. *See supra* Section I.2 at 15-16. That case is not controlling here, where Meshal, a U.S. citizen, seeks to

hold accountable four federal law enforcement officers for their personal roles in rendering him for the purpose of near-incommunicado detention and interrogation.

### 3. The Defendants' Coercive Interrogation of Meshal Violated His Clearly Established Fifth Amendment Rights.

The Defendants subjected Meshal to more than thirty coercive interrogations in which they threatened him with torture, forced disappearance, and other serious harm in order to coerce a confession. AC ¶¶ 3, 86-88, 156. These actions violate clearly established Fifth Amendment rights.

### a. Meshal Has Shown a Fifth Amendment Violation.

It is "deeply embedded" that due process protects the subject of an interrogation by law enforcement officials against the use of coercive interrogation techniques. *Miller*, 474 U.S. at 109; *see also Rochin,* 342 U.S. at 172 (interrogation techniques may be "too close to the rack and the screw to permit of constitutional differentiation").[36] Doe 1, Hersem and Higgenbotham employed extraordinarily coercive techniques when interrogating Meshal. They threatened him with forced disappearance, physical torture, and forced transfer for purposes of interrogation, and refused to permit him to return home—although they knew he desperately wanted to—absent a confession to activity in which he had not engaged. AC ¶¶ 206, 210-11; *see supra* Section II.A.2. The context in which they employed these techniques—Meshal's near-incommunicado detention in foreign countries, thousands of miles away from home—rendered the interrogations all the more coercive. *See Sheets v. Butera*, 389 F.3d 772, 778 (8th Cir. 2004) (considering the totality of the circumstances, including the degree of police coercion and length and location of interrogation in determining whether police interrogation tactics shock the conscience); *Armstrong*, 152 F.3d at

---

[36] *See also Palko v. Connecticut*, 302 U.S. 319, 326 (1937) (the Due Process Clause must at least "give protection against torture, physical or mental"); *Brown v. Mississippi*, 297 U.S. 278, 286 (1936) (interrogation through use of physical and psychological torture "revolting to the sense of justice"); *Harbury v. Deutch*, 233 F.3d 596, 602 (D.C. Cir. 2000) ("No one doubts that under Supreme Court precedent, interrogation by torture like that alleged by [plaintiff] shocks the conscience."), *rev'd on other grounds sub nom.*, *Christopher v. Harbury*, 536 U.S. 403 (2002).

570.[37]   The use of such coercive techniques by federal law enforcement officers to elicit a confession

from a U.S. citizen for use in a criminal prosecution "shocks the conscience."

### b.   Meshal's Fifth Amendment Rights Were Clearly Established.

The well established Supreme Court and circuit authority cited above condemns precisely the

sort of the coercive interrogation techniques—threats to inflict serious physical and psychological

harm—that Doe 1, Hersem and Higgenbotham employed in an attempt to coerce a confession from

Meshal.  *See Beecher v. Alabama*, 389 U.S. 35, 38 (1967) (condemning confession elicited through

threat that defendant "speak his guilt or be killed" as a due process violation); *Giuffre v. Bissell*, 31

F.3d 1241, 1258 (3d Cir. 1994) (finding due process violation in use of "coercive conduct through

threats and intimidation in order to induce a suspect to make a statement"); *Wilkins v. May*, 872 F.2d

190, 195 (7th Cir. 1989).  Moreover, the FBI's Legal Handbook for Special Agents placed any

reasonable FBI officer in the position of Defendants Hersem and Higgenbotham on notice in 2007

that threatening a U.S. citizen with abuse and placing psychological pressure on him during an

interrogation was coercive, prohibited, and a deprivation of due process.  *See* "A Review of the

FBI's Involvement in and Observations of Detainee Interrogations in Guantánamo Bay, Afghanistan,

and Iraq," U.S. Department of Justice, Office of the Inspector General (October 2009) (Revised) at

47-49, *available at* http://luxmedia.com.edgesuite.net/aclu/fbi_oig_1_100.pdf (noting that FBI

confessions and interrogation policy developed before September 2001 instructed agents that a

coerced confession constitutes "a denial of the accused's right to due process of law" and that courts

would consider the use of "threats of abuse, . . . threats and psychological pressure, . . . . . trickery,

ruse, and deception" in determining whether the "totality of the circumstances" demonstrated that a

---

[37] Should the Court determine that Meshal cannot challenge the Defendants' act of forcibly transferring Meshal from Kenya to Somalia and Ethiopia for detention and interrogation without constitutional protection, the rendition should be understood to fall within the totality of the circumstances of Defendants' coercive interrogation of Meshal.

confession was coerced).[38]  Similarly, an internal FBI legal memorandum suggests that agents in the field understood that the "[u]se of scenarios designed to convince [a] detainee that death or severe pain is imminent for him or his family" is "not permitted by the U.S. Constitution."  AC ¶ 89 (FBI BAU Legal Analysis).[39]  FBI agents were aware that threats of the exact kind made by Hersem, Higgenbotham and Doe 1 were unconstitutional and prohibited.  *See Lewis*, 523 U.S. at 847 n.8.

