**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
AMIR MESHAL,                   )
                               )
            Plaintiff,         )
                               )   Case No. 1:09-2178 (EGS)
        v.                     )
                               )
CHRIS HIGGENBOTHAM, et al.,    )
                               )
            Defendants.        )
_____)
```

<u>**MEMORANDUM OPINION**</u>

Amir Meshal is an American citizen who alleges that, while
travelling in the Horn of Africa, he was detained, interrogated,
and tortured at the direction of, and by officials in, the
American government in violation of the United States
Constitution.  After four months of mistreatment, Mr. Meshal was
returned home to New Jersey.  He was never charged with a crime.
Mr. Meshal commenced this suit against various U.S. officials
under *Bivens v. Six Unknown Agents of Federal Bureau of
Narcotics*, 403 U.S. 388 (1971), which allows a victim of
constitutional violations to sue the responsible federal
officers or employees for damages.  The defendants have moved to
dismiss his case, alleging that even if Mr. Meshal's allegations
are true, he has no right to hold federal officials personally

liable for their roles in his detention by foreign governments on foreign soil.

The facts alleged in this case and the legal questions presented are deeply troubling. Although Congress has legislated with respect to detainee rights, it has provided no civil remedies for U.S. citizens subject to the appalling mistreatment Mr. Meshal has alleged against officials of his own government. To deny him a judicial remedy under *Bivens* raises serious concerns about the separation of powers, the role of the judiciary, and whether *our* courts have the power to protect *our* own citizens from constitutional violations by *our* government when those violations occur abroad.

Nevertheless, in the past two years, three federal courts of appeals, including the United States Court of Appeals for the District of Columbia Circuit, have expressly rejected a *Bivens* remedy for citizens who allege they have been mistreated, and even tortured, by the United States of America in the name of intelligence gathering, national security, or military affairs. This Court is constrained by that precedent. Only the legislative branch can provide United States citizens with a remedy for mistreatment by the United States government on foreign soil; this Court cannot. Accordingly, defendants' motion to dismiss must be **GRANTED.**

## I.     BACKGROUND

For the purposes of the pending motion to dismiss, the
Court accepts as true the following factual allegations in
Plaintiff Amir Meshal's Second Amended Complaint.  Mr. Meshal is
a U.S. citizen who was born and raised in New Jersey.  In
November 2006, he travelled to Somalia.  Sec. Am. Compl. ¶ 23.
A few weeks after his arrival, fighting erupted between the
Supreme Council of Islamic Courts, which then controlled
portions of Somalia, and the Transitional Federal Government of
Somalia.  *Id.* ¶ 34.  Plaintiff fled Mogadishu along with
thousands of other civilians.  *Id.* ¶ 36.  He then attempted to
flee from Somalia to Kenya on or about January 3, 2007.  *Id.* ¶
38.

Around the same time, U.S. officials planned to intercept
individuals entering Kenya in an attempt to capture al Qaeda
members.  By way of background, after the 1998 bombings of the
American Embassies in Kenya and Tanzania, the U.S. government
deployed civilian and military personnel to the Horn of Africa
to identify, arrest, and detain individuals suspected of
terrorist activity.  *Id.* ¶ 24.  Following the terrorist attacks
of September 11, 2001, the U.S. government was of the opinion
that Somalia was a potential haven for members of al Qaeda
fleeing Afghanistan.  *Id.* ¶ 26.  Accordingly, in 2002, the
Department of Defense initiated joint counterterrorism

3

operations with nations in the Horn of Africa region, including Kenya and Ethiopia.  *Id.* ¶ 27.  Since at least 2004, military personnel and FBI agents have been directly involved in training foreign armies and police units and conducting criminal investigations of individuals with alleged ties to foreign terrorists or terrorist organizations.  *Id.* ¶ 29.  According to FBI procedures and policies, FBI officers have no law enforcement authority in foreign countries, but may conduct investigations abroad with the approval of the host government.  *Id.* ¶ 30.  Such extraterritorial activities may be conducted "with the written request or approval of the Director of Central Intelligence and the Attorney General or their designees."  *Id.* ¶ 56.

On or about January 24, 2007, Mr. Meshal was captured by Kenyan soldiers and interrogated by Kenyan authorities.  *Id.* ¶ 46.  The following day, he was hooded, handcuffed and flown to Nairobi, where he was taken to the Ruai Police Station and questioned by an officer of Kenya's Criminal Investigation Department.  *Id.* ¶ 51.  The officer told Mr. Meshal that he had to find out what the United States wanted to do with him before he could send him back to the United States.  *Id*. ¶ 52.  Plaintiff was detained at Ruai for approximately one week.  He was not allowed to use the telephone or have access to an attorney.  *Id*. ¶¶ 54-55, 71, 99.  On approximately February 3,

2007, he was escorted outside the police station for an encounter with three Americans, who identified themselves as "Steve," "Chris," and "Tim." *Id.* ¶ 58. "Steve" is defendant FBI Supervising Special Agent Steve Hersem, and "Chris" is FBI Supervising Special Agent Chris Higgenbotham. "Tim" is Doe 1. *Id.* ¶ ¶ 59-63. During the following week, Hersem, Higgenbotham, and Doe 1 interrogated Mr. Meshal at least four times. Each session lasted a full day and took place in a suite in a building controlled by the FBI. *Id.* ¶ 69-70. When he was not being questioned by Defendants, he remained in a cell at a Kenyan police station. *Id.* ¶ 90.