The Defendants' contention that the well established right of a U.S. citizen to freedom from coercive interrogation by law enforcement officials of his own government was not clearly established is unpersuasive.  They argue that the physical aspects of Hersem and Higgenbotham's interrogations of Meshal should be analyzed under the Fourth Amendment excessive force standard, rather than under due process.  MTD at 36.  To do so is contrary to Supreme Court precedent applying due process in the context of confessions produced through both physical and psychological coercion.  *See Miller*, 474 U.S. at 109 (recognizing that due process condemns the use of "beatings and other forms of physical and psychological torture" to extract inculpatory statements).  Their claim that "no court has even opined on the scope of the substantive due process rights that attend the interrogation of a U.S. citizen detained in a foreign country by foreign officials on suspicion of terrorist involvement," MTD at 37, ignores that previous cases are not required to be on all fours with the challenged conduct for a right to be clearly established.  *Hope*, 536 U.S. at 741 ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts. . . . [T]he salient question . . . is whether the

---

[38] The Court may consider "matters of general public record" in resolving a motion to dismiss.  *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir.1979).

[39] Defendants note that "[u]nlawful threats during interrogation are not condoned and do not comport with Executive branch policies."  MTD at 36.  This admission underscores the need for a *Bivens* remedy here, where Meshal seeks to deter misconduct by law enforcement officers who apparently failed to abide by the requirements of the Constitution and this apparent policy.  *See supra* Section I at 10-17.

state of the law [at the time] gave respondents fair warning that their alleged [action] was unconstitutional.").[40]

The Defendants also mischaracterize the nature of the alleged offense. Meshal brings this due process claim against the federal law enforcement officers who personally interrogated him, physically grabbed him, yelled at him, and uttered the threats that made him fear that he would be subjected to physical torture and forced disappearance. Foreign officials were in no way involved in these acts. The fact that the Defendants suspected Meshal of being a terrorist does not absolve them from their duty, as federal law enforcement officers, to respect his constitutional rights. *See, e.g.*, *Miller*, 474 U.S. at 109-110 (applying due process analysis to determine whether confession of individual accused of mutilating body of 17-year-old girl was obtained through coercion).

## III.  Meshal States a Clearly Established Violation of the Torture Victim Protection Act.

Higgenbotham and Hersem seek dismissal of Meshal's TVPA claim, arguing that they acted under U.S.—not foreign—law, that Meshal has not alleged that they engaged in acts constituting "torture," and because it was not clearly established that the statute applied to U.S. officials acting under color of foreign law. These arguments are without merit.

### A.  Hersem and Higgenbotham Acted Under Actual or Apparent Kenyan Authority or Under Color of Kenyan Law.

Hersem and Higgenbotham's principal argument for dismissal misunderstands the law concerning the "under color of foreign law" requirement and Meshal's factual allegations supporting an inference of joint activity and conspiracy between these defendants and foreign officials to deprive Meshal of his rights. By its own terms, the TVPA attaches liability to those who have committed torture "under actual or apparent authority, or color of law, of any foreign nation." 28

---

[40] For example, another court has held that in 2006, clearly established law prohibited U.S. officials from using "torturous treatment methods" in their interrogation of U.S. civilians abroad and underscored "the importance of citizenship" in its qualified immunity analysis. *Vance*, 694 F. Supp. 2d at 970 (citing *Verdugo-Urquidez*, 494 U.S. 259, and *Rasul*, 563 F.3d 527).