On the first day of interrogation, Doe 1 presented a form to Mr. Meshal that notified him he could refuse to answer any questions without a lawyer present. *Id.* ¶ 71. When Mr. Meshal asked for an attorney, however, Doe 1 said that he was not permitted to make any phone calls. *Id.* When Mr. Meshal asked if he had a choice not to sign the document because he had no way of contacting an attorney, Higgenbotham responded: "If you want to go home, this will help you get there. If you don't cooperate with us, you'll be in the hands of the Kenyans, and they don't want you." *Id.* Higgenbotham also told Mr. Meshal that he was being held "in a 'lawless country' and did not have any right to legal representation." *Id.* Mr. Meshal was presented with the same document for signature before each subsequent interrogation

in Kenya. *Id.* ¶ 83. Mr. Meshal maintains that he signed the documents because he believed he had no choice and hoped that it would expedite his return to the United States. *Id.* ¶ 71.

During these interrogation sessions, Mr. Meshal was continuously accused of having received weapons and interrogation resistance training in an al Qaeda camp. *Id.* ¶ 84. Hersem told Mr. Meshal that "his buddy 'Beantown,'" a U.S. citizen named Daniel Maldonado, who Mr. Meshal met in Kenya and who was seized by Kenyan soldiers on or about January 21, 2007, "had a lot to say about [Mr. Meshal]." *Id.* ¶ 65-67. Hersem told Mr. Meshal that his story would have to match Maldonado's.[1] *Id.* ¶ 66.

The Defendants mistreated Mr. Meshal during the interrogation sessions. *Id.* ¶¶ 86-88. Higgenbotham threatened to send Mr. Meshal to Israel, where he said the Israelis would "make him disappear." *Id.* ¶ 86. Hersem told Mr. Meshal that if he confessed his connection to al Qaeda, he would be returned to the United States to face civilian courts there, but if he refused to answer more questions he would be returned to

---

[1] Maldonado was taken back to the U.S. from Kenya and charged in U.S. courts with receiving military-type training from a foreign terrorist organization. Sec. Am. Compl. ¶ 120. According to one U.S. official, Mr. Meshal was not brought home because there was insufficient evidence to detain or charge him in the United States. *Id.* ¶ 121.

Somalia. *Id.* ¶ 87.  Hersem also told Mr. Meshal that he could send him to Egypt, where he would be imprisoned and tortured if he did not cooperate and admit his connection with al Qaeda, and told him "you made it so that even your grandkids are going to be affected by what you did." *Id.* ¶ 88.  At one point, Higgenbotham "grabbed" Mr. Meshal and "forced" him to the window of a room, *id.* ¶ 86; at another, Hersem "vigorously pok[ed]" Mr. Meshal in the chest while yelling at him to confess his connection to al Qaeda. *Id.* ¶ 87.

Kenyan authorities never interrogated or questioned Mr. Meshal, nor did they provide him with any basis for his detention. *Id.* ¶¶ 76, 78.  On February 7, 2007, a consular affairs officer from the U.S. Embassy in Nairobi, accompanied by a Kenyan man, visited Mr. Meshal in jail. *Id.* ¶ 103.  The consular affairs officer told Mr. Meshal that he was trying to get him home, and that someone would be in touch with his family in New Jersey.  *Id.*  Also on or about February 7, 2007, Kenyan courts began hearing habeas corpus petitions allegedly filed by the Muslim Human Rights Forum (MHRF), a Kenyan human rights organization, on behalf of Mr. Meshal and other detainees who were seized fleeing Somalia and held without charge.  *Id.* ¶ 100.

On February 9, 2007, Kenyan officials removed Mr. Meshal from the jail, hooded and handcuffed him, and flew him and twelve others to Somalia.  *Id.* ¶¶ 109-12.  There, he was

detained in handcuffs in an underground room, with no windows or
toilets, referred to as "the cave." *Id.* ¶¶ 111-12. Immediately
after Mr. Meshal's rendition, Kenyan authorities presented
evidence to the Kenyan court showing that he was no longer in
Kenya; the court dismissed the habeas petition for lack of
jurisdiction. *Id.* ¶ 114. Mr. Meshal alleges that Defendants
arranged for his removal from Kenya so they could continue to
detain and interrogate him without judicial pressure from Kenyan
courts. *Id.* ¶¶ 108, 128.

On or around February 16, 2007, Mr. Meshal was transported,
still handcuffed and blindfolded, by plane to Addis Ababa,
Ethiopia, and driven to a military barracks where he was
detained by the Ethiopian government with others who had been
rendered from Kenya to Somalia and Ethiopia. *Id.* ¶¶ 117-119,
130-137. After a week of incommunicado detention, and
continuing over the next three months, Ethiopian officials
regularly transported Plaintiff and other prisoners to a villa
for interrogation. *Id.* ¶¶ 140-41, 151. Plaintiff was
interrogated by Doe 1, who had interrogated him in Kenya, and
Doe Defendant 2, a U.S. official who introduced himself as
"Dennis," and whose name has been filed with the Court under
seal. *Id.* ¶¶ 140-41, 144-45. Apart from a brief initial
interrogation upon his arrival, Mr. Meshal was never questioned
by Ethiopian officials. *Id.* ¶¶ 132-33. Doe 1 led all but one of

the interrogations of Mr. Meshal in Ethiopia. *Id.* ¶¶ 146, 149. He was joined at times by Doe 2, who led the final interrogation. *Id.* ¶ 146. Each time, Doe 1 made Mr. Meshal believe that he and the other FBI agents would send Mr. Meshal home if he was "truthful". *Id.* ¶¶ 148-49. Does 1 and 2 refused Mr. Meshal's repeated requests to speak with a lawyer. *Id.* ¶ 152. When he was not being interrogated, Plaintiff was handcuffed in his prison cell. He was twice moved into solitary confinement for several days. *Id.* ¶ 154.