U.S.C. § 1350 note.  Courts have looked to general principles of agency law and to jurisprudence regarding 42 U.S.C. § 1983 ("Section 1983") to interpret this statutory requirement.  *See, e.g.*, *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1264 (11th Cir. 2009); *Arar*, 585 F.3d at 568.  "The traditional definition of acting under color of state law requires that the defendant . . . have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotation marks omitted).  The Supreme Court has squarely held that a non-State actor who "is a willful participant in a joint action with the State or its agents" fulfills this requirement, *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980); *see also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 & n.2 (2001), as does a federal officer who has "conspired" with a state officer in the commission of the alleged illegal acts, *Williams v. United States*, 396 F.3d 412, 414-15 (D.C. Cir. 2005) (collecting circuit authority); *see also Arar*, 585 F.3d at 568.  The proper test "[w]hen the violation is the joint product of the exercise of a State power and of a non-State power . . . is whether the state or its officials played a 'significant' role in the result."  *Kletschka v. Driver*, 411 F.2d 436, 448-49 (2d Cir. 1969).  Therefore, a non-foreign party acts under actual or apparent foreign authority, or under color of foreign law, when he is a willful participant in joint action with foreign authorities or conspires with them, *or* when foreign officials play a significant role in the alleged torturous action.

Meshal has more than satisfied these standards.  Hersem and Higgenbotham threatened to subject him to forcible disappearance, torture, and rendition.  Because they acted in "close partnership" with Kenyan authorities in their law enforcement operation, AC ¶ 123, and would not have been able to interrogate Meshal without the approval and cooperation of the Kenyan government, *id*. ¶ 30, they necessarily acted under actual or apparent Kenyan authority.  Even if, as Meshal alleges, these U.S. agents played a leading role, they willfully worked with Kenyan

authorities to prolong his detention.  AC ¶¶ 206, 210-11.  For example, although the Kenyan CID

officer indicated that U.S. authorities would determine whether Meshal could go home, *id.* ¶ 52, he

escorted Meshal to the agents, attended the first interrogation, and worked with the agents to transfer

Meshal to a police station closer to the interrogation site to facilitate U.S. interrogations.  *Id.* ¶¶ 79-

81.[41]  Whether Meshal was subsequently detained in Kenya under actual or apparent Kenyan

authority, *see id.* ¶¶ 210-11, these facts demonstrating joint activity and participation support the

inference that during the time period in which Hersem and Higgenbotham torturously threatened

Meshal, they were acting under color of foreign law.  The active Kenyan involvement in this joint

action permits Meshal's TVPA claim against the non-foreign actors to go forward.  *See Aldana v.*

*Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1249-50 (11th Cir. 2005) (permitting TVPA

claim to proceed due to joint action between private entity and one foreign public official who had

"active involvement").  Meshal, a U.S. citizen seeking to redress torture that took place abroad,

properly brings this action.[42]

Defendants Hersem and Higginbotham's claim that their sole authority for interrogating

Meshal derived from the Attorney General's Guidelines for FBI National Security Investigations and

Foreign Intelligence Collection ("FBI Guidelines") misconstrues Meshal's claim or is contradicted

by public documents explaining FBI operations overseas.  MTD at 39.  While the FBI Guidelines

provide that FBI officers may "participate with foreign officials in investigations abroad," a 2004

report of the Office of the Inspector General clarifies that because FBI officers "have no law

---

[41] The Kenyan CID officer introduced Meshal to Hersem, Higgenbotham and Doe 1, traveled with the U.S. agents and Meshal to the interrogation site, was physically present during at least several hours of the interrogation, and was asked by Doe 1 if "he wanted to ask any questions" of Meshal.  *Id.* ¶¶ 58, 64, 76, 78.  A Kenyan official took Meshal from his jail cell and brought him to the U.S. agents who drove him to the interrogation site on each of his subsequent U.S. interrogations in Kenya, including the ones in which Hersem and Higginbotham tortured Meshal.  *Id.* ¶ 82.  While these Defendants alone uttered the torturous threats, all of the aforementioned allegations show that Kenyan officials worked or conspired with them.

[42] Courts have recognized that the express purpose of the TVPA was to provide a cause of action to U.S. citizens for acts of torture committed abroad.  *Enahoro v. Abubakar*, 408 F.3d 877, 888 (7th Cir. 2005).

enforcement authority in foreign countries," joint investigations have been conducted "in accordance with local laws and policies and procedures established by the host country." AC ¶ 30 (citing Office of the Inspector General, Dep't of Justice, Audit Report 04-18, Federal Bureau of Investigation Legal Attaché Program 8 (2004) (Redacted and Unclassified) ("2004 OIG Report")).  A 2002 Memorandum from FBI Director Robert Mueller similarly explains that "FBI Agents abroad do not have the law enforcement authority they possess in the United States" and "do not have . . . the authority to conduct investigations in other countries without the approval of the host government." AC ¶ 30 (citing Robert S. Mueller III to All Special Agents in Charge, Re: Conducting FBI Investigations Overseas 2 (July 11, 2002) ("Mueller Memorandum")).  The Defendants were necessarily clothed with the authority of Kenyan law when arranging for and conducting interrogations in which they tortured Meshal.  *Arar*, 585 F.3d at 559.