No charges were ever filed against Mr. Meshal in Ethiopia. *Id.* ¶¶ 155, 160, 162. On three occasions, he was taken for closed proceedings before a military tribunal. *Id.* After the first proceeding, Doe 1 pressed Mr. Meshal to admit that he was connected to al Qaeda and told him that he would not be allowed to go home unless he told Doe 1 what he wanted to hear. *Id.* ¶ 156. Although FBI agents had been regularly interrogating Mr. Meshal in Ethiopia for more than a month, U.S. consular officials did not gain access to him until on or about March 21, 2007, after the fact of his detention became public knowledge when McClatchy Newspapers first reported that he was being held at a secret location in Ethiopia. *Id.* ¶ 157. On or about May 24, 2007, Mr. Meshal was taken to the U.S. Embassy in Addis Ababa and flown to the United States, where he was released. During the four months he was detained abroad, he lost

approximately eighty pounds.  *Id.* ¶¶ 166-67.   He was never charged with a crime.

Plaintiff seeks to hold Defendants individually liable for monetary damages for violations of his constitutional and statutory rights.   Count I alleges Defendants violated his Fifth Amendment right to substantive due process by threatening him with disappearance and torture; by directing, approving and participating in his detention in Kenya and his illegal rendition to Somalia and Ethiopia without due process; and by subjecting him to months of custodial interrogation in Africa. Count II alleges Defendants violated Mr. Meshal's Fifth Amendment right to procedural due process by subjecting him to prolonged and arbitrary detention without charge; denying him access to a court or other processes to challenge his detention; and denying him access to counsel. Count III alleges Defendants violated his Fourth Amendment right to be free from unreasonable seizure without a probable cause hearing.   Count IV alleges Defendants violated his rights under the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350, note.   *Id.* ¶¶ 171-213.

Defendants have moved to dismiss all counts of the complaint.   They argue that the Court should also dismiss the constitutional claims because (1) "special factors" preclude implying a cause of action under *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971); and (2)

Defendants are entitled to qualified immunity.  They also argue that Mr. Meshal's TVPA claim must be dismissed because none of the Defendants were acting under color of foreign law.  For the reasons explained below, the motion to dismiss will be granted because binding precedent from this Circuit prohibits either a TVPA or a *Bivens* remedy for Mr. Meshal.

## II.  STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted).  While detailed factual allegations are not necessary, plaintiff must plead enough facts "to raise a right to relief above the speculative level."  *Id.*  The Court must construe the complaint liberally in plaintiff's favor and grant plaintiff the benefit of all reasonable inferences deriving from the complaint.  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  However, the Court must not accept plaintiff's inferences that are "unsupported by the facts set out in the complaint. . . . [or] legal conclusions cast in the form of factual allegations."

*Id.* "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## III. ANALYSIS

### A. Plaintiff Has Alleged Deprivations of His Constitutional Rights

In analyzing a *Bivens* claim, a court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998); *Al-Aulaqi v. Panetta*, Civ. No. 12-1192, 2014 U.S. Dist. LEXIS 46689 *37 (D.D.C. Apr. 4, 2014). Plaintiff has stated a plausible violation of both the Fourth and Fifth Amendments.

It has been "well settled" for over fifty years that "the Bill of Rights has extraterritorial application to the conduct abroad of federal agents directed at United States citizens." *United States v. Toscanino*, 500 F.2d 267, 280-81 (2d Cir. 1974).

> The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.

*Reid v. Covert,* 354 U.S. 1, 5-6, (1957) (plurality).

Plaintiff has alleged that Defendants violated his Fourth Amendment rights by detaining him for four months without a probable cause hearing.  The Fourth Amendment requires a "prompt" hearing to assess the sufficiency of evidence supporting detention.  *See Gerstein v. Pugh*, 420 U.S. 103, 125 (1975).  "The touchstone of [such an inquiry] is reasonableness." *United States v. Knights*, 534 U.S. 112, 118 (2001).  In the criminal context, a detained individual must receive a hearing within 48 hours of seizure.  *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).  Non-citizens detained under the USA Patriot Act must receive a probable cause hearing within seven days.  *See* 8 U.S.C. § 1226a(a)(5). Plaintiff has plausibly alleged that his detention without a hearing for four months – particularly when Defendants told him over and over that they had the power to send him back to the United States at any time – is unreasonable.[2]

---

[2]    The Second Circuit has recognized that the Fourth Amendment attaches "where the cooperation between the United States and law enforcement officials is designed to evade constitutional requirements applicable to American officials." *U.S. v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992).  Mr. Meshal claims exactly that. He alleges that Defendants told him if he confessed his involvement with al Qaeda he would immediately be returned to the United States. to face civilian courts, but if he refused to answer more questions he would be returned to Somalia.  Sec. Am. Compl. ¶ 87.  Plaintiff claims that another individual detained under similar circumstances, Daniel Maldonado, was in fact returned to the United States to be charged after he confessed to receiving terrorist training, and alleges Defendants deliberately kept Plaintiff from returning home because they did

Mr. Meshal also asserts that Defendants deprived him of his Fifth Amendment right to substantive due process by, *inter alia*, coercively interrogating him during his detention and extraordinary rendition, including threatening him with torture, disappearance and death.  Sec. Am. Compl. ¶¶ 86-88. [3]

To state a substantive due process claim, a plaintiff must assert that government officials were so "deliberately indifferent" to his constitutional rights that the officials' conduct "shock[s] the . . . conscience."  *Estate of Phillips v. Dist. of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006).  Every substantive due process inquiry "demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."  *Lewis*, 523 U.S. at 850.

The parties have cited no case law examining the precise substantive due process rights of a U.S. citizen coercively interrogated while on foreign soil.  The government concedes, however, that coercive interrogation, standing alone, may give rise to a substantive due process claim.  Defs.' Mot. to Dismiss

_____

not have enough information to charge him.  *Id*. ¶¶ 120-21. These allegations do not suggest that it was "unreasonable" for Mr. Meshal to expect a probable cause hearing; to the contrary, Defendants deliberately refused to provide him access to one.