Hersem and Higgenbotham do not provide persuasive authority for the proposition that they must be understood to have acted under only one sovereign's authority at a time.[43]  Congress explicitly identified agency law as a source of guidance for understanding the "under actual or apparent foreign authority" requirement for TVPA claims. *See* S. Rep. 102-249, at 8 (1991); H.R. Rep. 102-367, at 5 (1991).  "[W]hen two persons engage jointly in a partnership for some criminal objective, the law deems them agents for one another.  Each is deemed to have authorized the acts and declarations of the other undertaken to carry out their joint objective."  *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002).  By engaging in willful joint action with Kenyan officials acting

---

[43] The cases cited by Defendants Hersem and Higginbotham are distinguishable from Meshal's case.  In *Williams*, the court determined *after discovery* that state officials had not "provided significant encouragement" or "otherwise participated in" the challenged actions so as to render the federal officer as having acted under color of state law.  396 F.3d at 415 (internal quotation marks omitted).  While the district court in *Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005), dismissed TVPA claims against Henry Kissinger on the ground that he had acted under U.S. law, 310 F. Supp. 2d at 267, the plaintiff did not allege, as does Meshal, that the U.S. defendant directly tortured the victim and engaged in joint activities with foreign officials on the ground.

under Kenyan law, the defendants acted under Kenyan law and authority within the meaning of the TVPA.[44]

Defendants' contention that Kenyan officials would have to direct the conduct of the Defendants to satisfy the "under color of foreign law" requirement is wrong. The authority they cite for this proposition actually permitted Section 1983 claims to go forward against three federal defendants whom the plaintiff adequately alleged had conspired with state officials to deprive him of his rights. *See Kletschka*, 411 F.2d at 448-49.[45] The other cases cited by the Defendants are also unpersuasive. Although the Second Circuit in *Arar* dismissed the plaintiff's TVPA claims, it found the complaint lacking where it alleged only that high-level officials in Washington, D.C. had "encouraged and facilitated" foreign actors to carry out the torturous acts on foreign soil. *Arar*, 585 F.3d at 568. Meshal, in contrast, alleges that Higgenbotham and Hersem tortured him. *Harbury v. Hayden*, 444 F. Supp. 2d 19 (D.D.C. 2006), *aff'd* 552 F.3d 413 (D.C. Cir. 2008), also does not help the Defendants: the court there concluded in *dicta* that the defendants acted under color of U.S. law, 444 F. Supp. 2d at 42, the TVPA claims were dismissed as untimely, *id*. at 40, and there is no indication that the plaintiff's allegations of joint activity were as extensive as Meshal's.

## B. Hersem and Higgenbotham Subjected Meshal to Psychological Torture for the Purpose of Coercing a Confession.

Hersem and Higgenbotham also contend that they are entitled to qualified immunity on the TVPA claim because the actions alleged do not clearly constitute "torture."[46] The TVPA expressly provides that torture encompasses actions against an individual held in the offender's physical

---

[44] *See Hampton v. Hanrahan*, 600 F.2d 600, 623 (7th Cir. 1979) (per curiam) ("[W]hen federal officials are engaged in a conspiracy with state officials to deprive constitutional rights, the state officials provide the requisite state action to make the entire conspiracy actionable under section 1983."), *rev'd on other grounds*, 446 U.S. 754 (1980).

[45] Although the court dismissed the two federal defendants against whom the plaintiff had "lodge[d] only general charges of conspiring with the state defendants, alleging no specific overt acts taken in concert with them," it explicitly noted that "[s]uch allegations may have been sufficient to state a good cause in the complaint," even if they were insufficient to withstand summary judgment. *Id*. at 449.

[46] Defendants also wrongly contend that the TVPA allegations fail to meet *Iqbal's* pleading requirements. MTD at 42.