[3]  Mr. Meshal has also alleged other violations of his Fifth Amendment rights; however, it is unnecessary to determine whether each and every one would go forward. For the purpose of the *Bivens* analysis, it is enough to conclude that Plaintiff has plausibly alleged a deprivation of at least *some* constitutional rights. *Lewis*, 523 U.S. at 841, n.5.

at 30; *see Chavez v. Martinez*, 538 U.S. 760, 779 (2003).  Within
the United States, plaintiffs may state a claim for a
substantive due process violation where they have been verbally
threatened with "the terror of instant and unexpected death at
the whim of [their] . . . custodians," *Burton v. Livingston*,
791 F.2d 97, 100 (8th Cir. 1986), or when the interrogation is
"so terrifying in the circumstances . . . that [it] is
calculated to induce not merely momentary fear or anxiety, but
severe mental suffering." *Wilkins v. May*, 872 F.2d 190, 195
(7th Cir. 1989).  In this case, Plaintiff has alleged that FBI
agents threatened him with torture, disappearance, and death if
he did not immediately confess to his interrogators that he was
a terrorist.  These threats were made when Mr. Meshal was
thousands of miles from home, in a foreign prison where he had
no access to any country's legal system, and with no idea when,
if ever, he would be allowed to see a lawyer, face charges, or
return home.  Under these circumstances, accepting the
allegations of the Complaint as true, the Court finds he has
stated a plausible substantive due process claim.

The Court does not determine whether Mr. Meshal would
prevail on his constitutional claims, if he were permitted to
assert them.  It does, however, hold that he has stated a
"plausible claim for relief" under the Fourth and Fifth
Amendments to the Constitution.  *Iqbal*, 556 U.S. at 679.

15

**B. Binding Precedent Deprives Mr. Meshal of a Remedy for the Alleged Deprivations of His Constitutional Rights.**

**1. Mr. Meshal Has No Other Remedies: It is "Damages or Nothing."**

In *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971), the Supreme Court established that victims of constitutional violations by a federal agent have a right to recover damages against the official in federal court despite the absence of a statute conferring that right.[4] A court follows a two-step process to determine whether a *Bivens* remedy is available. First, it must consider whether "any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (citations omitted). If an alternative remedy does not exist, the court proceeds to step two: "mak[ing] the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Bush v. Lucas*, 462 U.S. 367, 378 (1983); *see also Bivens*, 403 U.S. at 396 (a cause of action for damages against

_____

[4] "A *Bivens* suit is the federal counterpart of a claim brought pursuant to 42 U.S.C. § 1983 against a state or local officer/employee for the violation of the claimant's constitutional rights." *Rasul v. Myers*, 512 F.3d 644, 652 n.2 (D.C. Cir. 2008), *vacated*, 555 U.S. 1083 (2008).

federal officials may not lie where there are "special factors counseling hesitation in the absence of affirmative action by Congress."). These special factors "relate not to the merits of a particular remedy, but to the question of who should decide whether such a remedy should be provided." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (citations omitted).

The parties agree that Mr. Meshal has no alternative remedy for his constitutional claims. "Without [*Bivens*], Meshal has no recourse and the judiciary will be powerless to vindicate the constitutional rights of a U.S. citizen against illegal detention and mistreatment by officials of his own government. Here, as in *Bivens*, it is 'damages or nothing.'" [5] Pl.'s Opp'n at 8, (quoting *Bivens*, 403 U.S. at 410 (Harlan, J., concurring)). They dispute, however, whether "special factors counsel hesitation" in implying a *Bivens* cause of action on these facts.

---

[5] Plaintiff has also alleged a violation of the Torture Victim Protection Act, 28 U.S.C. § 1350, note ("TVPA"), which, if successful, would provide a partial, limited remedy against two of the individual Defendants for the use of torturous interrogation techniques. Sec. Am. Compl. ¶¶ 204-13. The TVPA, however, is not available to Mr. Meshal. In *Doe v. Rumsfeld*, this Circuit reaffirmed that the TVPA "[does] not include as possible defendants either American government officers or private U.S. persons." 683 F.3d 390, 396 (D.C. Cir. 2012) (quoting *Saleh v. Titan Corp.*, 580 F.3d 1, 16 (D.C. Cir. 2009). Accordingly, Plaintiff's TVPA claim must be **DISMISSED.**

**2.    The Special Factors Counseling Hesitation**

Defendants argue that "matters implicating national security and intelligence operations, particularly those involving foreign governments, are 'the province and responsibility of the Executive.'" Defs.' Mot. to Dismiss Pl.'s Am. Compl. at 11 (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988)). Defendants argue that Mr. Meshal is essentially attacking the nation's foreign policy, specifically joint operations in the Horn of Africa and executive policies which permit FBI agents to conduct and participate in investigations abroad. *Id*. at 12. They claim that, if allowed to go forward, Mr. Meshal's claims would interfere with the management of our country's relations with other sovereigns, a power constitutionally allocated to the executive branch. *Id.* at 13. Defendants argue that this is not the judiciary's role, impinges on bedrock separation of powers principles, and would "undermine the Government's ability to speak with one voice in this area." *Id.* (quoting *Munaf v. Geren*, 128 S.Ct. 2207, 2226 (2008)). In a related argument, Defendants claim the litigation would threaten national security by necessitating inquiry into, *inter alia*, specific terrorist threats, substances and sources of intelligence, and the extent to which other countries cooperate with the United States. *Id*. at 13-14. Defendants also argue that this litigation would "enmesh foreign countries and their

officials in civil litigation in U.S. courts," which could impact relations with those countries. *Id.* at 16.