41

control that intentionally inflict "severe pain or suffering . . . whether physical or mental" for the purpose of obtaining information or a confession from the victim. 28 U.S.C. § 1350 note § 3(b) (2006). It also expressly provides that "mental pain or suffering refers to prolonged mental harm caused by or resulting from," among other things, "the intentional infliction or threatened infliction of severe physical pain or suffering." *Id.* The definition of torture "borrows from" the Convention Against Torture and "includes a severity requirement that is crucial to ensuring that the conduct proscribed . . . is sufficiently extreme and outrageous to warrant . . . universal condemnation . . . ." *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003). Allegations of intentionally inflicted emotional pain and suffering adequately allege torture. *Aldana*, 416 F.3d at 1252-53 (finding that death threats "could constitute torture" by resulting in the intentional infliction of emotion pain and suffering).[47]

    Meshal has alleged misconduct that clearly falls within the TVPA's express definition of torture. Hersem and Higgenbotham threatened to subject him to forcible disappearance by Israeli authorities, brutal torture at the hands of Egyptian officials, and rendition to war-torn Somalia during interrogations held when he was in their custody or physical control in an effort to coerce him to confessing to connections with al Qaeda that he did not have. AC ¶¶ 206, 210-11.[48] He adequately alleges that they engaged in such acts for a torturous purpose recognized by the TVPA while he was in their custody or physical control. He also alleges threats that necessarily caused him severe mental pain and suffering due both to their nature and the context in which they were made— coercive interrogations that took place while he was held in prolonged and near-incommunicado

---

[47] *See also Ali v. Achim*, 468 F.3d 462, 471-72 (7th Cir. 2006).
[48] Defendant Higgenbotham grabbed Meshal, forced him to a window, told him that "the agents knew he was hiding something, but that they had ways of getting the information they want," and threatened to send him to Israel where "the Israelis would make him 'disappear.'" AC ¶ 86. Hersem yelled in Meshal's face while vigorously poking him in the chest, accused him of having connections to al Qaeda, and threatened to send Meshal to war-torn Somalia if he refused to answer questions. *Id.* ¶ 87. Hersem warned Meshal that the "Egyptians had ways of making him talk" and threatened to ensure that Meshal was thrown in prison and tortured unless he admitted to a connection to al Qaeda. *Id.* ¶ 88.

detention without charge or legal process, thousands of miles from home.  *See supra* at 3-6; *id.* at

Section II.A.1.  In this context such threats were far from "contingent or speculative."  MTD at 42.

By causing him to quite reasonably fear that he would be subject to severe pain and suffering at the

hands of foreign authorities unless he confessed to nonexistent associations, Higgenbotham and

Hersem necessarily caused Meshal to experience severe and prolonged mental harm.  His resulting

psychological pain and suffering were so severe that his cellmate witnessed and reported it to

MHRF, and to this day, Meshal remains deeply traumatized by this treatment.  AC ¶¶ 86, 168, 213.

Although Defendants identify cases featuring physical torture to imply that their threats and conduct

toward Meshal did not constitute torture, MTD at 43, Meshal's allegations of intentionally inflicted

emotional pain and suffering adequately allege torture prohibited by the TVPA.  *Aldana*, 416 F.3d at

1252-53.[49]

### C.  Meshal's Right Not To Be Tortured by U.S. Officials Was Clearly Established.

Higgenbotham and Hersem do not assert, nor could they, that Meshal, a U.S citizen, did not

possess a clearly established right to be free from torture at the hands of U.S. officials, or that a

reasonable FBI agent would not have known this was the case in early 2007.  At the time, torture had

not only been prohibited not only by the TVPA since 1992, but also by the Convention Against

Torture since its 1994 ratification by the United States and by the U.S. Torture Statute, which

established criminal penalties that same year for U.S. citizens and non-citizens present on U.S. soil

who, "acting under the color of law," commit or conspire to commit torture abroad.  18 U.S.C. §

2340; Convention Against Torture, art. 2, cl. 2, 1465 U.N.T.S. 85 ("No exceptional circumstances

---

[49] Higgenbotham and Hersem contrast Meshal's experience with that of the plaintiff in *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, who was interrogated and threatened, but found not to have sufficiently alleged torture.  Unlike Simpson, however, Meshal has alleged that Hersem and Higgenbotham  threatened him with torture, forced disappearance and rendition to coerce his confession—a prototypical purpose of torture as defined by the TVPA. *See id.* at 235 ("Simpson alleges that she was held captive and incommunicado for several months, but she does not allege that Libya's intended purpose behind her detention was to compel anyone to do or abstain from doing any act").

whatsoever, whether a state of war or a threat of war, internal political instability or any other public emergency, may be invoked as a justification of torture."); *see Renkel v. United States*, 456 F.3d 640, 645 (6th Cir. 2006) (describing Torture Statute).[50]  By early 2007, therefore, a reasonable FBI Supervising Special Agent knew that he was barred from intentionally inflicting prolonged mental harm upon a U.S. citizen abroad.