Plaintiff responds that no special factors counsel hesitation in this case. First, he argues that he does not challenge the nation's foreign policy. "[R]ather, this suit concerns only *the manner* in which four federal law enforcement officers treated a U.S. citizen . . . . Recognizing a judicial remedy here would not prevent the government from carrying out counter-terrorism operations in the Horn of Africa . . . . It would require only that U.S. officials abide by the Constitution in their treatment of U.S. citizens during the course of those operations[.]" Pl.'s Opp'n at 9-10. Plaintiff maintains that separation of powers principles underscore why this Court should permit a *Bivens* remedy here: the Court would be performing its traditional role of protecting the constitutional rights of a U.S. citizen. *Id.* at 10-11. Plaintiff contends that Defendants should not be able to escape their constitutional obligations to American citizens "by directing or colluding with foreign actors or hiding behind the fig-leaf of a foreign custodian." *Id.* at 11. In response to Defendants' predictions that the litigation would entail a broad-based inquiry into matters of national security and foreign affairs, Plaintiff argues that while the litigation "may require some inquiry into the Defendants' relationship and communication with foreign officials," the

focus of the litigation is on conduct by U.S. officials against a U.S. citizen. *Id.* at 14. Plaintiff further argues that the judiciary has the experience and institutional competence to conduct necessary inquiries into cooperation between the United States and foreign governments, as well as matters involving national security. *Id.* at 14-15.

### 3. The Judiciary's Traditional Ability to Protect the Rights of American Citizens

In *Bivens*, the Supreme Court held that a damages remedy exists in the rare case in which "[t]he mere invocation of federal power by a federal law enforcement official will normally render futile any attempt to resist. . . . In such case, there is no safety for *the citizen*, except in the protection of judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name." *Bivens*, 403 U.S. at 394-95 (citing *Weeks v. United States*, 232 U.S. 383, 386 (1914); *United States v. Lee*, 106 U.S. 196, 219 (1882) (emphasis added)). Even when such conduct is committed overseas, the judiciary has historically concluded it still has a role in applying the protections of the Constitution to U.S. citizens. *See Reid v. Covert*, 354 U.S. at 5-6 (plurality opinion)("When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and

liberty should not be stripped away just because he happens to be in another land.").

In *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985), this Circuit declined to imply a *Bivens* remedy for Nicaraguan citizens.  In that case, the plaintiffs claimed as a result of American support, the Contras carried out widespread attacks on Nicaraguan civilians.  The D.C. Circuit relied heavily on the fact that the plaintiffs were foreign nationals:

> Just as the special needs of the armed forces require the courts to leave to Congress the creation of damage remedies against military officers for allegedly unconstitutional treatment of soldiers, so also the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad. . . . [T]he danger of foreign citizens' using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.

770 F.2d at 208-209 (internal citations omitted).  See also *Arar v. Ashcroft,* 585 F.3d 559, 575-76 (2d Cir. 2009) (foreign nationals may not seek damages against U.S. officials for actions abroad, relying on *Sanchez-Espinoza*); *In re Iraq & Afghanistan Detainees Litig.*, 479 F.Supp.2d 85, 105-106 (D.D.C. 2007) (same), *aff'd Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011).

By contrast, where American citizens' constitutional
interests are at stake, courts have traditionally been far less
willing to allow foreign policy concerns to extinguish the role
of the judiciary.  In *Ramirez de Arellano v. Weinberger,* 745
F.2d 1500 (D.C. Cir. 1984), this Circuit allowed a U.S. citizen
to sue for declaratory and injunctive relief when the U.S.
military seized his ranch in Honduras.  The Court held that
"[w]hile separation of powers concerns may outweigh judicial
adjudication in the typical case involving a foreign act of
state, the prudential balance may shift decidedly when [U.S.]
citizens assert constitutional violations by [U.S.] officials. .
. .  [T]eaming up with foreign agents cannot exculpate officials
of the United States from liability to [U.S.] citizens for the
United States officials' unlawful acts."  *Id*. at 1542-43.
Likewise, in *Abu Ali v. Ashcroft*, 350 F.Supp.2d 28, 61 (D.D.C.
2004), the district court found that an American citizen
indefinitely detained in a Saudi Arabian prison, allegedly at
the behest of U.S. authorities, could challenge his detention in
a habeas proceeding.  The district court acknowledged the
considerable authority of the executive branch in diplomatic
relations, and noted that such authority would "cabin the
Court's inquiry" so as not to intrude on executive functions.
*Id*.  Ultimately, however, the court found "there is simply no
authority or precedent . . . for [the government's] suggestion

that the executive's prerogative over foreign affairs can
overwhelm to the point of extinction the basic constitutional
rights of citizens of the [U.S.] to freedom from unlawful
detention by the executive." *Id.* at 61-62. Finally, in *Hamdi
v. Rumsfeld*, 542 U.S. 507, 535-36 (2004), the Supreme Court
rejected the argument that separation of powers principles
prohibit the judiciary from examining the indefinite detention
of American citizens by their own governments, even when the
detainee is captured on a foreign battlefield fighting against
the U.S., and even when he has been designated an enemy
combatant.  "[T]he position that the courts must forgo any
examination of the individual case . . . serves only to *condense*
power into a single branch of government." *Hamdi*, 542 U.S. at
535-36 (emphasis in original).  "We have long since made clear
that a state of war is not a blank check for the President when
it comes to the rights of *the Nation's citizens*." *Id.* at 536
(emphasis added).

    In short, when the constitutional rights of American
citizens are at stake, courts have not hesitated to consider
such issues on their merits even when the U.S. government is
allegedly working with foreign governments to deprive citizens
of those rights. *United States v. Yousef*, 327 F.3d 56, 145
(D.C. Cir. 2003) (for suppression purposes, courts must inquire
into  statements elicited in overseas interrogation conducted by

foreign police to determine whether U.S. agents actively participated in the questioning, or used the foreign for the interrogation in order to circumvent constitutional requirements such as *Miranda*); *United States v. Toscanino*, 500 F.2d 267, 281 (2d Cir. 1974) (trial court must conduct an evidentiary inquiry to determine whether the defendant was brought into the jurisdiction of court through abduction at the hands of foreign officials at the behest of U.S.); *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144, 155 (D.D.C. 1976) (plaintiffs were entitled to discovery of facts which would show that the German government wiretapped American citizens at the direction of the United States).