The FBI BAU Legal Analysis, moreover, recognized in 2002 that the "[u]se of scenarios designed to convince [a] detainee that death or severe pain is imminent for him or his family" is prohibited by the Constitution and "may violate the [U.S.] Torture Statute, 18 U.S.C. § 2340."  AC ¶ 89.[51]  As discussed above, while this document may not be a statement of official FBI policy, it nevertheless suggests that in 2007 reasonable FBI officers involved in interrogating terrorism suspects like Meshal were aware that domestic and international law prohibited them from inflicting prolonged mental harm on a U.S. citizen abroad by, for example, threatening to send the suspect to a third country as a means of eliciting information or securing a confession.

President Bush's 1992 signing statement, Stmt. By Pres. George H.W. Bush Upon Signing H.R. 2092, 22 Weekly Comp. Pres. Doc. 465 (Mar. 16, 1992), does not change the analysis.  The plain language of the TVPA—not a presidential signing statement—governs a court's interpretation of the statute and does not limit the TVPA's application to the acts of non-U.S. officials.  *See* 28 U.S.C. § 1350 note § 2 ("*An individual* who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil action, be liable for damages to that individual") (emphasis supplied); *Duncan v. Walker*, 533 U.S. 167, 172 (2001) ("We begin,

---

[50] Like the TVPA, the Torture Statute prohibits the intentional infliction of "severe . . . mental pain or suffering" upon a person in the offender's physical custody or control, where "severe mental pain and suffering" is defined as "prolonged mental harm caused by or resulting from the intentional infliction or threatened infliction of severe physical pain or suffering."  18 U.S.C. § 2340.

[51] It also concluded that it is a per se violation of the Torture Statute to send a detainee "either temporarily or permanently to Jordan, Egypt, or another third country to allow those countries to employ interrogation techniques that will enable them to obtain the requisite information," with the intent "to utilize, outside the U.S., interrogation techniques which would violate [the Torture Statute]."  AC ¶ 89 (citing FBI BAU Legal Analysis at 1021).

as always, with the language of the statute."); *Caruth v. United States*, 688 F. Supp. 1129 (N.D. Tex. 1987) (excluding presidential signing statements when considering legislative history).[52]  Moreover, the D.C. Circuit has recognized that although the political question doctrine may bar TVPA claims against certain high-ranking U.S. foreign policy officials, TVPA claims may go forward against U.S. officials in circumstances in which nonjusticiable political questions do not arise.  *See Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1264 (D.C. Cir. 2006) ("To be sure, we can imagine a case in which a rogue agent commits an act so removed from his official duties that it cannot fairly be said to represent the policy of the United States.").  Such is the precise situation presented by this case.

## CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss should be denied.

Respectfully submitted,

 /s/ Nusrat J. Choudhury
Nusrat J. Choudhury
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: 212-549-2500, Fax: 212-549-2583
nchoudhury@aclu.org

Jonathan Hafetz
169 Hicks Street
Brooklyn, NY 11201
Phone: 917-3550-6896
hafetzj@yahoo.com

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital Area

---

[52] Defendants rely on *Harbury v. Hayden*, 444 F. Supp. 2d 19 (D.C. Cir. 2006), for the contrary position.  The court in that case, however, first dismissed the TVPA claim as untimely, then found that the plaintiff had failed to exhaust remedies and, as a third basis for its holding, interpreted President Bush's signing statement to prohibit TVPA claims against U.S. law enforcement officers.  *Id.* at 41-43.  That interpretation is not binding on this Court.  Although Defendants also rely on *Harbury v. Hayden*, 522 F.3d 413, 423 n.5 (D.C. Cir. 2008), the D.C. Circuit did not "address the scope of the TVPA as applied to U.S. officials" in that case because the plaintiff did not allege a TVPA claim.  The court stated in *dicta* that had she done so, her particular claim would have presented a nonjusticiable political question. *Id.*

45

1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
Phone: 202-457-0800, Fax: 202-452-1868
artspitzer@aol.com

Hope R. Metcalf
National Litigation Project of the Allard K.
  Lowenstein International Human Rights Clinic
Yale Law School
P.O. Box 209090
New Haven, CT 0650-9090
Phone: 203-432-9404, Fax: 203-432-9128
hope.metcalf@yale.edu

*Counsel for Plaintiff Amir Meshal*

September 3, 20100