**4.    *Doe, Lebron*, and *Vance***

Notwithstanding our courts' long history of providing judicial access to citizens whose rights are violated by our government, in the last two years, three courts of appeals, including this Circuit, have dismissed *Bivens* actions by U.S. citizens alleging constitutional violations by U.S. government officials.

In *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012), *cert. denied*, 132 S. Ct. 2751 (2012), the Fourth Circuit refused to recognize a *Bivens* remedy for Jose Padilla, an American citizen detained as an enemy combatant and allegedly tortured for three years while in U.S. military custody.  The circuit rejected

Padilla's claims against seven defendants, high ranking policy makers as well as the two former commanders of the Naval Consolidated Brig in which he was held. It found that under separation of powers principles, the Constitution assigned the legislature plenary control over the military establishment, and the President control over national security and military affairs as Commander in Chief. *Lebron*, 670 F.3d at 549 (citing U.S. Const. art. II, § 2, cl. 1); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) (judges "traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs"); *Winter v. NRDC, Inc.*, 555 U.S. 7, 24, 26 (2008) (courts must afford "great deference" to what "the President – the Commander in Chief – has determined . . . to [be essential to] national security"). The *Lebron* court explicitly found the question of citizenship not to be dispositive, as "[t]he source of hesitation is the nature of the suit and the consequences flowing from it, not just the identity of the plaintiff." 670 F.3d at 554. The court found that the plaintiff's lawsuit would intrude into military affairs, in violation of the separation of powers. *Id.* at 550. It also found troubling that the lawsuit challenged the government's detainee policies, both as applied to Padilla and much more generally.

> In short, Padilla's complaint seeks . . . to have the judiciary review and disapprove sensitive military decisions made after extensive deliberations within the executive branch as to what the law permitted, what national security required, and how best to reconcile competing values. It takes little enough imagination to understand that a judicially devised damages action would expose past executive deliberations affecting sensitive matters of national security to the prospect of searching judicial scrutiny.

*Id.* at 551. The *Lebron* court recognized that people may "not agree with [these] policies. [People] may debate whether they were or were not the most effective counterterrorism strategy. But the forum for such debates is not the civil cause of action pressed in the case at bar. The fact that Padilla disagrees with policies allegedly formulated or actions allegedly taken does not entitle him to demand the blunt deterrent of money damages under *Bivens* to promote a different outcome." *Id.* at 552.

In *Doe v. Rumsfeld*, 683 F.3d 390 (D.C. Cir. 2012) *pet. for reh'g en banc denied*, 2012 U.S. App. LEXIS 15717 (D.C. Cir. July 30, 2012), the D.C. Circuit refused to allow a *Bivens* remedy for a U.S. citizen, a government contractor who alleged he was illegally detained, interrogated, and tortured for nearly ten months on a U.S. military base in Iraq before being released without charges. The *Doe* court began with the observation that courts have been reluctant to extend *Bivens* remedies to new contexts, and "[t]he Supreme Court has never implied a *Bivens*

26

remedy in a case involving the military, national security, or
intelligence . . . caution[ing] that matters intimately related
to . . . national security are rarely proper subjects for
judicial intervention." *Id.* at 394-95 (internal citations and
quotation marks omitted). With respect to intelligence
gathering, the court observed that the D.C. Circuit had recently
declined to recognize a *Bivens* cause of action in *Wilson v.
Libby*, in which undercover CIA operative Valerie Plame and her
husband Joseph Wilson sought a *Bivens* remedy from Bush
Administration officials who deliberately revealed her identity.
"[T]he required judicial intrusion into national security and
intelligence matters was . . . a special factor counseling
hesitation because such intrusion would subject sensitive
operations and operatives to judicial and public scrutiny." *Id.*
(*citing Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008))
(quotation marks omitted). Finally, the Circuit rejected the
plaintiff's argument that his United States citizenship
distinguished his case from *Arar v. Ashcroft* and *Ali v.
Rumsfeld*, in which the courts rejected non-citizens' *Bivens*
claims against American officials based on alleged torture in
the United States and abroad, noting that "[Doe's] citizenship
does not alleviate the . . . special factors counseling
hesitation." *Id.* at 396.

Most recently, in *Vance v. Rumsfeld,* 701 F.3d 193 (7th Cir. 2012) (*en banc*), *cert. denied*, 133 S. Ct. 2796 (2013), a divided Seventh Circuit, sitting *en banc*, reversed a panel judgment and dismissed the *Bivens* claims of two government contractors, both American citizens, who were allegedly arrested, detained and tortured by the U.S. military in Iraq. One was detained for about one month, the other for three months; as in *Doe*, neither was ever charged with a crime.  The circuit began by noting that the Supreme Court "has never created or even favorably mentioned a non-statutory right of action for damages on account of conduct that occurred outside the borders of the United States." *Id.* at 198-99.  Like the *Doe* and *Lebron* courts, the *Vance* court found plaintiffs' American citizenship not "dispositive one way or the  other," *id.* at 203; the principal point was that civilian courts should not interfere with the military chain of command or with "[m]atters intimately related to national security." *Id.* at 199-200.

Several judges wrote separately to explain their disagreement with the reasoning and/or dissent from the outcome of the *Vance* decision.  They observed that Congress has legislated remedies for U.S. citizens to sue foreign officials for damages, and non-citizens to sue anyone who has committed a tort in violation of the law of nations, but *not* for U.S. citizens to sue U.S. officials.

> [I]f it were true that there is no *Bivens* theory under
> which a U.S. citizen may sue an official of the U.S.
> government . . . who tortures that citizen on foreign
> land under the control of the United States . . . then U.S.
> citizens will be singled out as the only ones *without* a
> remedy under U.S. law. . . . . Only by acknowledging the
> *Bivens* remedy is it possible to avoid treating U.S.
> citizens worse than we treat others. The fear of offense to
> our allies that the majority fears dissipates as soon as we
> look at the broader picture.

*Vance*, 701 F.3d at 209 (Wood, J., concurring) (discussing TVPA

and Alien Tort Statute, 28 U.S.C. § 1350); *see also id.* at 218-

20 (Hamilton, J., dissenting).  The *Vance* concurrence and

dissents argue that citizenship matters: The government has a

well-established obligation to protect its own citizens'

constitutional rights abroad.  *Id.* at 221-22 (Hamilton, J.,

dissenting).  And they maintain that *Bivens* must provide a

remedy against, at the very least, the individual officers who

are alleged to have committed the mistreatment.

> Every government institution errs . . . . The point of
> judicial participation is not infallibility but
> independence and neutrality, something executive entities
> do not have when evaluating their own officers' conduct . .
> . . I cannot agree that the separation of powers bars a
> citizen's recovery from a rogue officer affirmatively
> acting to subvert the law. That is a quintessential
> scenario where *Bivens* should function to enforce individual
> rights.

*See id.* at 230-31 (Williams, J., dissenting); *see also id.* at

207-08 (Wood, J., concurring); *id.* at 222-24 (Hamilton, J.,

dissenting).

**5.    *Doe, Lebron, and Vance Doom Mr. Meshal's Claims***

Mr. Meshal struggles to distinguish this case from *Doe*, *Vance*, and *Lebron*. First, he argues that these cases only prohibit *Bivens* actions against the military, or on the battlefield. Pl.'s Resp. to Defs.' Dec. 5, 2012 Notice of Suppl. Authority, 1-3. The cases cannot be read that narrowly. Each case states that the same special factors compelling hesitation in military cases also compel hesitation in cases involving national security and intelligence. *Lebron*, 670 F.3d at 549 (noting that judges "traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs," and courts must afford "great deference" to what "the President – the Commander in Chief – has determined . . . is essential to national security.") (citations omitted); *Doe*, 683 F.3d at 395 ("In the context of national security and intelligence, the Court has cautioned that matters . . . are rarely proper subjects for judicial intervention.") (internal citations and quotation marks omitted); *Vance*, 701 F.3d at 199-200, 203 (finding plaintiffs' American citizenship not "dispositive one way or another," – either way,  civilian courts should not interfere with the military chain of command or with matters intimately related to national security).  The cases hold that implying a *Bivens* cause of action in any of these types of cases would intrude into the affairs of the

legislative and executive branches, in violation of the separation of powers. *Lebron*, 670 F.3d at 550; *Doe*, 683 F.3d at 394-95; *Vance*, 701 F.3d at 198-99.

In this case, Mr. Meshal alleges that Defendants acted in accordance with guidelines established by the executive branch. Specifically, he alleges that Defendants were part of the Combined Joint Task Force-Horn of Africa, a joint counterterrorism operation with nations in the Horn of Africa region, which was established by the U.S. government and includes military employees, civilian employees, including FBI agents, and representatives of coalition countries. Defs.' Mot. to Dismiss at 12; *see also* Second Amended Compl. ¶¶ 24-30, 56. A central theme of Mr. Meshal's claims is that Defendants in this case acted with the cooperation of the foreign governments which held him in their prisons, transferred him between nations, and permitted Defendants access to him. *See generally* Second Am. Compl. As the government points out, these claims have the potential to implicate "national security threats in the Horn of Africa region; substance and sources of intelligence; the extent to which each government in the region participates in or cooperates with U.S. operations to identify, apprehend, detain, and question suspected terrorists on their soil; [and] the actions taken by each government as part of any participation or cooperation with U.S. operations." Mot. to

Dismiss at 13.  They involve the same separation of powers concerns which were decisive in *Lebron*, *Doe*, and *Vance*.

Second, Mr. Meshal tries to distinguish *Lebron*, *Doe*, and *Vance* by arguing that he only brings this action against the "non-supervisory law enforcement officers directly involved in his detention and mistreatment," and does not seek to hold remote superiors liable for his constitutional abuses.  Pl.'s Response to Notice of Supp. Auth., ECF #59 at 2; *see also* Pl.'s Response to Notice of Supp. Auth., ECF #57 at 2-3.  He therefore claims that his lawsuit would not require the Court to intrude into the functions of the other branches of government.  *Id.* at 2; *see also* ECF #59 at 2.  This argument also cannot survive. *Lebron* and *Vance* also included defendants who were directly responsible for their torture; the plaintiffs in those cases argued they implemented the policies "devised and authorized" by the cabinet officials at the highest levels of government. *Lebron*, 670 F.3d at 547; *see also Vance*, 701 F.3d at 196, (plaintiffs sued "persons who conducted or approved their detention and interrogation, and many others who had supervisory authority over those persons").  Neither court differentiated among the defendants in denying a *Bivens* remedy; as the *Lebron* court stated: "The source of hesitation is the nature of the suit and the consequences flowing from it," not the identity of the parties to the lawsuit.  670 F.3d at 554; *see also Vance*,

701 F.3d at 198-99 (no right of action against either the soldiers who mistreated plaintiffs or their remote supervisors).

Even if the defendants' place in the chain of command were relevant under *Vance*, *Doe*, and *Lebron*, the Second Amended Complaint makes clear that this case is about far more than Mr. Meshal's own experiences. The Complaint explicitly alleges that Mr. Meshal's detention, transfer, and interrogation were part of a much larger trend: the government's "increasing[] engage[ment] in 'proxy detention,' a practice in which individuals alleged or suspected to have ties to foreign terrorists or foreign terrorist organizations are detained by foreign authorities at the behest of, the direction of, and/or with the active and substantial participation of the United States." Second Am. Compl. ¶ 31. Central to Mr. Meshal's complaint are his allegations that Kenyan, Somalian, and Ethiopian officials were substantial participants in his detention and transfer between countries. *Id.* ¶¶ 56-59, 76-82, 108-12, 115-19, 123-25, 130-37. He alleges that they were also partners in the similar treatment of many other people of interest to the United States. *Id.* ¶¶ 122-23, 134-39. Moreover, he claims that his treatment and the similar treatment of others was authorized by and/or conducted with full awareness of other U.S. officials, "including officials designated by the Attorney General and the Director of Central Intelligence." *Id.* ¶ 139; *see also* ¶¶ 56-57, 129A, 122,

134-37, 165A, 170C, 170D.  Like the complaints in *Lebron*, *Doe*, and *Vance*, "it takes little enough imagination to understand that a judicially devised damages action would expose past executive deliberations affecting sensitive matters of national security" as well as sensitive matters of diplomatic relations, "to the prospect of searching judicial scrutiny." *Lebron*, 670 F.3d at 551.  In these circumstances, special factors counsel hesitation in the judicial creation of damages remedies.  *Id.*; *see also Doe*, 683 F.3d at 394; *Vance*, 701 F.3d at 199-200.

Finally, Mr. Meshal argues that *Vance* is distinguishable because the plaintiff in that case had access to other, "albeit partial" remedies for his injuries, while for Mr. Meshal, it is "damages or nothing."  ECF #59 at 3 (noting that the *Vance* plaintiffs could seek monetary damages under the Military Claims Act or the Foreign Claims Act).  Plaintiff acknowledges that the *Doe* plaintiff had no alternative remedy but seeks to distinguish that decision on grounds that Congress had deliberately acted to deprive military detainees of a private right of action by passing the Detainee Treatment Act.  ECF #57 at 4.  He argues that Congress has not affirmatively acted to foreclose a private right of action for plaintiffs such as himself, and accordingly, the judiciary is free to create a *Bivens* remedy.  *Id.*

Again, this argument cannot survive *Doe*, which holds that as long as special factors counseling hesitation exist,

congressional action or inaction is irrelevant to the creation of a *Bivens* remedy.  On the one hand, the existence of a statute that provides a partial remedy to a plaintiff seeking a *Bivens* remedy precludes a *Bivens* cause of action, even though the statute does not provide complete relief.  *Doe*, 683 F.3d at 396 (citing *Bush v. Lucas*, 462 U.S. 367, 380, 388 (1983)).  On the other hand, "the absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation."  *Id.* (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 421-22 (1988)).  When Congress has acted to legislate in a subject matter area, "congressional inaction can also inform [the judiciary's] understanding of Congress's intent" with respect to creation of a *Bivens* remedy.  *Doe*, 683 F.3d at 397 (explaining that where Congress has legislated in an area but failed to provide a private cause of action for damages, "[i]t would be inappropriate for this Court to presume to supplant Congress's judgment in a field so decidedly entrusted to its purview.").

Congress has legislated with respect to detainee rights both in the United States and abroad.  *See inter alia*, Torture Victim Protection Act, 28 U.S.C. § 1350, note; Military Claims Act, 10 U.S.C. § 2733; Foreign Claims Act 10 U.S.C. § 2734; and Federal Anti-Torture Statute, 18 U.S.C. § 2340.  Some of these

statutes provide private causes of action for money damages;
others authorize criminal prosecution.  The fact that none of
these acts extends a cause of action for detainees similarly
situated to Mr. Meshal to sue federal officials in federal court
does not lead to the conclusion, as Mr. Meshal argues, that
Congress intended the judiciary to recognize such a cause of
action.  On the contrary, under *Doe*, "evidence of congressional
inaction . . . supports our conclusion that this is not a proper
case for the implication of a *Bivens* remedy."  *Doe*, 683 F.3d at
397.

## IV.  CONCLUSION

When *Bivens* was decided over forty years ago, it was
intended for cases in which "[t]he mere invocation of federal
power by a federal law enforcement official will normally render
futile any attempt to resist . . . .  In such case, there is no
safety for the citizen, except in the protection of the judicial
tribunals, for rights which have been invaded by the officers of
the government, professing to act in its name."  *Bivens*, 403
U.S. at 394-95 (citations omitted).  Mr. Meshal has come to
court seeking the protection of judicial tribunals as the only
way to provide for his safety.  Under *Lebron*, *Doe*, and *Vance*,
however, when a citizen's rights are violated in the context of
military affairs, national security, or intelligence gathering
*Bivens* is powerless to protect him.  As one of the *Vance*

dissenters predicted, this evisceration of *Bivens* risks
"creating a doctrine of constitutional triviality where private
actions are permitted only if they cannot possibly offend anyone
anywhere. That approach undermines our essential constitutional
protections in the circumstances when they are often most
necessary." *Vance*, 701 F.3d at 230 (Williams, J., dissenting).
In issuing today's opinion, the Court fears that this prediction
is arguably correct.

This Court is outraged by Mr. Meshal's "appalling (and,
candidly, embarrassing) allegations" of mistreatment by the
United States of America. *Doe v. Rumsfeld*, Case No. 08-cv-1902,
2012 U.S. Dist. LEXIS 127184, *5 (D.D.C. Sept. 7, 2012).
Nevertheless, this Court is not writing on a clean slate;
rather, it is constrained by binding precedent. Only Congress
or the President can provide a remedy to U.S. citizens under
such circumstances. Accordingly, Defendants' motion to dismiss
is **GRANTED**. An appropriate order accompanies this Memorandum
Opinion.

SIGNED:     **Emmet G. Sullivan**
            **United States District Judge**
            **June 13, 2014**